# AMENDATORY AGREEMENT

AMENDATORY AGREEMENT made as of December 23, 2008 among (i) GCL SHIPPING CORP., a Marshall Islands corporation (the "Borrower"), (ii) GLOBAL CONTAINER LINES LIMITED, a Delaware corporation ("GCL"), SHIPTRADE, INC., a New York corporation, and GLOBAL PROGRESS LLC and GLOBAL PROSPERITY LLC., each a Marshall Islands limited liability company, as Guarantors (collectively, the "Guarantors"), and (iii) NATIONAL BANK OF PAKISTAN, as Lender (the "Lender").

## WITNESSETH:

WHEREAS, pursuant to a Credit Agreement dated as of October 22, 2008 (the "Credit Agreement"), made among the Borrower, the Guarantors and the Lender, the Lender agreed to make available to the Borrower credit facilities in an initial aggregate principal amount of up to U.S.$17,500,000 comprised of (i) a medium term loan facility in the amount of $12,000,000, (ii) a revolving short term loan facility in the initial amount of $5,000,000, and (iii) a letter of credit facility in the amount of $500,000, as provided in the Credit Agreement;

WHEREAS, the revolving short term loan facility was intended to assist the Borrower in financing receivables of the Borrower from the United Nations;

WHEREAS, at the request of the Borrower, the Lender has agreed also to finance receivables of GCL from the United Nations, such financing to be on a temporary basis pending the acceptance by the United Nations of the nomination of the Borrower as a contractor with the United Nations;

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

1. Definitions. Capitalized terms used herein and not otherwise defined herein are used as defined in the Credit Agreement.

2. Representations and Warranties. Each of the Obligors, jointly and severally, represents and warrants as follows:

(a) All of the representations and warranties contained in Article VII of the Credit Agreement are true and correct on and as of the date hereof as if made on and as of the date hereof.

(b) No Default or Event of Default has occurred and is continuing on the date hereof.

(c) The execution, delivery and performance by each Obligor of this Amendatory Agreement and by GCL of the GCL Security Agreement (as defined in Section 4(a) below), and the consummation of other transactions contemplated thereby, are within such Obligor's corporate or company powers, have been duly authorized by all necessary corporate or company action.

(d) This Amendatory Agreement has been, and the GCL Security Agreement when delivered hereunder will have been, duly executed and delivered by each Obligor party thereto. This Amendatory Agreement is, and the GCL Security Agreement when delivered hereunder will be, the valid, legal and binding obligation or agreement of each Obligor party thereto, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforceability of creditor's rights generally.

3. **Amendments to Credit Agreement, Etc.** With effect from the date the conditions specified in Section 4 hereof are fulfilled, the Credit Agreement shall be amended as follows:

(a) The Borrower shall be permitted until June 30, 2009 or such later date as the Lender may specify in writing to borrow Revolving Advances for the purpose of financing up to eighty-five percent (85%) of the amount of any account receivable of GCL in respect of services rendered to the United Nations, as evidenced by an invoice of GCL, and otherwise in accordance with Article III of the Credit Agreement, and the definition of "United Nations Receivable" in Section 1.01 shall include any such account receivable of GCL in respect of services rendered to the United Nations, as evidenced by an invoice of GCL.

(b) Each reference in the Loan Documents to "Collateral Document" or "Collateral Documents" shall include the GCL Security Agreement executed and delivered by GCL to the Lender in accordance with Section 4(a) hereof.

(c) Each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import, and each reference to the "Credit Agreement" in any of the other Loan Documents shall mean and refer to the Credit Agreement as amended hereby.

4. **Condition.** It shall be a condition of the effectiveness of the amendments provided in Section 3 hereof that the Lender shall have received each of the following, duly delivered in form and substance satisfactory to the Lender:

(a) a Security Agreement (the "GCL Security Agreement") executed by GCL in favor of the Lender in respect of United Nations Receivables; and

(b) evidence of the completion of all filings of, or with respect to, the GCL Security Agreement that the Lender may deem necessary or desirable in order to perfect and protect the Liens created thereby, including under the Uniform Commercial Code of New York (or such other jurisdiction where GCL may be located).

5. **Execution in Counterparts.** This Amendatory Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

6. **Costs and Expenses.** The Borrower agrees that the provisions of Section 12.04 (Costs and Expenses) shall apply to this Amendatory Agreement.

7. **Continuing Effect.** Except as expressly amended by or in accordance with this Amendatory Agreement, the Credit Agreement, the Notes, and the other Loan Documents shall be and remain in full force and effect.

8. **Law.** This Amendatory Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Amendatory Agreement to be executed by their respective representatives thereunto duly authorized as of the date first above written.

GCL SHIPPING CORP.

By: _____
Name: Bijan Paksima
Title: President

GLOBAL CONTAINER LINES LIMITED

By: _____
Name: Kazem Paksima
Title: President

SHIPTRADE, INC.

By: _____
Name: Kazem Paksima
Title: Vice President

GLOBAL PROGRESS LLC

By: _____
Name: Bijan Paksima
Title: President

GLOBAL PROSPERITY LLC

By: _____
Name: Bijan Paksima
Title: President

NATIONAL BANK OF PAKISTAN

By:_____
Aslam Boolani
Executive Vice President & General Manager


By:_____
Ishtiaque Ahmed
Senior Vice President & Chief Financial Officer

4

19104062 v1

# SECURITY AGREEMENT

SECURITY AGREEMENT, dated December 23, 2008 (as such may hereafter be amended, amended and restated, supplemented or otherwise modified from time to time, this "<u>Agreement</u>"), made by GLOBAL CONTAINER LINES LIMITED, a Delaware corporation (the "<u>Grantor</u>"), to NATIONAL BANK OF PAKISTAN (the "<u>Bank</u>").

<u>W I T N E S S E T H:</u>

WHEREAS, pursuant to a Credit Agreement dated as of October 22, 2008 as amended by an Amendatory Agreement dated as of December 23, 2008 (as so supplemented and as further amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>") by and among (i) GCL Shipping Corp. as Borrower, (ii) the Grantor and the other companies described therein as Guarantors and (iii) the Bank as Lender, the Bank agreed to make available to the Borrower credit facilities in an initial aggregate principal amount of up to U.S.$17,500,000 comprised of (i) a medium term loan facility in the amount of $12,000,000, (ii) a revolving short term loan facility in the initial amount of $5,000,000, and (iii) a letter of credit facility in the amount of $500,000, as provided in the Credit Agreement;

WHEREAS, it is a condition precedent to the making of the Revolving Advances and the issuance of Letters of Credit by the Bank, that the Grantor shall have granted the security interest contemplated by this Agreement;

NOW, THEREFORE, in consideration of the premises and to induce the Bank to maintain the Term Loan, make the Revolving Advances and to issue Letters of Credit pursuant to the Credit Agreement, the Grantor hereby agrees with the Bank as follows:

Section 1 <u>Definitions and Interpretation</u>. (a) As used in this Agreement, the following terms shall have the following meanings:

"<u>Agreement</u>" has the meaning given such term in the introduction hereof.

"<u>Bank</u>" has the meaning given such term in the introduction hereof, subject to Section 11(b).

"<u>Collateral</u>" has the meaning given such term in Section 2.

"<u>Credit Agreement</u>" has the meaning given such term in the recitals hereof.

"<u>Grantor</u>" has the meaning given such term in the introduction hereof.

"<u>Receivables</u>" has the meaning given such term in Section 2(a).

"<u>Related Contracts</u>" has the meaning given such term in Section 2(b).

"<u>Secured Obligations</u>" has the meaning given such term in Section 3.

"<u>UCC</u>" means the Uniform Commercial Code as in effect, from time to time, in the State of New York; <u>provided</u> that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a

jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United Nations Contract" means each agreement now or hereafter entered into by the Grantor with the United Nations for the provision of transportation services by the Grantor for the account of the United Nations, as such agreement may be amended, amended and restated, supplemented or otherwise modified from time to time.

(b) Each other capitalized term used and not otherwise defined herein has the meaning given such term in the Credit Agreement. Further, unless otherwise defined in this Agreement or in the Credit Agreement, terms defined in Article 9 of the UCC (as defined below) are used in this Agreement as such terms are defined in such Article 9.

(c) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. The words "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation". Unless the context requires otherwise (i) each definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications), (ii) each reference to any statute or act shall include all related current regulations, all amendments to such statutes, acts and regulations and any successor statutes, acts and regulations (and any reference to any statute, act or regulation, without additional reference, shall be deemed to refer to federal statutes, acts and regulations of the United States), (iii) each reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iv) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (v) each reference herein to articles, sections, paragraphs, clauses and schedule are to the articles, sections, paragraphs and clauses of, and the schedule to, this Agreement, and (vi) the headings of the several articles, sections, subsections and schedule of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 2  Grant of Security. The Grantor hereby grants to the Bank a security interest in, the Grantor's right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by the Grantor, wherever located, and whether now or hereafter existing or arising (collectively, the "Collateral"):

(a) All accounts arising out of or in connection with each United Nations Contract, including (i) all rights of the Grantor to receive moneys due and to become due under or pursuant to the United Nations Contracts, whether or not earned by performance, and all claims of the Grantor for damages arising out of or for breach of or default under the United Nations Contracts (all such rights and claims, being the "Receivables"), and (iii) all rights now or hereafter existing in and to all supporting obligations and in and to all collateral, security agreements, mortgages, Liens, leases, guarantees, letters of credit, escrow agreements, instruments and other contracts securing or otherwise relating to the foregoing property (all such supporting obligations and property, being the "Related Contracts");

(b) all books and records (including printouts and other computer output materials and records) of the Grantor pertaining to any of the Collateral; and

19104053 v1

(c) all proceeds of and all other payments now or hereafter due and payable with respect to any and all of the Collateral (including proceeds that constitute property of the types described in clauses (a) and (b) of this Section 2 and cash).

Section 3    Security for Obligations. This Agreement secures the payment of all obligations of the Borrower and each other Obligor to the Bank now or hereafter existing under the Credit Agreement, the Notes and the other Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise (all such obligations being the "Secured Obligations"). Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts that constitute part of the Secured Obligations and would be owed by the Borrower or any other Obligor to the Bank under the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving the Borrower or any other Obligor.

Section 4    Grantor Remains Liable. Anything herein to the contrary notwithstanding, (a) the Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Bank of any of the rights hereunder shall not release the Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral and (c) the Bank shall have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement or any other Loan Document, nor shall the Bank be obligated to perform any of the obligations or duties of the Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Section 5    Representations and Warranties. The Grantor represents and warrants as follows:

(a) The Grantor's exact legal name, as defined in Section 9-503(a) of the UCC, is correctly set forth in Schedule I. The Grantor is located (within the meaning of Section 9-307 of the UCC), and has its chief executive office and the office in which it maintains the original copies of each United Nations Contract and Related Contract, in the state or jurisdiction set forth in Schedule I. The information set forth in Schedule I is true and accurate in all respects. The Grantor has not previously changed its name, location, chief executive office, place where it maintains its agreements, type of organization, jurisdiction of organization or organizational identification number from those set forth in Schedule I.

(b) The Grantor is the legal and beneficial owner of the Collateral free and clear of any Lien, claim, option or right of others, except for the security interests created under this Agreement or permitted under the Credit Agreement. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral or listing the Grantor or any trade name of the Grantor as debtor is on file in any recording office, except such as may have been filed in favor of the Bank relating to the Loan Documents or as otherwise permitted under the Credit Agreement.

(c) All filings and other actions necessary to perfect the security interest in the Collateral created under this Agreement have been duly made or taken and are in full force and effect, and this Agreement creates in favor of the Bank a valid and, together with such

3                                            19104053 v1

filings and other actions, perfected first-priority security interest in the Collateral securing the payment of the Secured Obligations.

(d) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or any other third party is required for (i) the grant by the Grantor of the security interest granted hereunder or for the execution, delivery or performance of this Agreement by the Grantor, (ii) the perfection or maintenance of the security interest created hereunder (including the first-priority nature of such security interest), except for the filing of financing and continuation statements under the UCC, which financing statements have been duly filed and are in full force and effect, or (iii) the exercise by the Bank of its rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement.

Section 6   Further Assurances. (a) The Grantor shall from time to time, at the expense of the Grantor, promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary or desirable, or that the Bank may request, to perfect and protect any pledge or security interest granted or purported to be granted by the Grantor hereunder or to enable the Bank to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, the Grantor shall promptly: (i) mark conspicuously each chattel paper included in Receivables, each Related Contract and, at the request of the Bank, each of its records pertaining to such Collateral with a legend, in form and substance satisfactory to the Bank, indicating that such chattel paper, Related Contract or Collateral is subject to the security interest granted hereby; (ii) if any Collateral shall be evidenced by a promissory note or other instrument or chattel paper, deliver and pledge to the Bank hereunder such note or instrument or chattel paper duly indorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to the Bank; (iii) execute or authenticate and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Bank may request, to perfect and preserve the security interest granted or purported to be granted by the Grantor hereunder (including the first-priority nature thereof); and (iv) deliver to the Bank evidence that all other action that the Bank may deem reasonably necessary or desirable to perfect and protect the security interest created under this Agreement has been taken.

(b) The Grantor hereby authorizes the Bank to file one or more financing or continuation statements, and amendments thereto, including one or more financing statements indicating that such financing statements cover all assets or all personal property (or words of similar effect) of the Grantor, in each case without the signature of the Grantor, and regardless of whether any particular asset described in such financing statements falls within the scope of the UCC or the granting clause of this Agreement. A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law. The Grantor ratifies its authorization for the Bank to have filed such financing statements, continuation statements or amendments filed prior to the date hereof.

(c) The Grantor shall furnish to the Bank from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with such Collateral as the Bank may reasonably request, all in reasonable detail.

Section 7   Post-Closing Changes; Collections on Receivables and Related Contracts. (a) The Grantor shall not change its name, type of organization, jurisdiction of organization,

4

organizational identification number or location from those set forth in Section 5(a) of this Agreement without first giving at least thirty days' prior written notice to the Bank and taking all action required by the Bank for the purpose of perfecting or protecting the security interest granted by this Agreement. The Grantor shall not change the location of the place where it keeps the originals of the United Nations Contracts and the Related Contracts and all originals of all chattel paper that evidence Receivables from the locations therefor specified in Section 5(a) without first giving the Bank at least 30 days' prior written notice of such change. The Grantor shall not become bound by a security agreement authenticated by another Person (determined as provided in Section 9-203(d) of the UCC) without giving the Bank at least thirty days' prior written notice thereof and taking all action required by the Bank to ensure that the perfection and first-priority nature of the Bank's security interest in the Collateral will be maintained. The Grantor shall hold and preserve its records relating to the Collateral, including the Related Contracts, and shall permit representatives of the Bank at any time during normal business hours to inspect and make abstracts from such records and other documents. If the Grantor does not have an organizational identification number and later obtains one, it shall forthwith notify the Bank of such organizational identification number.

(b) Except as otherwise provided in this subsection (b), the Grantor shall continue to collect, at its own expense, all amounts due or to become due the Grantor under the Receivables and the Related Contracts. In connection with such collections, the Grantor may take (and, at the Bank's direction, shall take) such action as the Grantor or the Bank may deem necessary or advisable to enforce collection of the Receivables and the Related Contracts; <u>provided, however</u>, that the Bank shall have the right at any time, upon the occurrence and during the continuance of an Event of Default and upon written notice to the Grantor of its intention to do so, to notify the obligors under any Receivables and the Related Contracts of the assignment of such Receivables and Related Contracts to the Bank and to direct such obligors to make payment of all amounts due or to become due to the Grantor thereunder directly to the Bank and, upon such notification and at the expense of the Grantor, to enforce collection of any such Receivables and Related Contracts, to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as the Grantor might have done, and to otherwise exercise all rights with respect to such Receivables and Related Contracts, including those set forth set forth in Section 9-607 of the UCC. After receipt by the Grantor of the notice from the Bank referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including instruments) received by the Grantor in respect of the Receivables and Related Contracts shall be received in trust for the benefit of the Bank hereunder, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Bank in the same form as so received (with any necessary indorsement) and either (A) released to the Grantor so long as no Default or Event of Default shall have occurred and be continuing or (B) if any Event of Default shall have occurred and be continuing, applied as provided in Section 12(b) and (ii) the Grantor shall not adjust, settle or compromise the amount or payment of any amount due on any Receivable or Related Contract, release wholly or partly any obligor thereof, or allow any credit or discount thereon. The Grantor shall not permit or consent to the subordination of its right to payment under any of the Receivables and Related Contracts to any other indebtedness or obligations of the obligor thereof.

Section 8    <u>As to the United Nations Contracts</u>.  The Grantor shall at its expense:

(a)    instruct the United Nations to make payment of each Receivable to an account of the Grantor with the Bank;

(b) perform and observe all terms and provisions of the United Nations Contracts to be performed or observed by it, maintain the United Nations Contracts in full force and effect, enforce the United Nations Contracts in accordance with the terms thereof and take all such action to such end as may be requested from time to time by the Bank;

(c) furnish to the Bank promptly upon receipt thereof copies of all notices, requests and other documents received by the Grantor under or pursuant to the United Nations Contracts, and from time to time (A) furnish to the Bank such information and reports regarding the United Nations Contracts and such other Collateral of the Grantor as the Bank may reasonably request and (B) upon request of the Bank make to each other party to any United Nations Contract such demands and requests for information and reports or for action as the Grantor is entitled to make thereunder; and

(d) promptly upon the Grantor's receipt, or the execution and delivery, of any United Nations Contract, any amendment, restatement or supplement thereto or any other security agreement, mortgage, lease, guarantee, letter of credit, instrument or other contract constituting Collateral hereunder, notify the Bank thereof and deliver to the Bank a copy thereof.

Section 9  Transfers and Other Liens.  The Grantor shall not (a) sell, assign or otherwise dispose of, or grant any option with respect to, any of the Collateral, or (b) create or suffer to exist any Lien upon or with respect to any of the Collateral except for the pledge, assignment and security interest created by this Agreement and Liens permitted by the Credit Agreement.

Section 10  Bank Appointed Attorney-in-Fact.  The Grantor hereby irrevocably appoints the Bank the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time, upon the occurrence and during the continuance of an Event of Default, in the Bank's discretion, to take any action and to execute any instrument that the Bank may deem necessary or advisable to accomplish the purposes of this Agreement, including:

(a) to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(b) to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) above, and

(c) to file any claims or take any action or institute any proceedings that the Bank may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Bank with respect to any of the Collateral.

Section 11  The Bank's Duties.  (a) The powers conferred on the Bank hereunder are solely to protect the Bank's interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Bank shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not the Bank has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral. The Bank shall be deemed to have exercised reasonable

care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.

(b) Anything contained herein to the contrary notwithstanding, the Bank may from time to time, when the Bank deems it to be necessary, appoint one or more agent (each an "<u>Agent</u>") with respect to all or any part of the Collateral. In the event that the Bank so appoints any Agent with respect to any Collateral, (i) the assignment and pledge of such Collateral and the security interest granted in such Collateral by the Grantor hereunder shall be deemed for purposes of this Agreement to have been made to such Agent, in addition to the Bank, as security for the Secured Obligations, (ii) such Agent shall automatically be vested, in addition to the Bank, with all rights, powers, privileges, interests and remedies of the Bank hereunder with respect to such Collateral, and (iii) the term "Bank," when used herein in relation to any rights, powers, privileges, interests and remedies of the Bank with respect to such Collateral, shall include such Agent; <u>provided, however</u>, that no such Agent shall be authorized to take any action with respect to any such Collateral unless and except to the extent expressly authorized in writing by the Bank.

Section 12   <u>Remedies</u>.  If any Event of Default shall have occurred and be continuing:

(a) The Bank may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may: (i) require the Grantor to, and the Grantor hereby agrees that it shall at its expense and upon request of the Bank forthwith, assemble all or part of the Collateral as directed by the Bank and make it available to the Bank at a place and time to be designated by the Bank that is reasonably convenient to both parties; (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Bank's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Bank may deem commercially reasonable; (iii) occupy any premises owned or leased by the Grantor where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under law, without obligation to the Grantor in respect of such occupation; and (iv) exercise any and all rights and remedies of any of the Grantor under or in connection with the Collateral, or otherwise in respect of the Collateral, including (A) any and all rights of the Grantor to demand or otherwise require payment of any amount under, or performance of any provision of, the Receivables and Related Contracts and the other Collateral, and (B) exercise all other rights and remedies with respect to the Receivables and Related Contracts and the other Collateral, including those set forth in Section 9-607 of the UCC. The Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Bank shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Bank may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b) Any cash held by or on behalf of the Bank and all cash proceeds received by or on behalf of the Bank in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Bank, be held by the Bank as collateral for, or then or at any time thereafter applied in whole or in part by the Bank against, all or any part of the Secured Obligations.

19104053 v1

(c)     All payments received by the Grantor under or in connection with any Receivable or Related Contract or otherwise in respect of the Collateral shall be received in trust for the benefit of the Bank, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Bank in the same form as so received (with any necessary indorsement).

(d)     The Bank may, without notice to the Grantor except as required by law and at any time or from time to time, charge, set-off and otherwise apply all or any part of the Secured Obligations against any funds held as Collateral.

Section 13     Indemnity and Expenses. (a) The Grantor agrees to indemnify, defend and save and hold harmless the Bank and each of its subsidiaries, parent companies and other affiliates and their respective officers, directors, employees, agents and advisors (each, an "Indemnified Party") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

(b)     The Grantor shall upon demand pay to the Bank the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts and agents, that the Bank may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Bank hereunder or (iv) the failure by the Grantor to perform or observe any of the provisions hereof.

Section 14     Amendments, Waivers, Etc. No amendment or waiver of any provision of this Agreement, and no consent to any departure by the Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the Bank to exercise, and no delay in exercising any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

Section 15     Notices, Etc. Unless otherwise expressly provided herein, all notices and other communications to the Grantor or the Bank provided for hereunder shall be given in accordance with Section 12.02 of the Credit Agreement.

Section 16     Continuing Security Interest; Assignments under the Credit Agreement. (a) This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the Secured Obligations shall have been paid in full and the Bank shall have no further Commitments under the Credit Agreement, (ii) be binding upon the Grantor, its successors and assigns and (iii) inure, together with the rights and remedies of the Bank hereunder, to the benefit of the Bank and its successors, transferees and assigns.

(b)     Without limiting the generality of Section 16(a), the Bank may assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement (including, without limitation, all or any portion of its Commitments and the Term Loan, Revolving Advances

and Unpaid Drawings owing to it) to any other person, and such other person shall thereupon become vested with all the benefits in respect thereof granted to the Bank herein or otherwise, in each case as provided in Section 12.06 of the Credit Agreement.

Section 17  Release.  Upon the payment in full in cash of the Secured Obligations and the termination of all the Bank's Commitments, the pledge and security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Grantor. Upon any such termination, the Bank will, at the Grantor's expense, execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such release.

Section 18  Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 19  Governing Law; Submission To Jurisdiction; Venue; Waiver Of Jury Trial.  (a) This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

(b)  The Grantor hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and the Grantor hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State Court or, to the extent permitted by law, in such Federal court. The Grantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Subject to the foregoing and to paragraph (c) below, nothing in this Agreement shall affect any right that any party hereto may otherwise have to bring any action or proceeding relating to this Agreement against any other party hereto in the courts of any jurisdiction.

(c)  The Grantor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State or Federal court and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any immunity from jurisdiction of any court or from any legal process with respect to itself or its property.

(d)  The Grantor agrees that service of process may be made on it by personal service of a copy of the summons and complaint or other legal process in any such suit, action or proceeding, or by registered or certified mail (postage prepaid) to its address specified in Section 12.02 or the Credit Agreement, or by any other method of service provided for under the applicable laws in effect in the State of New York.

Section 20  WAIVER OF JURY TRIAL.  EACH OF THE GRANTOR AND THE BANK IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF THE BANK IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

IN WITNESS WHEREOF, the Grantor has caused this Agreement to be duly executed and delivered by its representative thereunto duly authorized on the date first above written.

GLOBAL CONTAINER LINES LIMITED

By: _____
Name: Kareem Parkswell
Title: President