# FIFTH AMENDATORY AGREEMENT

FIFTH AMENDATORY AGREEMENT made as of November 11, 2009 among (i) GCL SHIPPING CORP., a Marshall Islands corporation (the "Borrower"), (ii) GLOBAL CONTAINER LINES LIMITED, a Delaware corporation ("GCL"), SHIPTRADE, INC., a New York corporation, and GLOBAL PROGRESS LLC and GLOBAL PROSPERITY LLC., each a Marshall Islands limited liability company, as Guarantors (collectively, the "Guarantors"), and (iii) NATIONAL BANK OF PAKISTAN, as Lender (the "Lender").

WITNESSETH:

WHEREAS, pursuant to a Credit Agreement dated as of October 22, 2008 as amended by an Amendatory Agreement dated as of December 23, 2008, a Second Amendatory Agreement dated as of February 23, 2009, a Third Amendatory Agreement dated as of August 5, 2009 and a Fourth Amendatory Agreement dated as of August 26, 2009 (the "Credit Agreement"), made among the Borrower, the Guarantors and the Lender, the Lender made available to the Borrower credit facilities in an initial aggregate principal amount of up to U.S.$17,500,000 comprised of (i) a medium term loan facility in the amount of $12,000,000, (ii) a revolving short term loan facility in the initial amount of $5,000,000, and (iii) a letter of credit facility in the amount of $500,000, as provided in the Credit Agreement;

WHEREAS, on November 11, 2009 (the "Petition Date"), each of the Borrower and the Guarantors filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") commencing cases (the "Chapter 11 Cases") under Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code"), and each of the Borrower and the Guarantors continues in possession of its assets and in the management of its business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, at the request of the Borrower and the Guarantors, the Lender has agreed, subject to the terms and conditions set forth in this Fifth Amendatory Agreement and in the Financing Order (as hereinafter defined), (i) to provide a secured debtor-in-possession credit facility in the principal amount of $4,000,000 (the "DIP Facility"), (ii) to modify the schedule for repayment of the term loan outstanding under the Credit Agreement in the principal amount of $12,000,000 (the "Existing Term Loan"), and the rate of interest payable thereon, and (iii) to extend the availability of the revolving short term loan facility and the letter of credit facility under the Credit Agreement;

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

1. Definitions. (a) Capitalized terms used herein and not otherwise defined herein are used as defined in the Credit Agreement.

(b) As used in this Fifth Amendatory Agreement, the following terms shall have the following meanings:

"Bankruptcy Code" has the meaning specified in the second Whereas clause hereof.

"Bankruptcy Court" has the meaning specified in the second Whereas clause hereof.

"Chapter 11 Cases" has the meaning specified in the second Whereas clause hereof.

"Critical Pre-Petition Liabilities" means the outstanding liabilities of the Borrower and Guarantors set forth in Annex A hereto.

"DIP Advance" has the meaning provided in Section 3(a) hereof.

"DIP Commitment" has the meaning provided in Section 3(a) hereof.

"DIP Facility" has the meaning specified in the third Whereas clause hereof.

"DIP Facility Effective Date" has the meaning provided in Section 6 hereof.

"DIP Loan" has the meaning provided in Section 3(a) hereof.

"DIP Note" has the meaning provided in Section 3(f) hereof.

"Emergency Financing Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases at a hearing pursuant to Local Rule 4001-5, Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 which authorizes the Lender in its sole discretion, the Borrower and the Guarantors to perform their respective obligations under the terms of this Fifth Amendatory Agreement pending the Interim Hearing referred to therein.

"Existing Term Loan" has the meaning specified in the third Whereas clause hereof.

"Final Financing Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be in form and substance satisfactory to the Lender in its sole discretion, and from which no appeal or motion to reconsider has been timely filed or, if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless the Lender waives such requirement), together with all extensions, modifications, and amendments thereto, which, among other matters, but not by way of limitation, authorizes the Borrower and the Guarantors to obtain credit, incur (or guarantee) indebtedness, and grant superpriority, priming first priority liens under this Fifth Amendatory Agreement, as the case may be, and provides for the super-priority administrative expense status of the Lender's claims.

"Financing Order" means, collectively and individually, the Emergency Financing Order, the Interim Financing Order, until such time as it is superseded by the Final Financing Order, and such other orders, and related findings of fact and conclusions of law in support thereof, relating thereto or authorizing on or after the date hereof, the incurrence of indebtedness by the Borrower and the Guarantors, the provision of loans and other financial accommodations by the Lender to the Borrower and the Guarantors, the granting of liens, interests, priority claims and other rights in favor of the Lender pursuant to this Fifth Amendatory Agreement, on an emergency, interim, final or other basis pursuant to Section 364 of the Bankruptcy Code and other applicable sections of the Bankruptcy Code as may be issued or entered in the Chapter 11 Cases, each and all in form and substance satisfactory to the Lender in its sole discretion.

"Interim Financing Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Lender in its sole discretion, which, among other matters, but not by way of limitation, authorizes, on an interim basis,

the Borrower and the Guarantors to perform their respective obligations under the terms of this Fifth Amendatory Agreement.

"Petition Date" has the meaning specified in the second Whereas clause hereof.

2. Representations and Warranties. Each of the Obligors, jointly and severally, represents and warrants as follows:

(a) Each of the representations and warranties contained in Article VII of the Credit Agreement (excluding Section 7.01((o)) are true and correct on and as of the date hereof as if made on and as of the date hereof, except to the extent affected by the Chapter 11 Cases.

(b) Subject only to Bankruptcy Court's entry of the Financing Order, the execution, delivery and performance by each Obligor of this Fifth Amendatory Agreement, and the consummation of other transactions contemplated thereby, are within such Obligor's corporate or company powers, and have been duly authorized by all necessary corporate or company action; and do not (i) contravene such Obligor's articles of incorporation or by-laws, or certificate of formation or limited liability company agreement, as the case may be, (ii) violate any applicable law, rule, regulation, order, writ, judgment, injunction, decree, determination or award, (iii) conflict with or result in the breach of, or constitute a default under, any loan agreement, contract, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting such Obligor or any of its properties, or (iv) except for the Liens created by the Collateral Documents or contemplated by this Fifth Amendatory Agreement, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of such Obligor.

(c) Except for the Bankruptcy Court's entry of the Financing Order, no authorization, approval, consent or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other consent or approval of any other Person is required for the due execution, delivery and performance by any Obligor of this Fifth Amendatory Agreement or any other document to which it is or is to be a party or for the consummation of the transactions contemplated hereby.

(d) This Fifth Amendatory Agreement has been duly executed and delivered by each Obligor party hereto and, upon the Bankruptcy Court's entry of the Financing Order, this Fifth Amendatory Agreement shall be the valid, legal and binding obligation or agreement of each Obligor party hereto, enforceable in accordance with its terms and the Financing Order.

(e) All proceeds of the DIP Facility shall be used by the Borrower solely for payment of Critical Pre-Petition Liabilities, and otherwise for the general operating and working capital purposes in the ordinary course of the business of the Obligors, provided, however, no such proceeds shall be applied to the payment of any liabilities of Gilmore Shipping Corporation, a Marshall Islands corporations and a subsidiary of the Borrower, or relating to the Panamanian flag vessel GLOBAL PRECISION.

(f) Upon the Bankruptcy Court's entry of the Financing Order, the security interests granted pursuant to the Collateral Documents will constitute valid, enforceable, perfected and first priority Liens on the Collateral described therein securing the DIP Facility, the Existing Term Loan, the Revolving Advances and Unpaid Drawings, except to the extent otherwise expressly provided in the Financing Order and except for Permitted Encumbrances.

3. <u>The DIP Facility</u>. (a) The Lender agrees, on the terms and conditions hereinafter set forth, to make available to the Borrower on any Business Day during the period from the DIP Facility Effective Date until the date sixty (60) days thereafter a loan (the "<u>DIP Loan</u>") in the principal amount of $4,000,000 (the "<u>DIP Commitment</u>") in up to three advances (each a "<u>DIP Advance</u>") as follows:

   (i) The first DIP Advance shall be in an amount up to the DIP Commitment as shall be permitted to be applied to payment of Critical Pre-Petition Liabilities pursuant to the Emergency Financing Order, the Interim Financing Order or Final Financing Order, as the case may be, and shall be so applied by the Borrower;

   (ii) Each subsequent DIP Advance shall be in an amount up to the balance, if any, of the DIP Commitment remaining after disbursement of the first DIP Advance described in the preceding clause (i) as shall be permitted to be applied to payment of Critical Pre-Petition Liabilities or other working capital purposes pursuant to the Final Financing Order, and shall be so applied by the Borrower; and

   (iii) Amounts borrowed in respect of the DIP Loan or the Existing Term Loan and repaid or prepaid may not be reborrowed.

   (b) Each DIP Advance shall be made available on notice given not later than 11:00 A.M. (New York City time) by the Borrower to the Lender on the first Business Day prior to the proposed drawdown date in respect of the first DIP Advance and the third Business Day prior to the proposed drawdown date in respect of the second DIP Advance. Each such notice shall be in writing, specifying therein (i) the requested drawdown date which shall be a Business Day, (ii) the principal amount of the DIP Advance thereof requested on such drawdown date, and (iii) identify the recipients (including payment instructions) of the proceeds of such DIP Advance. Upon fulfillment of the conditions set forth in Section 3(e) of this Fifth Amendatory Agreement, the Lender will make such funds available to, or for the account of the Borrower according to the payment instructions set forth in such notice.

   (c) The Borrower shall repay to the Lender the aggregate outstanding principal amount of the DIP Loan and the Existing Term Loan in sixty (60) consecutive equal monthly installments on the last day of each month, commencing on January 31, 2011.

   (d) The Borrower shall pay to the Lender interest on the aggregate outstanding principal amount of the DIP Loan and the Existing Term Loan from the Petition Date until such principal amount is paid in full, at a rate per annum equal to the sum of (i) the Applicable Margin specified below, plus (ii) the Prime Rate in effect from time to time:

| Period | Applicable Margin |
|---|---|
| Petition Date to December 31, 2010 | 1.75% per annum |
| January 1, 2011 to December 31, 2011 | 2.50% per annum |
| January 1, 2012 and thereafter | 3.50% per annum |

and such interest shall be payable monthly in arrears on the last day of each month after the DIP Facility Effective Date. The Borrower shall pay on demand interest on the unpaid principal amount

of the DIP Loan and the Existing Term Loan that is not paid when due and on the unpaid amount of all interest, fees and other amounts then due and payable under the Credit Agreement as amended by this Fifty Amendatory Agreement that is not paid when due for the period from the due date thereof to the date paid, at a rate per annum equal to 2% per annum above the rate of interest per annum specified above in the preceding sentence.

(d)   The Borrower's obligation to pay the principal of, and interest on, the DIP Loan and the Existing Term Loan shall be evidenced by a promissory note of the Borrower payable to the order of the Lender, in substantially the form of Annex B hereto, evidencing the aggregate indebtedness of the Borrower to the Lender in respect of the DIP Loan and the Existing Term Loan made or to be made by the Lender (the "DIP Note").

(e)   The obligation of the Lender to disburse a DIP Advance is subject to the conditions precedent that the Lender shall have received, in form and substance satisfactory to the Lender (or waived in writing by the Lender):

(i)   the DIP Note, duly executed by the Borrower to the order of the Lender;

(ii)   an amended and restated security agreement duly executed by GCL in favor of the Lender granting a first priority security interest in all property of GCL, in substantially the form of Annex C hereto;

(iii)   evidence of the completion of all filings of, or with respect to, the amended and restated security agreement specified in Section 3(e)(ii) that Lender may deem necessary or desirable in order to perfect and protect the Liens created thereby, including under the Uniform Commercial Code of New York (or such other jurisdiction where the relevant Obligor and/or any Collateral may be located);

(iv)   the Borrower shall have paid in full all amounts due and payable to the Lender under Section 12.04 of the Credit Agreement;

(v)   evidence that cash contributions by the Sponsors to the capital of the Borrower shall have been made after the DIP Facility Effective Date in an aggregate amount not less than $100,000; and

(vi)   evidence that each of the conditions precedent specified in Section 6.03 of the Credit Agreement as amended by this Fifth Amendatory Agreement has been satisfied.

4.   Amendments to Credit Agreement, Etc.   With effect from and as of the DIP Facility Effective Date, the Credit Agreement shall be amended as follows:

(a)   The definition of "Commitment" in Section 1.01 of the Credit Agreement shall include the DIP Commitment.

(b)   The definition of "Credit Event" in Section 1.01 of the Credit Agreement shall include the disbursement of any DIP Advance.

(c)   The definition of "Loan Document" in Section 1.01 of the Credit Agreement shall include the Financing Order.

(d) The definition of "Payment Date" in Section 1.01 of the Credit Agreement is amended to read in its entirety as follows:

"'Payment Date' means (i) January 31, 2011, and (ii) the last day of each month thereafter; provided, however, the sixtieth (60th) and final Payment Date shall be December 31, 2015."

(e) The definition of "Revolving Credit and Letter of Credit Commitment Termination Date" in Section 1.01 of the Credit Agreement is amended to read in its entirety as follows:

"'Revolving Credit and Letter of Credit Commitment Termination Date' means September 30, 2010 or, upon request of the Borrower and with the approval in writing of the Lender (which approval shall be subject to the Lender's customary credit review and may be withheld in the Lender's sole discretion), any anniversary thereof."

(f) The definition of "Term Loan" in Section 1.01 of the Credit Agreement is amended to refer collectively to the DIP Loan and the Existing Term Loan.

(g) The definition of "Term Loan Note" in Section 1.01 of the Credit Agreement is amended to refer to the DIP Note.

(h) Section 1.01 of the Credit Agreement is amended to add the following definitions in alphabetical order:

"Bankruptcy Code" has the meaning specified in the Fifth Amendatory Agreement to this Agreement.

"Bankruptcy Court" has the meaning specified in the Fifth Amendatory Agreement to this Agreement.

"Chapter 11 Cases" has the meaning specified in the Fifth Amendatory Agreement to this Agreement.

"Final Financing Order" has the meaning specified in the Fifth Amendatory Agreement to this Agreement.

"Financing Order" has the meaning specified in the Fifth Amendatory Agreement to this Agreement.

"Petition Date" has the meaning specified in the Fifth Amendatory Agreement to this Agreement.

(i) Each of Sections 2.01, 2.02, 2.03 and 2.05 of the Credit Agreement is deleted in its entirety.

(j) Section 3.04(a) of the Credit Agreement is deleted in its entirety.

(k) Section 5.04(c) of the Credit Agreement is amended by deleting the reference to Section 2.05.

(l) Section 6.03 of the Credit Agreement shall apply to the obligation of the Lender to disburse each DIP Advance, except that Section 6.03(a) is amended to require in the case of disbursement of a DIP Advance, that the Lender shall have received a notice of drawdown as required by Section 3(b) of this Fifth Amendatory Agreement.

(m) Section 7.01(g) of the Credit Agreement is amended to make an exception for the Chapter 11 Cases.

(n) Section 7.01(o) of the Credit Agreement is deleted in its entirety.

(o) Section 9.01(a) of the Credit Agreement is amended to apply from and as of the DIP Facility Effective Date instead of the "first Payment Date".

(p) Section 10.01(h) of the Credit Agreement is amended to renumber paragraph (v) to (vii), and to add new paragraphs (v) and (vi) as follows:

"(v) as soon as available and in any event within 7 Business Days after the end of each month, a complete list of all accounts receivable and accounts payable of each of the Obligors, including payroll, certified by an officer of the relevant Obligor;"

"(vi) as soon as available and in any event within 7 Business Days after the end of each calendar quarter, a complete list of all salary, including bonus and benefits, paid to any Sponsor during such quarter, certified by an officer of the relevant Obligor; and"

(q) The Obligors shall be excused from complying with Section 10.01(l)(i) (Vessel Value Maintenance) of the Credit Agreement from the DIP Facility Effective Date until December 31, 2012, but shall continue to provide valuations in accordance with Section 10.01(l)(ii).

(r) The preamble of Section 10.02 of the Credit Agreement is amended to read in its entirety as follows:

"So long as the Term Loan or any Revolving Advance shall remain unpaid, any Letter of Credit shall remain outstanding, or the Lender shall have any Commitment hereunder, none of the Obligors shall:"

(s) Section 10.02(f) of the Credit Agreement is amended to read in its entirety as follows:

"Debt. Create, incur, assume or suffer to exist any Debt other than (i) Debt under the Loan Documents, (ii) Debt for (x) trade payables and expenses accrued in the ordinary course of business and that are not overdue, or (y) customer advance payments and customer deposits received in the ordinary course of business, (iii) Debt owing to Affiliates provided that such Debt is subordinated on terms and conditions acceptable to the Lender and subject in right of payment to the prior payment in full of all amounts outstanding under this Agreement and the Notes, and (iv) Debt incurred prior to the Petition Date as set forth in the Obligor's disclosure schedules filed in the Chapter 11 Cases."

(t) Section 10.02(g) of the Credit Agreement is amended to read in its entirety as follows:

"Dividends. Declare or pay any dividend of any kind or make any purchase or redemption of or distribution on any stock, limited liability company interest or other equity interest without the prior written consent of the Lender."

(u) Section 10.02(n) (Net Worth) of the Credit Agreement is amended to read in its entirety as follows:

"Net Worth. Permit the Net Worth of the Borrower to fall below the amount specified below during the period specified below:

| Period | Net Worth |
|---|---|
| January 1, 2010 to December 31, 2010 | $500,000 |
| January 1, 2011 to December 31, 2011 | $1,000,000 |
| January 1, 2012 to December 31, 2012 | $2,000,000 |
| January 1, 2013 to December 31, 2013 | $3,000,000 |
| January 1, 2014 to December 31, 2013 | $4,000,000 |

provided, however, that the Obligors shall cause the Sponsors to make cash contributions to the capital of the Borrower an aggregate amount not less than $50,000 during each six month period ending June 30, 2010, December 31, 2010 and June 30, 2011.

(v) Section 10.02 of the Credit Agreement is amended to add new paragraphs (o) and (p) as follows:

"(o) Payments to Sponsors. Pay any amount, or agree to make any payment, whether for consideration or absent consideration, to or for the benefit of any of the Sponsors without the prior written consent of the Lender, except an aggregate amount not in excess of the amount specified below may be paid in any calendar month by the Obligors as salary, including bonus and benefits, to the Sponsors specified below:

| Sponsor | Maximum Monthly Amount |
|---|---|
| Ali Paksima | $24,300 |
| Kazem Paksima | $22,230 |
| Hormoz Shayegan | $19,167 |
| Bijan Paksima | $13,334 |
| Ali David Paksima | $13,334" |

19111353 v5

"(p) Operating Accounts. (i) Establish or maintain any deposit or other account with any bank or financial institution other than the Lender at any time after confirmation of a reorganization plan in Chapter 11 cases in form and substance satisfactory to the Lender, or (ii) make any withdrawal from any account maintained with the Lender except for the purpose of paying expenses incurred in connection with such Obligor's business; provided, however, it shall be a condition of any such withdrawal and payment that any instructions to the Lender from the relevant Obligor shall be accompanied with a true and correct copy of an invoice evidencing the relevant expense to be paid."

(w) Section 11.01(e) of the Credit Agreement is amended to read in its entirety as follows:

"Any Obligor shall fail to pay any principal of or premium or interest on any Debt incurred after the Petition Date which such Obligor is liable to pay, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or any such Debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof; or"

(x) Section 11.01(f) of the Credit Agreement is amended to read in its entirety as follows:

"Any Obligor shall fail to comply with the Financing Order in any material respect; a trustee shall be appointed in any Chapter 11 Case; an examiner shall be appointed in any Chapter 11 Case with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; any Chapter 11 Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; the Obligors shall obtain Bankruptcy Court approval of a disclosure statement for a reorganization plan other than a reorganization plan proposed by the Obligors and in form and substance satisfactory to the Lender in its sole discretion, or a confirmation order shall be entered with respect to a reorganization plan proposed by a Person other than the Obligors if such reorganization plan is not in form and substance satisfactory to the Lender in its sole discretion; there shall be filed by any Obligor any motion to sell all or a substantial part of the Collateral on terms that are not acceptable to the Lender in its sole discretion; the Final Financing Order is not entered within sixty (60) days of the Petition Date; any Obligor shall file any motion to alter, amend, vacate, supplement, modify or reconsider, in any respect, the Financing Order or, without the Lender's prior written consent, the Financing Order is amended, vacated, stayed, reversed or otherwise modified; the Bankruptcy Court shall enter an order granting to any Person (other than the Lender) relief from the automatic stay to foreclose upon a Lien with respect to any property of any Obligor or to terminate or otherwise exercise remedies under any material agreement, document or instrument, whether or not it relates to

Debt; any Obligor shall file a motion or other request with the Bankruptcy Court seeking authority to use any cash Collateral or obtain any additional financing not otherwise permitted pursuant to this Agreement or otherwise secured by a Lien upon any Collateral (in each case (i) without the Lender's prior written consent or (ii) if such motion fails to contemplate payment in full of all outstanding amounts payable to the Lender under this Agreement and the other Loan Documents and the cancellation of the Commitments on or before the effective date of such financing); any Obligor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Debt incurred prior to the Petition Date other than payments permitted under this Agreement or the Financing Order; an order shall be entered by the Bankruptcy Court avoiding or requiring repayment of any portion of the payments made to the Lender under this Agreement or the Notes; or, without the Lender's prior written consent, the any Obligor shall discontinue or suspend all or any material part of its business operations or commence an orderly wind-down or liquidation of any material part of the Collateral; or"

(y) The last paragraph of Section 11.01 of the Credit Agreement is amended to read in its entirety as follows:

"then, and in any such event, the Lender may, by notice to the Borrower, (i) declare the Commitments terminated, whereupon the same shall forthwith terminate, (ii) declare the principal of and accrued interest on the Term Loan, the Revolving Advances, the Notes, and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the same shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower, (iii) terminate any Letter of Credit which may be terminated in accordance with its terms, (iv) direct the Borrower to pay (and the Borrower agrees that upon receipt of such notice it will pay) to the Lender such additional amount of cash, to be held as security by the Lender, as is equal to the aggregate Stated Amounts of all Letters of Credit issued for the account of the Borrowers and then outstanding less any Letter of Credit Margin Amounts then credited to the Debt Service Reserve Account."

(z) Each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import, and each reference to the "Credit Agreement" in any of the other Loan Documents, shall mean and refer to the Credit Agreement as amended by this Fifth Amendatory Agreement.

5. <u>Confirmation of Guarantee</u>. Each of the Guarantors hereby confirms that the Guaranteed Obligations include the obligations of the Borrower under the Credit Agreement as amended by this Fifth Amendatory Agreement.

6. <u>Effectiveness</u>. This Fifth Amendatory Agreement shall become effective on the date (the "<u>DIP Facility Effective Date</u>") on which the following conditions have been satisfied:

(a) Each of the Borrower, the Guarantors and the Lender shall have signed a counterpart hereof (whether the same or different counterparts) and each such counterpart shall have been delivered to the Lender;

19111353 v5

(b) The Lender shall have received a certificate of the Secretary or other officer of each Obligor certifying (i) a copy of the articles of incorporation and by-laws, or certificate of formation and limited liability company agreement, as the case may be, of such Obligor, (ii) resolutions of the board of directors or other appropriate governing body of such Obligor approving this Fifth Amendatory Agreement and each other document contemplated thereby to which it is or is to be a party, and (iii) the names and true signatures of the respective officers and attorneys-in-fact of such Obligor authorized to sign this Fifth Amendatory Agreement and each other document contemplated thereby to which it is or is to be a party;

(c) The Lender shall have received a certificate of the appropriate authority in the jurisdiction of incorporation or formation of each Obligor confirming its valid existence in good standing; and

(d) The Financing Order shall have been duly entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been vacated, reversed, modified or stayed in any respect (and, if such order is the subject of a pending appeal, no performance of any obligation of any party shall have been stayed pending such appeal).

7. <u>Execution in Counterparts</u>. This Fifth Amendatory Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

8. <u>Costs and Expenses</u>. The Borrower agrees that the provisions of Section 12.04 (Costs and Expenses) shall apply to this Fifth Amendatory Agreement.

9. <u>Continuing Effect</u>. Except as expressly amended by or in accordance with this Fifth Amendatory Agreement, the Credit Agreement, the Notes, and the other Loan Documents shall be and remain in full force and effect.

10. <u>Law</u>. This Fifth Amendatory Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Fifth Amendatory Agreement to be executed by their respective representatives thereunto duly authorized as of the date first above written.

GCL SHIPPING CORP.

By:_____
Name:
Title:

GLOBAL CONTAINER LINES LIMITED

By: _____
Name:
Title:

SHIPTRADE, INC.

By:_____
Name:
Title:

GLOBAL PROGRESS LLC

By:_____
Name:
Title:

GLOBAL PROSPERITY LLC

By:_____
Name:
Title:

NATIONAL BANK OF PAKISTAN

By:_____
Name:
Title:


By:_____
Name:
Title: