$17,500,000

## CREDIT AGREEMENT

Dated as of October 22, 2008

Among

## GCL SHIPPING CORP.

as Borrower,

GLOBAL CONTAINER LINES LIMITED
SHIPTRADE, INC.
GLOBAL PROGRESS LLC
GLOBAL PROSPERITY LLC

as Guarantors,

and

## NATIONAL BANK OF PAKISTAN

as Lender

ARTICLE I - DEFINITIONS AND ACCOUNTING TERMS ............................................................. 1

    SECTION 1.01. Certain Defined Terms ........................................................................ 1
    SECTION 1.02. Interpretation ....................................................................................... 9
    SECTION 1.03. Computation of Time Periods ........................................................... 10
    SECTION 1.04. Accounting Terms .............................................................................. 10

ARTICLE II - AMOUNT AND TERMS OF THE TERM LOAN FACILITY ................................... 10

    SECTION 2.01. The Term Loan Commitment ........................................................... 10
    SECTION 2.02. Drawdown .......................................................................................... 10
    SECTION 2.03. Repayment .......................................................................................... 11
    SECTION 2.04. Prepayment ......................................................................................... 11
    SECTION 2.05. Interest ................................................................................................ 11

ARTICLE III - AMOUNT AND TERMS OF THE REVOLVING CREDIT FACILITY ................... 12

    SECTION 3.01. The Revolving Credit Commitment ................................................. 12
    SECTION 3.02. Drawdown .......................................................................................... 12
    SECTION 3.03. Repayment .......................................................................................... 13
    SECTION 3.04. Adjustment of Revolving Credit Commitment ................................ 13
    SECTION 3.06. Interest ................................................................................................ 14

ARTICLE IV - AMOUNT AND TERMS OF THE LETTER OF CREDIT FACILITY .................... 14

    SECTION 4.01. The Letter of Credit Facility ............................................................ 14
    SECTION 4.02. Maximum Letter of Credit Outstandings; Expiration ..................... 15
    SECTION 4.03. Letter of Credit Requests; Margin Amount ..................................... 15
    SECTION 4.04. Agreement to Repay Letter of Credit Drawings .............................. 15

ARTICLE V - FEES AND COMMISSIONS, INCREASED COSTS, ILLEGALITY, PAYMENTS
AND COMPUTATIONS, TAXES ................................................................................................. 16

    SECTION 501. Fees and Commissions ...................................................................... 16
    SECTION 5.02. Increased Costs .................................................................................. 16
    SECTION 5.03. Illegality ............................................................................................. 17
    SECTION 5.04. Payments and Computations ............................................................ 18
    SECTION 5.05. Taxes .................................................................................................. 18

ARTICLE VI - CONDITIONS PRECEDENT ................................................................................. 19

    SECTION 6.01. Conditions Precedent to Credit Events .......................................... 19
    SECTION 6.02. Condition Precedent to Disbursement of the Second Tranche of th e Term Loan ... 22
    SECTION 6.03. Conditions Precedent to Each Credit Event .................................... 22

ARTICLE VII - REPRESENTATIONS AND WARRANTIES ......................................................... 23

    SECTION 7.01. Representations and Warranties ....................................................... 23

ARTICLE VIII - GUARANTY ....................................................................................................... 26

    SECTION 8.01. Guaranty ............................................................................................ 26
    SECTION 8.02. Obligations Absolute ........................................................................ 26
    SECTION 8.03. Guaranty Unconditional .................................................................... 26
    SECTION 8.04. Waiver of Subrogation; Contribution ............................................. 27
    SECTION 8.05. Reinstatement .................................................................................... 27
    SECTION 8.06. Waiver ................................................................................................ 27
    SECTION 8.07. Payments; No Reductions ................................................................ 27
    SECTION 8.08. Set-Off ................................................................................................ 28

SECTION 8.09. Continuing Guarantee.................................................................28
SECTION 8.10. Right of Contribution ................................................................28
SECTION 8.11. Limitation of Liability ...............................................................29

ARTICLE IX - DEBT SERVICE RESERVE ACCOUNT .....................................29
SECTION 9.01. Debt Service Reserve Account...................................................29

ARTICLE X - COVENANTS OF THE BORROWER ...........................................30
SECTION 10.01. Affirmative Covenants ............................................................30
SECTION 10.02. Negative Covenants.................................................................33

ARTICLE XI - EVENTS OF DEFAULT ...............................................................35
SECTION 11.01. Events of Default .....................................................................35

ARTICLE XII - MISCELLANEOUS ....................................................................37
SECTION 12.01. Amendments, Etc ....................................................................37
SECTION 12.02. Notices, Etc..............................................................................37
SECTION 12.03. No Waiver, Remedies ..............................................................37
SECTION 12.04. Costs; Expenses.......................................................................37
SECTION 12.05. Right of Set-off........................................................................39
SECTION 12.06. Assignments and Participations ..............................................39
SECTION 12.07. Judgment..................................................................................40
SECTION 12.08. Governing Law; Submission to Jurisdiction ...........................40
SECTION 12.09. Execution in Counterparts.......................................................40
SECTION 12.10. WAIVER OF JURY TRIAL.....................................................41
SECTION 12.11. Entire Agreement ....................................................................41
SECTION 12.12. Severability of Provisions .......................................................41
SECTION 12.12. USA PATRIOT Act Notice .....................................................41

| Exhibit A | - | Form of Term Loan Note |
| Exhibit B | - | Form of Revolving Note |
| Exhibit C | - | Form of Term Loan Notice of Drawdown |
| Exhibit D | - | Form of Revolving Notice of Drawdown |
| Exhibit E | - | Form of Letter of Credit Request |
| Exhibit F | - | Form of Mortgage |
| Exhibit G | - | Form of Deed of Covenant |
| Exhibit H | - | Form of Assignment of Bareboat Charter |
| Exhibit I | - | Form of Assignment of Earnings |
| Exhibit J | - | Form of Assignment of Insurances |
| Exhibit K | | Form of Assignment of Time Charter |
| Exhibit L | - | Form of Pledge Agreement |
| Exhibit M | | Form of Security Agreement |
| Exhibit N | - | Form of Approved Manager's Undertaking |
| Exhibit O | - | Form of Sponsors' Undertaking |

19101732 v3

CREDIT AGREEMENT dated as of October 22, 2008 among (i) GCL SHIPPING CORP., a Marshall Islands corporation (the "Borrower"), (ii) GLOBAL CONTAINER LINES LIMITED, a Delaware corporation ("GCL"), SHIPTRADE, INC., a New York corporation ("Shiptrade"), and GLOBAL PROGRESS LLC ("Progress") and GLOBAL PROSPERITY LLC. ("Prosperity"), each a Marshall Islands limited liability company, as Guarantors (collectively, the "Guarantors"), and (iii) NATIONAL BANK OF PAKISTAN, as Lender (the "Lender").

PRELIMINARY STATEMENTS:

1.      Pursuant to a Bareboat Charter dated as of May 14, 2007 (the "Prosperity BBC/HP") between Drawbridge Chartering III LLC, a Delaware limited liability company ("DC III"), and the Borrower, DC III chartered the Bahamian registered vessel GLOBAL PROSPERITY ("GLOBAL PROSPERITY") to the Borrower with an option in favor of the Borrower to purchase GLOBAL PROSPERITY.

2.      Pursuant to a Bareboat Charter dated as of May 14, 2007 (the "Progress BBC/HP") between Drawbridge Chartering IV LLC, a Delaware limited liability company ("DC IV"), and the Borrower, DC IV chartered the Bahamian registered vessel GLOBAL PROGRESS ("GLOBAL PROGRESS") to the Borrower with an option in favor of the Borrower to purchase GLOBAL PROGRESS.

3.      In connection with its exercise of the purchase options under the Prosperity BBC/HP and the Progress BBC/HP, the Borrower desires to borrow from the Lender funds to finance the acquisition of GLOBAL PROSPERITY by Prosperity as the Borrower's nominee and of GLOBAL PROGRESS by Progress as the Borrower's nominee, to finance United Nations Receivables and for other corporate purposes.

4.      The Lender has agreed to make available to the Borrower credit facilities in an aggregate principal amount of $17,500,000 upon the terms and conditions set forth herein comprised of (i) a medium term loan facility in the amount of $12,000,000, (ii) a revolving short term loan facility in the amount of $5,000,000, and (iii) a standby and/or import letter of credit facility in the amount of $500,000.

5.      As a condition to the obligation of the Lender to make the credit facilities available to the Borrower hereunder, the Guarantors have agreed to guarantee, on the terms and conditions set forth herein, the obligations of the Borrower under this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person.

For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to vote 50% or more of the voting stock, membership or partnership interests, or other similar interests of such Person or to direct or cause direction of the management and policies of such Person, whether through the ownership of voting stock, membership or partnership interests, or other similar interests, by contract or otherwise.

"Agreement" has the meaning specified in the recital hereto.

"Approved Broker" means, as the context may require, Merrill Marine Services Inc., or such other independent ship broker as may from time to time be approved by the Lender, which approval shall not unreasonably be withheld.

"Approved Manager" means Gulf Liner Shipping Agencies (L.L.C.), a United Arab Emirates company, or any other company approved by the Lender from time to time as the technical manager of a Vessel, which approval shall not unreasonably be withheld.

"Approved Manager's Undertakings" means each of the undertakings made or to be made by an Approved Manager in favor of the Lender in respect of a Vessel and in substantially the form of Exhibit N hereto.

"Assignments of Bareboat Charter" means each of the first priority assignments made or to be made by an Owner in favor of the Lender in respect of a Bareboat Charter and in substantially the form of Exhibit H hereto.

"Assignments of Earnings" means each of the first priority assignments of earnings made or to be made by an Owner in favor of the Lender in respect of a Vessel and in substantially the form of Exhibit I hereto.

"Assignments of Insurances" means each of the first priority assignments of insurances made or to be made by an Owner and the Borrower in favor of the Lender in respect of a Vessel and in substantially the form of Exhibit J hereto.

"Assignments of Time Charter" means each of the first priority assignments made or to be made by the Borrower in favor of the Lender in respect of the Time Charters and in substantially the form of Exhibit K hereto.

"Bareboat Charters" means, collectively, the Progress Bareboat Charter and the Prosperity Bareboat Charter.

"BBC/HPs" means, collectively, the Prosperity BBC/HP and the Progress BBC/HP.

"Borrower" has the meaning specified in the recital hereto.

"Business Day" means a day of the year on which banks are not required or authorized to close in New York City.

"Change of Control" means the occurrence of either of the following: (a) the Borrower ceases directly to own one hundred percent (100%) of the membership interests of each of the Owners, or (b) the Sponsors or any of them shall at any time cease, directly or indirectly, beneficially

or of record, to own shares representing at least fifty-one percent (51%) of the outstanding voting or economic equity interests of the Borrower.

"Classification Society" means Bureau Veritas or such other classification society as is selected by the Borrower with the prior consent of the Lender, which consent shall not unreasonably be withheld.

"Collateral" means all "Collateral" referred to in the Collateral Documents and all other property that is or is intended to be subject to any Lien in favor of the Lender.

"Collateral Documents" means (a) this Agreement (where the context so admits), (b) the Mortgages, (c) the Deeds of Covenant, (d) the Assignments of Bareboat Charter, (e) the Assignments of Earnings, (f) the Assignments of Insurances, (g) the Assignments of Time Charter, (h) the Approved Manager's Undertakings, (i) the Security Agreement, (j) the Pledge Agreement, (k) the Sponsors' Undertaking, and (l) any other document that provides for the guarantee of the obligations of any Person under any Loan Document or that creates, or purports to create, a Lien in favor of, or for the benefit of, the Lender.

"Commitments" means the commitments of the Lender hereunder, i.e., the Term Loan Commitment, the Revolving Credit Commitment or the Letter of Credit Commitment.

"Credit Event" means the disbursement of any Tranche of the Term Loan, the making of any Revolving Advance or the issuance of any Letter of Credit.

"DC III" has the meaning specified in the Preliminary Statements.

"DC IV" has the meaning specified in the Preliminary Statements.

"Debt" of any Person means, at any date, without duplication, (i) all indebtedness of such Person for borrowed money; (ii) all obligations of such Person for the deferred purchase price of property or services; (iii) all obligations of such Person evidenced by bonds, notes, debentures or other similar instruments; (iv) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default, acceleration, or termination are limited to repossession or sale of such property); (v) all obligations of such Person as lessee under capital leases; (vi) any Debt secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; (vii) all obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities; (viii) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any capital stock or shares of such Person or any warrants, rights or options to acquire such capital stock or shares; (ix) any obligation of such Person with respect to an interest rate or currency swap agreement, cap, floor or collar agreement, interest rate or currency future or option contract or other similar obligation; and (x) all Guaranteed Debt of such Person.

"Debt Service Reserve Account" has the meaning provided in Section 9.01 hereof.

"Debt Service Reserve Amount" has the meaning provided in Section 9.01(a) hereof

19101732 v3

"Deeds of Covenant" means each of the deeds of covenant supplemental to a Mortgage to be made by an Owner in favor of the Lender in substantially the form of Exhibit G hereto.

"Default" means any Event of Default or any event that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"Dollars" and the sign "$" each means lawful money of the United States.

"Drawdown Date" means each requested date for the borrowing, as the case may be, of (i) a Tranche of the Term Loan, or (ii) a Revolving Advance.

"Drawing" has the meaning provided in Section 4.04(b) hereof.

"Environmental Action" means any administrative, regulatory or judicial action, suit, demand, demand letter, claim, notice of non-compliance or violation, investigation, proceeding, consent order or consent agreement based upon or arising out of any Environmental Law including without limitation (a) any claim by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions, or fines, penalties or damages pursuant to any Environmental Law, and (b) any claim by any third party seeking damages, contribution, or injunctive relief arising from alleged injury or threat of injury to health, safety or the environment.

"Environmental Laws" means any and all applicable federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions relating to the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, petroleum or petroleum products, chemicals or industrial, toxic or hazardous substances or wastes into the environment, including, without limitation, ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, petroleum or petroleum products, chemicals or industrial, toxic or hazardous substances or wastes or the clean-up or other remediation thereof.

"Environmentally Sensitive Material" means oil, oil products, any other substance which is polluting, toxic or hazardous or any substance the release of which into the environment is regulated, prohibited or penalized by or pursuant to any Environmental Law.

"Event of Loss", means any of the following events: (x) the actual or constructive total loss or the agreed or compromised total loss of a Vessel; or (y) the capture, condemnation, confiscation, requisition (excluding any requisition for hire for a fixed period not in excess of ninety (90) days), purchase, seizure or forfeiture of, or any taking of title to, a Vessel. An Event of Loss shall be deemed to have occurred (i) in the event of an actual loss of a Vessel, at noon Greenwich Mean Time on the date of such loss or if that is not known on the date which such Vessel was last heard from; (ii) in the event of damage which results in a constructive or compromised or arranged total loss of a Vessel, at noon Greenwich Mean Time on the date of the event giving rise to such damage; or (iii) in the case of an event referred to in clause (y) above, at noon Greenwich Mean Time on the date on which such event is expressed to take effect by the Person making the same. Notwithstanding the foregoing, if the relevant Vessel shall have been returned to the relevant Owner following any capture, requisition or seizure referred to in clause (y) above prior to the date upon which payment is required to be made under Section 2.04(c) hereof, no Event of Loss shall be deemed to have occurred by reason of such capture, requisition or seizure.

19101732 v3

"Events of Default" has the meaning specified in Section 11.01 hereof.

"Facility Effective Date" means the date on which all the conditions precedent specified in Sections 7.01 and, to the extent applicable, 7.03 hereof have been satisfied (in the opinion of the Lender) in full and shall in no event be later than October 31, 2008 unless the Lender otherwise agrees in its sole and absolute discretion.

"Fair Market Value" means, in relation to a Vessel, the fair market value of such Vessel determined by means of a valuation made (at the expense of the Borrower) at any relevant time by an Approved Broker. Such valuation shall be made with or without physical inspection of such Vessel (as the Lender may require), on the basis of a sale for prompt delivery for cash at arms' length on normal commercial terms as between a willing seller and a willing buyer, free of any existing charter or other contracts of employment, and shall be conclusive evidence of the fair market value of such Vessel at the date of such valuation.

"GAAP" means accounting principles, concepts, bases and policies generally adopted and accepted in the United States of America consistently applied.

"GCL" has the meaning specified in the recital hereto.

"GCL Facility Letter" means the Facility Letter Agreement dated January 25, 2008 between GCL and the Lender.

"GCL Receivables Facility" means the short term loan facility under the Facility Letter Agreement for financing receivables from the agencies of the United States and the United Nations, pursuant to which a principal amount of $5,200,000 has been advanced by the Lender to GCL and remains outstanding as of the date hereof.

"GLOBAL PROGRESS" has the meaning specified in the Preliminary Statements.

"GLOBAL PROSPERITY" has the meaning specified in the Preliminary Statements.

"Guaranteed Debt" of a Person means all Debt or other obligation guaranteed, contingently or otherwise, directly or indirectly in any manner by such Person, or in effect guaranteed, contingently or otherwise, directly or indirectly by such Person through an agreement (i) to pay or purchase such Debt or a participation in such Debt or to advance or supply funds for the payment or purchase of such Debt or a participation in such Debt, or other obligation (whether arising by virtue of partnership arrangement, by agreement to keep-well or support, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise), (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily to enable the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (iii) to apply funds to, or in any manner invest in, the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iv) otherwise to assure a creditor against loss; provided, however, that insurance, reinsurance, surety and other similar obligations entered into by the Borrower in the ordinary course of its business shall not constitute Guaranteed Debt.

"Guaranteed Obligations" has the meaning specified in Section 8.01 hereof.

"Guarantors" has the meaning specified in the recital hereto.

19101732 v3

"Guaranty" means the joint and several guaranty of the Guarantors provided in Article VIII hereof.

"Indemnified Party" has the meaning specified in Section 9.04(c) hereof.

"Iraqi Shipment Facility" means the facility under the Facility Letter Agreement for financing receivables from the Iraqi government for the shipment of grains, pursuant to which a principal amount of $2,000,000 has been advanced by the Lender to GCL and remains outstanding as of the date hereof.

"ISM Code" means in relation to its application to each Guarantor, any relevant Approved Manager, each Vessel and its operation, the International Safety Management Code (including the guidelines on its implementation) adopted by the International Maritime Organization ("IMO") as Resolution A.741(18) and Resolution A.913(22) (superseding Resolution A.788(19)), as the same may be amended, supplemented or replaced from time to time (and the terms "safety management system", "Safety Management Certificate" and "Document of Compliance" have the meanings specified in the ISM Code).

"ISPS Code" means in relation to its application to each Guarantor, any relevant Approved Manager, each Vessel and its operation, the International Ship and Port Facility Security Code constituted pursuant to resolution A.924(22) of the IMO adopted by a Diplomatic Conference of the IMO on Maritime Security on 13 December 2002 and now set out in Chapter XI-2 of the Safety of Life at Sea Convention (SOLAS) 1974 (as amended).

"Lender" has the meaning ascribed thereto in the recital hereto.

"Letter of Credit" has the meaning provided in Section 4.01(a) hereof.

"Letter of Credit Commitment" has the meaning specified in Section 4.02 hereof.

"Letter of Credit Margin Amount" has the meaning provided in Section 4.03(b) hereof.

"Letter of Credit Request" has the meaning provided in Section 4.03(a) hereof.

"Lien" means any lien, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional vendor.

"Loan Documents" means this Agreement, the Notes and the Collateral Documents.

"Margin Stock" has the meaning specified in Regulation U of the Board of Governors of the Federal Reserve System and any successor regulations thereto, as in effect from time to time.

"Material Adverse Effect" means, with respect to any Person, a material adverse effect upon (a) the condition (financial or otherwise), operations, assets or business of such Person and its Subsidiaries, taken as a whole, (b) the ability of such Person to perform any of its material obligations under any Loan Document to which it is a party, or (c) the material rights and remedies of the Lender under any Loan Document to which such Person is a party.

"**Mortgage**" means each of the first priority statutory mortgages made or to be made by an Owner in favor of the Lender in respect of a Vessel and in substantially the form of Exhibit F hereto.

"**Net Worth**" means, as of any relevant date, the Borrower's total paid up capital plus retained earnings less treasury stock and accumulated losses, as stated in the most recent financial statement of the Borrower.

"**Notes**" means, collectively, the Term Loan Note and the Revolving Note.

"**Obligors**" means, collectively, the Borrower and the Guarantors.

"**Other Taxes**" has the meaning specified in Section 5.05(b) hereof.

"**Owners**" means collectively, Progress and Prosperity.

"**Payment Date**" means (i) the day which is four months after the Facility Effective Date, and (ii) the same day of each month thereafter; provided, however the fifty-seventh (57th) and final Payment Date shall be the fifth anniversary of the Facility Effective Date.

"**Permitted Encumbrances**" has the meaning specified in the Deeds of Covenant.

"**Person**" means an individual, partnership, corporation (including a business trust), joint stock company, limited liability company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"**Pledge Agreement**" means the pledge, and security agreement to be made by the Borrower in favor of the Lender in respect of the limited liability company interests of each of the Owners, in substantially the form of Exhibit L hereto.

"**Prime Rate**" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the "Prime Rate", as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by The Wall Street Journal, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Lender from three major New York banks of recognized standing selected by it.

"**Progress**" has the meaning specified in the recital hereto.

"**Progress Bareboat Charter**" means the Bareboat Charter dated as of October 7, 2008 between Progress as Owners and the Borrower as Charterers.

"**Progress BBC/HP**" has the meaning specified in the Preliminary Statements.

"**Progress Time Charter**" means the Time Charter dated October 22, 2008 between the Borrower as Owners and GCL as Charterers respecting GLOBAL PROGRESS.

"**Prosperity**" has the meaning specified in the recital hereto.

"**Prosperity Bareboat Charter**" means the Bareboat Charter dated as of October 7, 2008 between Prosperity as Owners and the Borrower as Charterers.

"Prosperity BBC/HP" has the meaning specified in the Preliminary Statements.

"Prosperity Time Charter" means the Time Charter dated October 22, 2008 between the Borrower as Owners and GCL as Charterers respecting GLOBAL PROSPERITY.

"Required Percentage" means, at any relevant time, with respect to any sale of a Vessel or an Event of Loss, (i) if one Vessel remains subject to a Mortgage, fifty percent (50%), and (ii) if neither Vessel remains subject to a Mortgage, one hundred percent (100%).

"Revolving Advance" has the meaning specified in Section 3.01 hereof.

"Revolving Credit Commitment" means, at any time, the maximum sum available to be advanced at such time by the Lender to the Borrower pursuant to Section 3.01 of this Agreement, as such amount may be increased time to time pursuant to Section 3.04 hereof or reduced from time to time pursuant to Sections 3.04 or 11.01 hereof.

"Revolving Credit and Letter of Credit Commitment Termination Date" means September 30, 2009 or, upon request of the Borrower and with the approval in writing of the Lender (which approval shall be subject to the Lender's customary credit review and may be withheld in the Lender's sole discretion), any anniversary thereof.

"Revolving Note" means the promissory note of the Borrower payable to the order of the Lender, in substantially the form of Exhibit B hereto, evidencing the aggregate indebtedness of the Borrower to the Lender in respect of the Revolving Advances made or to be made by the Lender.

"Revolving Notice of Drawdown" has the meaning specified in Section 3.02(a) hereof.

"Security Agreement" means the security agreement made or to be made by the Borrower in favor of the Lender in respect of United Nations Receivables and in substantially the form of Exhibit M hereto.

"Sellers" means, collectively, DC III and DC IV.

"Shiptrade" has the meaning specified in the recital hereto.

"Solvent" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Sponsors" means, collectively, Messrs. Kazem Paksima, Ali Paksima, Hormoz Shayegan, Bijan Paksima, Ali David Paksima and Hossein Alizadeh.

19101732 v3

"Sponsors' Undertaking" means an undertaking made or to be made by the Sponsors in favor of the Lender in respect of the ownership of the Borrower and in substantially the form of Exhibit O hereto.

"Stated Amount" of each Letter of Credit means, at any time, the maximum amount available to be drawn thereunder (in each case determined without regard to whether any conditions to drawing could then be met).

"Subsidiary" of any Person means any corporation, limited liability company, partnership, joint venture, trust or estate or other entity of which (or in which) more than 50% of (a) the voting stock or membership interests of such corporation or company, (b) the interest in the capital or profits of such partnership or joint venture or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"Taxes" has the meaning specified in Section 5.05(a) hereof.

"Term Loan" has the meaning specified in Section 2.01(a) hereof.

"Term Loan Commitment" has the meaning specified in Section 2.01(a) hereof.

"Term Loan Commitment Termination Date" means the date forty-five (45) days following the Facility Effective Date or such earlier day as the Lender's obligation to disburse the Term Loan shall have been cancelled pursuant to the provisions of this Agreement.

"Term Loan Note" means the promissory note of the Borrower payable to the order of the Lender, in substantially the form of Exhibit A hereto, evidencing the aggregate indebtedness of the Borrower to the Lender in respect of the Term Loan made or to be made by the Lender.

"Term Loan Notice of Drawdown" has the meaning specified in Section 2.02(a) hereof.

"Time Charters" means, collectively, the Progress Time Charter and the Prosperity Time Charter.

"Tranche" has the meaning specified in Section 2.01(a) hereof.

"United Nations Receivable" means an account receivable of the Borrower in respect of services rendered to the United Nations, as evidenced by an invoice of the Borrower.

"Unpaid Drawing" has the meaning provided in Section 4.04(a) hereof.

"Vessels" means, collectively, GLOBAL PROGRESS and GLOBAL PROSPERITY.

SECTION 1.02. Interpretation. When used in this Agreement, (i) the words "herein", "hereof" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any provision of this Agreement, and the words "Article", "Section" and "Exhibit" shall refer to Articles and Sections of, and Exhibits to, this Agreement unless otherwise specified, (ii) a "Loan Document" or any other agreement or instrument is shall refer to such Loan Document or other agreement or instrument as amended, restated or novated at any relevant time, and (iii) whenever the context so

requires, the neuter gender includes the masculine or feminine, the masculine gender includes the feminine, and the singular number includes the plural, and vice versa.

SECTION 1.03. Computation of Time Periods. In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".

SECTION 1.04. Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with GAAP.

ARTICLE II

AMOUNT AND TERMS OF THE TERM LOAN FACILITY

SECTION 2.01. The Term Loan Commitment. The Lender agrees, on the terms and conditions hereinafter set forth, to make available to the Borrower on any Business Day during the period from the Facility Effective Date until the Term Loan Commitment Termination Date a loan (the "Term Loan") in up to two (2) tranches (each a "Tranche") in the aggregate principal amount of $12,000,000 (the "Term Loan Commitment") as follows:

(a) The first Tranche shall be in an amount up to the aggregate amount of (i) the purchase price payable to DC III for GLOBAL PROSPERITY pursuant to the purchase option under the Prosperity Charter, and (ii) the purchase price payable to DC IV for GLOBAL PROGRESS pursuant to the purchase option under the Progress Charter, and shall be applied by the Borrower to pay such amounts to DC II and DC IV; and

(b) The second Tranche shall be in an amount up to the balance of the Term Loan Commitment remaining after disbursement of the first Tranche described in the preceding clause (a), and shall be applied by the Borrower for working capital purposes.

(c) The Term Loan Commitment (and each of the Revolving Credit Commitment and the Letter of Credit Commitment) shall terminate in its entirety on October 31, 2008 unless the Facility Effective Date shall have occurred on or prior to such date.

(d) In addition, the Term Loan Commitment shall terminate in its entirety on the Term Loan Commitment Termination Date.

Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.

SECTION 2.02. Drawdown. (a) Each Tranche shall be made available on notice given not later than 11:00 A.M. (New York City time) by the Borrower to the Lender on the first Business Day prior to the proposed Drawdown Date in respect of the first Tranche and the third Business Day prior to the proposed Drawdown Date in respect of the second Tranche. Each such notice (each a "Term Loan Notice of Drawdown") shall be in writing, in substantially the form of Exhibit C hereto, specifying therein (i) the requested Drawdown Date which shall be a Business Day, (ii) the principal amount of the Tranche thereof requested on such Drawdown Date and (iii) identify the recipients (including payment instructions) of the proceeds of such Tranche. Upon fulfillment of the applicable conditions set forth in Article VI, the Lender will make such funds available to, or for the account of the Borrower according to the payment instructions set forth in the Term Loan Notice of Drawdown.

(b)     Each Term Loan Notice of Drawdown shall be irrevocable and binding on the Borrower. The Borrower shall indemnify the Lender against any loss, cost or expense incurred by the Lender as a result of any failure to fulfill on or before the Drawdown Date specified in such Term Loan Notice of Drawdown the applicable conditions set forth in Article VI, including, without limitation, any loss, cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender to fund the Tranche when the Tranche, as a result of such failure, is not disbursed on such date.

SECTION 2.03. Repayment. The Borrower shall repay to the Lender the outstanding principal amount of the Term Loan, together with interest thereon in accordance with Section 2.05 hereof, in fifty-seven (57) equal consecutive monthly installments on the Payment Dates.

SECTION 2.04. Prepayment. (a)  The Borrower may, upon notice given not later than at least thirty (30) days' notice to the Lender (which notice shall be irrevocable), prepay on any Payment Date the outstanding principal amount of the Term Loan in whole or in part; provided, however, (i) that each partial prepayment shall be in an aggregate principal amount not less than $500,000 or an integral multiple of $500,000 in excess thereof (or, if the aggregate outstanding principal amount of the Term Loan is less, such aggregate principal amount), and (ii) any partial prepayment of the Term Loan shall be applied to the remaining installments thereof in the inverse order of their maturities.

(b)     If a Vessel is sold by its Owner, then the Borrower shall be required to prepay concurrently with the closing of such sale the Required Percentage of the Term Loan.

(c)     If an Event of Loss occurs in relation to a Vessel, then the Borrower shall be required to prepay the Required Percentage of the outstanding principal amount of the Term Loan on the earlier of (i) the Payment Date following the date of the Lender's receipt of insurance proceeds or other compensation attributable thereto, or (ii) one hundred eighty (180) days after the date on which such Event of Loss shall be deemed to have occurred.

(d)     Any prepayment of the Term Loan permitted or required hereunder shall be accompanied by (i) accrued interest to the date of such prepayment on the principal amount so prepaid plus, (ii) if such prepayment is made on or before the second anniversary of the Facility Effective Date, a premium of one quarter of one percent (.25%) of the amount so prepaid, (iii) if such prepayment is not made on a Payment Date, compensation to the Lender in accordance with the provisions of Section 12.04(b) hereof, and (iv) all other amounts which have become due and payable under the Loan Documents but which have not been paid prior to the date of such prepayment.

SECTION 2.05. Interest.  (a) Ordinary Interest.  The Borrower shall pay interest on the unpaid principal amount of each Tranche of the Term Loan from the relevant Drawdown Date until such principal amount shall be paid in full, at a rate per annum equal to the sum of (i) one and three quarters percent (1.75%) plus (ii) the Prime Rate in effect from time to time, and such interest shall be payable monthly in arrears commencing one month after the Facility Effective Date.

(b)     Default Interest. The Borrower shall pay on demand interest on the unpaid principal amount of the Term Loan that is not paid when due and on the unpaid amount of all interest, fees and other amounts then due and payable hereunder that is not paid when due for the period from the due

date thereof to the date paid, at a rate per annum equal to 2% per annum above the rate of interest per annum specified in Section 2.05(a).

(c)    Interest Upon Default. Upon the occurrence and during the continuance of any Event of Default (or, in the case of any involuntary proceeding described in Section 11.01(f), a Default), the Borrower shall pay interest on the aggregate unpaid principal amount of the Term Loan from the date of the occurrence of such Event of Default or Default, as the case may be, until such Event of Default or Default, as the case may be, shall have been cured or waived, at a rate per annum equal to two percent (2%) per annum above the rate per annum required to be paid on the Term Loan pursuant to clause (a) above.

ARTICLE III

AMOUNT AND TERMS OF THE REVOLVING CREDIT FACILITY

SECTION 3.01. The Revolving Credit Commitment. The Lender agrees, on the terms and conditions hereinafter set forth, to make available advances (each an "Revolving Advance") to the Borrower from time to time on any Business Day during the period from the Facility Effective Date until the Revolving Credit and Letter of Credit Commitment Termination Date in an aggregate amount not to exceed at any time the aggregate principal amount of $5,000,000 (as adjusted from time to time in accordance with Section 3.04 hereof) for the purpose of financing United Nations Receivables; provided, however:

(a)    The amount of each Revolving Advance shall not exceed eighty-five percent (85%) of the amount of the United Nations Receivable to which it relates; and

(b)    In addition to the conditions precedent set forth in Article VI hereof, the obligation of the Lender to make any Revolving Advance is subject to the condition precedent that GCL shall have paid from its own resources the amount outstanding under the GCL Receivables Facility on or prior to the relevant Drawdown Date in an amount equal to the lesser of (i) the amount of such Revolving Advance, and (ii) the amount outstanding under the GCL Receivables Facility.

Within the limits of the Revolving Credit Commitment, the Borrower may borrow under this Section 3.01, repay pursuant to Section 3.03 and reborrow under this Section 3.01.

SECTION 3.02. Drawdown. (a) Each Revolving Advance shall be made on notice given not later than 11:00 A.M. (New York City time) on the third Business Day prior to the proposed Drawdown Date by the Borrower to the Lender. Each such notice of drawdown (a "Revolving Notice of Drawdown") shall be in writing, in substantially the form of Exhibit D hereto, specifying therein (i) the requested Drawdown Date which shall be a Business Day, (ii) the principal amount of the Revolving Advance thereof requested on such Drawdown Date and the United Nations Receivable to which it relates, and (iii) the recipients (including payment instructions) of the proceeds of such Revolving Advance. Upon fulfillment of the applicable conditions set forth in Article VII, the Lender will make such funds available to, or for the account of, the Borrower according to the payment instructions set forth in the Revolving Notice of Drawdown.

(b)    Each Revolving Notice of Drawdown shall be irrevocable and binding on the Borrower. The Borrower shall indemnify the Lender against any loss, cost or expense incurred by the Lender as a result of any failure to fulfill on or before the Drawdown Date specified in any Revolving

Notice of Drawdown the applicable conditions set forth in Article VI, including, without limitation, any loss, cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender to fund the Revolving Advance to be made by the Lender on such Drawdown Date when such Revolving Advance, as a result of such failure, is not made on such date.

SECTION 3.03. Repayment. (a) Except as expressly provided in clause (c) below, on any day on which the aggregate principal amount of the Revolving Advances exceeds the aggregate amount of the Revolving Credit Commitment, the Borrower shall repay the principal amount of Revolving Advances in an amount equal to such excess.

(b)    The Borrower shall repay each Revolving Advance in full no later than one hundred eighty (180) days after the Drawdown Date of such Revolving Advance; provided, however, no later than one Business Day after the Borrower receives payment of any United Nations Receivable which is the subject of a Revolving Advance, the Borrower shall repay the principal amount of such Revolving Advance in an amount not less than the amount of such payment.

(c)    If a Vessel is sold by its Owner, then the Borrower shall be required to prepay concurrently with the closing of such sale the Required Percentage of the Revolving Advances outstanding immediately prior to such sale.

(d)    If an Event of Loss occurs in relation to a Vessel, then the Borrower shall be required to prepay the Required Percentage of the Revolving Advances outstanding immediately prior to such Event of Loss on the earlier of (i) the Payment Date following the date of the Lender's receipt of insurance proceeds or other compensation attributable thereto, or (ii) one hundred eighty (180) days after the date on which such Event of Loss shall be deemed to have occurred.

(e)    The Borrower may, upon not less than one (1) Business Days' notice to the Lender identifying the Revolving Advance to be prepaid in whole or in part and stating the proposed date and aggregate principal amount of such prepayment (which notice shall be irrevocable), and if such notice is given the Borrower shall, prepay the outstanding principal amount of such Revolving Advance in whole or in part.

(f)    Anything contained in this Agreement to the contrary notwithstanding, all then outstanding Revolving Advances shall be repaid on the Revolving Credit and Letter of Credit Commitment Termination Date.

(g)    With respect to each repayment of Revolving Advances required by this Section 3.03, the Borrower may designate the specific Revolving Advance or Revolving Advances pursuant to which a repayment is made, provided that in the absence of a designation by the Borrower as described in the preceding sentence, the Lender shall make such designation in its sole reasonable discretion.

(h)    Each such repayment of any Revolving Advance or relevant part thereof shall be accompanied by accrued interest to the date of such prepayment on the principal amount so repaid.

SECTION 3.04. Adjustment of Revolving Credit Commitment. (a) Upon repayment of an aggregate amount of $500,000 of the Term Loan, and so long as no Event of Default shall have occurred and be continuing, the Revolving Credit Commitment shall be increased by an equal amount of $500,000; provided, however, (i) the Revolving Credit Commitment shall be increased by

operation of this Section 3.04(a) up to a maximum aggregate amount of $2,000,000, and (ii) the aggregate amount of the Revolving Credit Commitment shall not exceed $7,000,000 at any time.

(b)     If a Vessel is sold by its Owner, then the Revolving Credit Commitment outstanding immediately prior to such sale shall be reduced by the Required Percentage upon the closing of such sale.

(c)     If an Event of Loss occurs in relation to a Vessel, then the Revolving Credit Commitment outstanding immediately prior to such Event of Loss of shall be reduced by the Required Percentage upon determination that such Event of Loss has occurred.

(d)     The Revolving Credit Commitment shall be reduced to nil on the Revolving Credit and Letter of Credit Commitment Termination Date.

SECTION 3.05. Interest. (a) Ordinary Interest. Subject to subsection (c) of this Section 3.05, the Borrower shall pay interest on the aggregate unpaid principal amount of each Revolving Advance from the relevant Drawdown Date until such principal amount shall be paid in full, at a rate per annum equal at all times to the sum of (i) one and one-half percent (1.5%) plus (ii) the Prime Rate in effect from time to time, and such interest shall be calculated daily and shall be payable in arrears on the date such Revolving Advance is repaid.

(b)     Default Interest. The Borrower shall pay on demand interest on the unpaid principal amount of each Revolving Advance and on the unpaid amount of all interest, fees and other amounts then due and payable hereunder that is not paid when due from the due date thereof to the date paid, at a rate per annum equal at such time to two percent (2%) per annum above the rate per annum required to be paid on such Revolving Advance pursuant to clause (a) above.

(c)     Interest Upon Default. Upon the occurrence and during the continuance of any Event of Default (or, in the case of any involuntary proceeding described in Section 11.01(f), a Default), the Borrower shall pay interest on the aggregate unpaid principal amount of each Revolving Advance from the date of the occurrence of such Event of Default or Default, as the case may be, until such Event of Default or Default, as the case may be, shall have been cured or waived, at a rate per annum equal to two percent (2%) per annum above the rate per annum required to be paid on such Revolving Advance pursuant to clause (a) above.

ARTICLE IV

AMOUNT AND TERMS OF THE LETTER OF CREDIT FACILITY

SECTION 4.01. The Letter of Credit Facility. (a) Subject to and upon the terms and conditions set forth herein, the Borrower may request that the Lender issue on a date occurring on or after the Facility Effective Date and prior to the Revolving Credit and Letter of Credit Commitment Termination Date, for the account of the Borrower and for the benefit of any Person not an Affiliate of any Obligor or any Sponsor, an irrevocable standby or import letter of credit for the import of any goods in the ordinary course of the Borrower's business, in a form customarily used by the Lender or in such other form as is reasonably acceptable to the Lender (each such letter of credit, a "Letter of Credit" and, collectively, the "Letters of Credit"). All Letters of Credit shall be denominated in Dollars and shall be issued on a sight or usance basis.

19101732 v3

(b)     Subject to and upon the terms and conditions set forth herein, the Lender agrees that it will, following its receipt of the respective Letter of Credit Request, issue for account of the Borrower, one or more Letters of Credit as are permitted to remain outstanding hereunder without giving rise to a Default or an Event of Default, provided that the Lender shall not be under any obligation to issue any Letter of Credit of the types described above if at the time of such issuance any order, judgment or decree of any governmental authority or arbitrator shall purport by its terms to enjoin or restrain the Lender from issuing such Letter of Credit or any requirement of law applicable to the Lender or any request or directive (whether or not having the force of law) from any governmental authority with jurisdiction over the Lender shall prohibit, or request that the Lender refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the Lender with respect to such Letter of Credit any restriction or reserve or capital requirement (for which the Lender is not otherwise compensated hereunder) not in effect with respect to the Lender on the date hereof, or any unreimbursed loss, cost or expense which was not applicable or in effect with respect to the Lender as of the date hereof and which the Lender reasonably and in good faith deems material to it.

(c)     The Letter of Credit Commitment shall terminate in its entirety on the Revolving Credit and Letter of Credit Commitment Termination Date.

SECTION 4.02. <u>Maximum Letter of Credit Outstandings; Expiration</u>.  Notwithstanding anything to the contrary contained in this Agreement, (i) no Letter of Credit shall be issued for a Stated Amount of which, together with the Stated Amounts of all outstanding Letters of Credit, would exceed $500,000 (the "<u>Letter of Credit Commitment</u>"), (ii) each Letter of Credit shall by its terms terminate on or before the earlier of (A) the date which occurs 12 months after the date of the issuance thereof, and (B) five Business Days prior to the Revolving Credit and Letter of Credit Commitment Termination Date unless such Letter of Credit expires by its terms on an earlier date.

SECTION 4.03. <u>Letter of Credit Requests; Margin Amount</u>. (a)  The Borrower shall give the Lender at least three (3) Business Days' written notice of a request for issuance of a Letter of Credit. Each notice shall be in the form of Exhibit E, appropriately completed (each, a "<u>Letter of Credit Request</u>").

(b)     The Lender shall not be under any obligation to issue a requested Letter of Credit unless the Borrower shall have deposited into the Debt Service Reserve Account immediately available funds an amount equal to twenty-five percent (25%) of the Stated Amount of such Letter of Credit (the "<u>Letter of Credit Margin Amount</u>").

SECTION 4.04. <u>Agreement to Repay Letter of Credit Drawings</u>. (a)  The Borrower agrees to reimburse the Lender for any payment or disbursement made by the Lender under any Letter of Credit issued by it (each such amount, so paid until reimbursed by the Borrower, an "<u>Unpaid Drawing</u>"), not later than one Business Day following receipt by the Borrower of notice of such payment or disbursement (except that no such notice shall be required to be given if an Event of Default under Section 11.01(f) shall have occurred and be continuing, in which case the Unpaid Drawing shall be due and payable immediately without presentment, demand, protest or notice of any kind (all of which are hereby waived by the Borrower)), with interest on the amount so paid or disbursed by the Issuing Lender, to the extent not reimbursed prior to 11:00 A.M. (New York time) on the date of such payment or disbursement, from and including the date paid or disbursed to but excluding the date the Lender was reimbursed by the Borrower therefor at a rate per annum equal to the interest rate as in effect from time to time under Section 3.05 hereof. The Lender shall give the

Borrower prompt written notice of each Drawing under any Letter of Credit issued by it, provided that the failure to give any such notice shall in no way affect, impair or diminish the Borrower's obligations hereunder.

(b) The obligations of the Borrower under this Section 4.04 to reimburse the Lender with respect to drafts, demands and other presentations for payment under Letters of Credit issued by it (each, a "Drawing") (including, in each case, interest thereon) shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment which the Borrower may have or have had against the Lender, including, without limitation, any defense based upon the failure of any drawing under a Letter of Credit to conform to the terms of the Letter of Credit or any nonapplication or misapplication by the beneficiary of the proceeds of such Drawing; provided, however, that the Borrower shall not be obligated to reimburse the Lender for any wrongful payment made by the Lender under a Letter of Credit issued by it as a result of acts or omissions constituting willful misconduct or gross negligence on the part of the Lender (as determined by a court of competent jurisdiction in a final and non-appealable decision).

ARTICLE V

FEES AND COMMISSIONS, INCREASED COSTS, ILLEGALITY, PAYMENTS AND COMPUTATIONS, TAXES

SECTION 5.01. Fees and Commissions. (a) The Borrower agrees to pay to the Lender a non-refundable processing fee of $85,000 in respect of the Term Loan Commitment, of which $42,500 has been paid and $42,500 shall be payable on the date hereof.

(b) The Borrower agrees to pay the Lender a non-refundable processing fee of $15,000 in respect of the Revolving Credit Commitment, which shall be payable on the date hereof.

(c) The Borrower agrees to pay to the Lender a commission in respect of each Letter of Credit for the period from and including the date of issuance of such Letter of Credit to but excluding the date of termination or expiration of such Letter of Credit, computed at a rate equal to one-quarter of one percent (0.25%) each calendar quarter (or part thereof) on the daily Stated Amount of each such Letter of Credit; provided, however, the quarterly fee for each Letter of Credit shall not be less than $250. Accrued commissions for any Letter of Credit shall be due and payable quarterly in arrears from the date of issuance of such Letter of Credit and on the first day on or after the expiration or termination of such Letter of Credit.

SECTION 5.02. Increased Costs. (a) If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation or (ii) the compliance by the Lender with any guideline or request from any central bank or other governmental authority in any case introduced, changed, interpreted or requested after the date hereof (whether or not having the force of law), there shall be (x) imposed, modified or deemed applicable any reserve, special deposit or similar requirement against assets held by, or deposits in or for the account of, the Lender or (y) imposed on the Lender any other condition relating to this Agreement, the Term Loan, the Revolving Advances or letters of credit issued by the Lender, and the result of any event referred to in clause (x) or (y) shall be to increase the cost to the Lender of agreeing to make or making, funding or maintaining the Term Loan, Revolving Advances or Letters of Credit, then the Borrower shall from time to time, upon demand by the Lender, pay to the Lender additional amounts sufficient to compensate the Lender for such increased cost; provided, however, that, before making any such demand, the Lender agrees to use its best efforts

(consistent with its internal policy and legal and regulatory restrictions) to designate a different lending office for monitoring the Term Loan, Revolving Advances or Letters of Credit if the making of such a designation would avoid the need for, or reduce the amount of, such increased cost and would not, in the reasonable judgment of the Lender, be otherwise disadvantageous to the Lender. A certificate as to the amount of such increased cost, submitted to the Borrower by the Lender, shall be conclusive and binding for all purposes, absent manifest error.

(b)     If the Lender determines that compliance with any law or regulation or any guideline or request from any central bank or other governmental or monetary authority in regard to capital adequacy (whether or not having the force of law), in any case in which such law, regulation, guideline or request became effective or was made after the date hereof, has or would have the effect of reducing the rate of return on the capital of, or maintained by, the Lender or any corporation controlling the Lender as a consequence of the Lender's Commitments or the Term Loan, Revolving Advances or Letters of Credit hereunder and other commitments of these types, by increasing the amount of capital required or expected to be maintained by the Lender, to a level below that which the Lender could have achieved but for such adoption, effectiveness, change or compliance (taking into account the Lender's policies with respect to capital adequacy) then the Borrower shall, from time to time, pay the Lender, upon demand by the Lender, such additional amount as may be specified by the Lender as being sufficient to compensate the Lender for such reduction in return, to the extent that the Lender reasonably determines such reduction to be attributable to the existence of the Lender's commitment to provide the Term Loan, Revolving Advances and Letters of Credit hereunder; provided however, that before making such demand, the Lender agrees to use its best efforts (consistent with its internal policy and legal and regulatory restrictions) to enter into consultations with the Borrower in good faith and without prejudice to the rights of the Lender under this Agreement and the other Loan Documents with regard to the impact of such law, regulation, guideline or request and the amount of compensation required by the Lender as aforesaid. A certificate as to such amounts submitted to the Borrower by the Lender shall be conclusive and binding for all purposes, absent manifest error.

SECTION 5.03. Illegality. Notwithstanding any other provision of this Agreement, if the introduction of or any change in or in the interpretation of any law or regulation makes it unlawful, or any central bank or other governmental authority asserts that it is unlawful, for the Lender to perform its obligations hereunder to make the Term Loan or Revolving Advances or to fund or maintain the Term Loan or Revolving Advances or any portion thereof hereunder, then, upon written notice by the Lender to the Borrower, the Lender and the Borrower shall negotiate in good faith to agree on terms for the Lender to continue the Term Loan or Revolving Advances or any portion thereof on a basis which is not unlawful. If no agreement shall be reached between the Borrower and the Lender within a period which in the sole discretion of the Lender is reasonable, the Lender shall be entitled to give notice to the Borrower that the obligation of the Lender to make or maintain the Term Loan and/or Revolving Advances or any portion thereof, as the case may be, shall be forthwith terminated and the amount of the Lender's Term Loan Commitment and/or Revolving Credit Commitment shall be reduced accordingly, and thereupon the aggregate outstanding principal amount of the Term Loan and/or Revolving Advances or any relevant portion thereof, as the case may be, shall become due and payable in full, together with accrued interest thereon and other sums payable hereunder, and such amounts as the Borrower shall be obligated to reimburse the Lender pursuant to Section 12.04(b) if earlier prepayment is required by any law, regulation and/or regulatory requirement; provided, however, that, before making any such demand, the Lender shall designate a different lending office for monitoring the Term Loan and/or Revolving Advances if the making of such a designation would avoid the need for giving such notice and demand and would not, in the judgment of the Lender, be otherwise disadvantageous to the Lender.

SECTION 5.04. <u>Payments and Computations</u>. (a) The Borrower shall make each payment hereunder and under the Notes not later than 11:00 A.M. (New York time) on the day when due in Dollars to the Lender at its office at 100 Wall Street, New York, New York 10005 (or at such other place as the Lender shall designate) in same day funds. Partial payments of overdue amounts in respect of fees, expenses, interest and/or principal shall (unless specifically provided for elsewhere herein or in any other Loan Document) be applied to the payment of such overdue fees, expenses, interest and/or principal, as the case may be, in such order as the Lender may determine.

(b) The Borrower hereby authorizes the Lender, if and to the extent payment of principal, interest or fees owed to the Lender is not made when due hereunder or under the Notes held by the Lender, to charge from time to time against any or all of the Borrower's accounts with the Lender any amount so due.

(c) All computations of interest or fees shall be made by the Lender on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable. Each determination by the Lender of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error. The Lender shall give prompt notice to the Borrower of the applicable interest rate determined by the Lender for purposes of Sections 2.05 and 3.05.

(d) Whenever any payment hereunder or under the Notes shall be stated to be due on a day other than a Business Day, the due date shall be extended to the next succeeding Business Day, and interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension; <u>provided</u>, <u>however</u>, if such extension would cause payment of interest on or principal of the Term Loan to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

SECTION 5.05. <u>Taxes</u>. (a) All payments by the Borrower of principal of, and interest on, the Term Loan, the Revolving Advances, the Notes and all other amounts payable by the Borrower hereunder shall be made free and clear of, and without deduction or withholding for or on account of any present or future income or franchise taxes and other taxes, fees, levies, duties, withholdings or other charges of any nature whatsoever now or hereafter imposed, withheld, collected or assessed by any taxing authority, but excluding (such non-excluded items being called "<u>Taxes</u>"), in the case of the Lender, (i) net income, capital, doing business, and franchise taxes imposed on the Lender by the jurisdiction under the laws of which the Lender is organized or any political subdivision or taxing authority thereof or therein, or by any jurisdiction in which the Lender's lending office with respect to this Agreement is located, as the case may be, or any political subdivision or taxing authority thereof or therein; and (ii) any taxes, fees, levies, duties, withholdings or other charges that would not have been imposed but for the failure of the Lender to comply with any certification, identification or other similar requirement with which the Lender is in its reasonable judgment eligible to comply, to establish entitlement to exemption from such tax. If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Notes to the Lender, (i) the sum payable shall be increased as may be necessary so that after making all required deductions of Taxes (including deductions of Taxes applicable to additional sums payable under this Section 5.05) the Lender receives an amount equal to the sum it would have received had no such deductions of Taxes been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law; <u>provided</u>, <u>however</u>, that the Lender shall designate a different lending office for monitoring the Term

Loan and/or the Revolving Advances if, in the judgment of the Lender, such designation would avoid the need for, or reduce the amount of, any Taxes required to be deducted from or in respect of any sum payable hereunder to the Lender and would not, in the judgment of the Lender, be otherwise disadvantageous to the Lender.

(b)    In addition, the Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or under the Notes or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or the Notes (hereinafter referred to as "Other Taxes").

(c)    The Borrower will indemnify the Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 5.05) paid by the Lender and any liability (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto.  This indemnification shall be made within 45 days from the date the Lender makes written demand therefor.

(d)    Within 30 days (or as soon thereafter as available) after the date of any payment of Taxes under this Section 5.05, the Borrower will furnish to the Lender, at its address referred to in Section 12.02, appropriate evidence of payment thereof.

(e)    Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 5.05 shall survive the payment in full of principal and interest hereunder and under the Notes.

ARTICLE VI

CONDITIONS PRECEDENT

SECTION 6.01. Conditions Precedent to Credit Events.  The obligations of the Lender to disburse any Tranche of the Term Loan, to make any Revolving Revolving Advance or to issue any Letter of Credit are subject to the conditions precedent that the Lender shall have received, in form and substance satisfactory to the Lender (or waived in writing by the Lender) on or prior to October 31, 2008:

(a)    certified copies of the resolutions of the board of directors or other appropriate governing body of each Obligor approving each Loan Document and each other document contemplated thereby to which it is or is to be a party, and of all documents evidencing other necessary corporate or company action and governmental approvals of such Obligor, if any, with respect to such Loan Documents and other documents to which it is or is to be a party;

(b)    a certificate of the Secretary or other officer of each Obligor certifying the names and true signatures of the respective officers and attorneys-in-fact of each Obligor authorized to sign each Loan Document and each other document contemplated thereby to which it is or is to be a party;

(c)    a copy of the articles of incorporation and by-laws, or certificate of formation and limited liability company agreement, as the case may be, of each Obligor and each amendment thereto, certified by the Secretary or other officer of such Obligor as being a true and correct copy thereof;

(d)     certificate of the appropriate authority in the jurisdiction of incorporation or formation of each Obligor confirming its valid existence in good standing;

(e)     evidence that the Borrower has duly opened the Debt Service Reserve Account and has delivered to the Lender all resolutions, signature cards and other documents or evidence required in connection with the opening, maintenance and operation of the Debt Service Reserve Account;

(f)     the Term Loan Note, duly executed by the Borrower to the order of the Lender;

(g)     The Revolving Note, duly executed by the Borrower to the order of the Lender;

(h)     a copy, certified by the Borrower as true and correct, of each of the BBC/HPs, duly executed by the respective parties thereto, together with evidence that (i) each of the Vessels has been unconditionally delivered by the relevant Seller to the relevant Owner in accordance with all the terms of the relevant BBC/HP, warranted free and clear of all Liens, (ii) each of the Sellers shall have been paid in full under the terms of the relevant BBC/HP; and (iii) each of the Vessels has been duly registered in the ownership of the relevant Owner under the laws and flag of the Bahamas;

(i)     a copy, certified by the Borrower as true and correct, of each of the Bareboat Charters and the Time Charters, duly executed by the respective parties thereto, together with evidence that (i) each of the Vessels has been delivered by the relevant Owner to the Borrower in accordance with all the terms of the relevant Bareboat Charter, and (ii) each of the Vessels has been delivered by the Borrower to GCL in accordance with all the terms of the relevant Time Charter;

(j)     one or more valuation(s), addressed to the Lender (at the expense of the Borrower) by an Approved Broker, indicating the Fair Market Value of each of the Vessels;

(k)     a Mortgage on each of the Vessels, duly executed by the relevant Owner;

(l)     a Deed of Covenant relating to each of the Vessels, duly executed by the relevant Owner;

(m)     an Assignment of Bareboat Charter respecting each of the Vessels, duly executed by the relevant Owner, together with the Consent and Agreement thereto duly executed by the Borrower;

(n)     an Assignment of Earnings respecting each of the Vessels, duly executed by the relevant Owner;

(o)     an Assignment of Insurances respecting each of the Vessels, duly executed by the relevant Owner and the Borrower, together with a signed and acknowledged Notice of Assignment, substantially in the form attached thereto, being furnished by or on behalf of the relevant Owner and the Borrower to the insurers, as required by the Assignment of Insurances;

(p)     evidence of insurance in respect of each of Vessels naming the Lender as loss payee and, if required by the Lender, as co-assured with such responsible and reputable insurance companies or associations, and in such amounts and covering such risks, as is required pursuant to the relevant Mortgage;

19101732 v3

(q) [intentionally omitted];

(r) an Approved Manager's Undertaking respecting each of the Vessels, duly executed by the Approved Manager thereof;

(s) an Assignment of Time Charter respecting each of the Vessels, duly executed by the Borrower, together with the Consent and Agreement thereto duly executed by GCL;

(t) the Security Agreement, duly executed by the Borrower;

(u) a Pledge Agreement respecting the limited liability company interests of each of the Owners, duly executed by the Borrower;

(v) the Sponsors' Undertaking, duly executed by each of the Sponsors;

(w) a transcript of register issued by the Bahamian Maritime Authority (or other relevant authority) stating that each of the Vessels is owned by the relevant Owner and that there are on record no Liens on such Vessel except the relevant Mortgage;

(x) evidence of the completion of all other recordings and filings of, or with respect to, the Collateral Documents that the Lender may deem necessary or desirable in order to perfect and protect the Liens created thereby, including under the Uniform Commercial Code of New York (or such other jurisdiction where the relevant Obligor and/or any Collateral may be located);

(y) a copy of a certificate duly issued by the Classification Society in respect of each of the Vessels, dated within fifteen (15) days of the delivery to the Lender, to the effect that such Vessel has received the highest classification and rating for vessels of the same age and type, free of all recommendations and notations of the Classification Society affecting class;

(z) evidence that each of the Vessels will, as from the date of delivery by the relevant Seller to the relevant Owner, be managed by an Approved Manager on terms acceptable to the Lender, together with copies of the Document of Compliance and Safety Management Certificate issued pursuant to the ISM Code in respect of each of the Vessels;

(aa) such other certificates relating to the relevant Vessel, or the operation thereof, as may be reasonably requested by the Lender;

(bb) a favorable opinion of Skoufalos LLC, counsel for the Obligors, as to such matters as the Lender may reasonably request;

(cc) a favorable opinion of Messrs. Higgs & Johnson, Bahamian counsel for the Lender, as to such matters as the Lender may reasonably request;

(dd) a favorable opinion of Watson, Farley & Williams (New York) LLP, counsel for the Lender, as to such matters as the Lender may reasonably request; and

(ee) such documents and evidence as the Lender shall require, based on applicable law and regulations and the Lender's own internal guidelines, relating to the Lender's knowledge of its customers.

19101732 v3

SECTION 6.02. <u>Condition Precedent to Disbursement of the Second Tranche of the Term Loan</u>. In addition to the conditions precedent set forth in Section 6.01 hereof, the obligation of the Lender to disburse the second Tranche of the Term Loan is subject to the condition precedent that GCL shall have paid in full from its own resources all amounts outstanding under the Iraqi Shipment Facility on or prior to the relevant Drawdown Date.

SECTION 6.03. <u>Conditions Precedent to Each Credit Event</u>. The obligations of the Lender to disburse each Tranche of the Term Loan, to make each Revolving Advance and to issue each Letter of Credit are subject to the conditions precedent that the Lender shall have received, in form and substance satisfactory to the Lender (or waived in writing by the Lender) at the time of the relevant Credit Event:

(a)     in the case of disbursement of a Tranche of the Term Loan, the Lender shall have received a Term Loan Notice of Drawdown as required by Section 2.02(a);

(b)     in the case of making a Revolving Advance, the Lender shall have received a Revolving Notice of Drawdown as required by Section 3.02(a);

(c)     in the case of issuance of a Letter of Credit, the Lender shall have received a Letter of Credit Request as required by Section 4.03(a);

(d)     the Borrower shall have paid the fees due pursuant to Section 5.01 and any other fees payable pursuant hereto;

(e)     immediately after the making of any relevant Revolving Advance, the aggregate outstanding principal amount of all Revolving Advances will not exceed the Revolving Credit Commitment;

(f)     immediately after the issuance of any relevant Letter of Credit, the aggregate Stated Amount of all Letters of Credit will not exceed the Letter of Credit Commitment;

(g)     evidence that, if the test set out in Section 10.01(l)(i) were applied immediately following the relevant Credit Event, the Borrower would not be obliged to provide additional security or repay part of the Term Loan as therein provided (determined on the basis of the most recent valuation for each Vessel delivered pursuant to Section 6.01(i) or Section 10.01(l)(ii), as the case may be);

(h)     immediately after the relevant Credit Event, no Default or Event of Default shall have occurred and be continuing;

(i)     the representations and warranties of the Obligors contained in this Agreement shall be true *mutatis mutandis* on and as of the date of the relevant Credit Event, unless such representation or warranty shall expressly relate to a different date;

(j)     a certificate of an officer of the Borrower certifying as to (A) the absence of any amendments to the articles of incorporation and by-laws, or certificate of formation and limited liability company agreement of each Obligor certified to the Lender pursuant to Section 6.01(c) above, (B) the due incorporation or formation, as the case may be, and good standing of each Obligor, as a corporation or limited liability company formed under the laws of the relevant jurisdiction and the absence of any proceeding for the dissolution or liquidation of such Obligor, (C)

19101732 v3

that the representations and warranties of the Obligors contained in this Agreement are true *mutatis mutandis* on and as of the date of the relevant Credit Event, unless such representation or warranty shall expressly relate to a different date, and (D) the absence of any Default or Event of Default;

(k)     true and complete copies of any governmental or regulatory consents, filings, registrations, approvals and waivers required in connection with the execution, delivery and performance of (A) each Loan Document executed in relation to the relevant Credit Event, and (B) the consummation of the transactions contemplated thereby;

(l)     such opinions, consents, agreements and documents in connection with this Agreement and the Collateral Documents as the Lender may reasonably request by notice to the Borrower prior to the time of the relevant Credit Event;  and

(m)     to the extent required by any change in applicable law and regulation or any changes in the Lender's own internal guidelines since the date on which the applicable documents and evidence were delivered to the Lender pursuant to Section 6.01(dd), such further documents and evidence as the Lender shall require relating to the Lender's knowledge of its customers.

The occurrence of each Credit Event hereunder shall be deemed to be a representation and warranty by the Obligors on the date of such Credit Event as to the facts specified in clauses (e), (f), (g), (h)  and (l) of this Section 6.03.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES

SECTION 7.01. Representations and Warranties.  Each of the Obligors, jointly and severally, represents and warrants as follows:

(a)     Existence and Power.  Each Obligor (i) is a corporation or limited liability company duly organized or formed, validly existing and in good standing under the laws of its jurisdiction of incorporation or formation, (ii) is duly qualified and in good standing as a foreign company in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed, and (iii) has all requisite corporate or company power and authority to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

(b)     Authorization; No Violation.  The execution, delivery and performance by each Obligor of this Agreement, the Notes and each other Loan Document to which it is or is to be a party, and the consummation of other transactions contemplated thereby, are within such Obligor's corporate or company powers, have been duly authorized by all necessary company action, and do not (i) contravene such Obligor's articles of incorporation or by-laws, or certificate of formation or limited liability company agreement, as the case may be, (ii) violate any applicable law, rule, regulation, order, writ, judgment, injunction, decree, determination or award, (iii) conflict with or result in the breach of, or constitute a default under, any loan agreement, contract, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting such Obligor or any of its properties, or (iv) except for the Liens created by the Collateral Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of such Obligor.  None of the Obligors is in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in

breach of any such loan agreement, contract, indenture, mortgage, deed of trust, lease or other instrument.

(c)    <u>Governmental Consents, Etc</u>. Except for the registration of the Mortgages and filing of proper financing statements in respect of the Assignments of Bareboat Charter, the Assignments of Earnings, the Assignments of Time Charter, the Security Agreement and the Pledge Agreement specified in Section 6.01(w), no authorization, approval, consent or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other consent or approval of any other Person is required for (i) the due execution, delivery and performance by any Obligor of this Agreement or the Notes or any other Loan Document to which it is or is to be a party or for the consummation of the transactions contemplated thereby, (ii) the grant by any Obligor of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created by the Collateral Documents (including the first priority nature thereof), or (iv) the exercise by the Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents.

(d)    <u>Binding Effect</u>. This Agreement has been, and the Notes, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by each Obligor party thereto. This Agreement is, and the Notes and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligations of each Obligor party thereto, enforceable against each such Obligor in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforceability of creditor's rights generally.

(e)    <u>Compliance with Laws</u>. Each Obligor is in compliance with all applicable statutes, regulations and laws, including, without limitation, all Environmental Laws.

(f)    <u>Financial Information; Other Obligations</u>. The audited consolidated balance sheet of the Borrower and its Subsidiaries as at December 31, 2007, a copy of which has been delivered to the Lender by the Borrower, fairly presents, in all material respects, the financial condition of the Borrower and its Subsidiaries as at such date.

(g)    <u>No litigation</u>. There is no pending or (to the knowledge of any Obligor) threatened action, proceeding, governmental investigation or arbitration affecting any Obligor or any of its properties before any court, governmental agency or arbitrator which may affect the legality, validity or enforceability of this Agreement, the Notes or any other Loan Document, or the consummation of the transactions contemplated hereby or thereby.

(h)    <u>Margin Stock</u>. None of the Obligors is engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock and no proceeds of the Term Loan or any Revolving Advance or Letter of Credit will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

(i)    <u>ERISA</u>. None of the Obligors has ever established or maintained any employee benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended.

(j)    <u>Not "Investment Company"</u>. None of the Obligors is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

19101732 v3

(k)     Subsidiaries. Neither of the Owners has any direct or indirect Subsidiaries.

(l)     Not "National". None of the Obligors is a "national" of any "designated foreign country", within the meaning of the Foreign Asset Control Regulations or the Cuban Asset Control Regulations of the U.S. Treasury Department, 31 C.F.R., Subtitle B, Chapter V, as amended, or any regulations or rulings issued thereunder.

(m)     No Restriction. None of making or the Term Loan or any Revolving Advance, the issuance of any Letter of Credit, the use of the proceeds thereof or the performance by the Obligors of this Agreement, violates any statute, regulation or executive order restricting loans to, investments in, or the export of assets to, foreign countries or entities doing business there.

(n)     Ownership of Obligors. All of the outstanding limited liability company interests of each of the Owners is directly owned and controlled by the Borrower. As of the date hereof, all of the issued and outstanding voting stock of the Borrower is directly owned by Mr. Kazem Paksima (30%), Mr. Ali Paksima (30%), Mr. Hormoz Shayegan (12%), Mr. Bijan Paksima (10%), Mr. Ali David Paksima (10%) and Mr. Hossein Alizadeh (8%).

(o)     Solvency. Each of the Obligors is, individually, and the Borrower and its Subsidiaries are, together, Solvent.

(p)     Use of Proceeds. The Borrower is using the proceeds of the Term Loan and Revolving Advances solely for the purposes set forth in the Preliminary Statements hereof.

(q)     Place of Business. None of the Obligors has a place of business in the United States of America, the District of Columbia, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States of America except each of the Obligors has a place of business at 100 Quentin Roosevelt Boulevard, Garden City, New York 11530.

(r)     Veracity of Statements. No representation, warranty or statement made or certificate, document or financial statement provided by any of the Obligors in or pursuant to this Agreement, the Note or any other Loan Document, or in any other document furnished in connection therewith, is untrue or incomplete in any material respect or contains any misrepresentation of a material fact or omits to state any material fact necessary to make any such statement herein or therein not misleading.

(s)     Collateral Documents. The provisions of each of the Collateral Documents create, or when delivered will create, in favor of the Lender, (i) in the case of the Mortgages and Deeds of Covenant, a valid first priority mortgage under the law of the Bahamas on the Vessels in favor of the Lender, subject to the registration of the Mortgages as described in the following sentence, and (ii) in the case of the Assignments of Bareboat Charter, the Assignments of Earnings, the Assignments of Insurances, the Assignments of Time Charter, the Security Agreement and the Pledge Agreement, a valid, binding and executed and enforceable security interest and Lien in all right, title and interest in the Collateral therein described, and shall constitute a fully perfected first priority security interest in favor of the Lender in all right, title and interest in such Collateral, subject to no other Liens and subject in the case of (A) Assignments of Bareboat Charter, the Assignments of Earnings, the Assignments of Time Charter, the Security Agreement and the Pledge Agreement, to notice being given to account parties and to filing proper financing statements in the State of New York, and (B) the Assignments of Insurances, to notice being given to underwriters and protection and indemnity clubs, and their consent being obtained where policy provisions or club rules so require. Upon execution and delivery by the

relevant Owner and registration in accordance with the laws of the Bahamas, each of the Mortgages will be a first priority mortgage under Bahamian law and will qualify for the benefits accorded a "preferred mortgage" under Chapter 313 of Title 46 of the United States Code and no other filing or recording or refiling or rerecording or any other act is necessary or advisable to create or perfect such security interest under the Mortgages or in the mortgaged property therein described.

(t)     No Money Laundering.  Without prejudice to the generality of the foregoing provisions of this Section 7.01, in relation to the borrowing by the Borrower of the Term Loan and the Revolving Advances, the performance and discharge of its obligations under this Agreement and the other Loan Documents and the transactions and other arrangements affected or contemplated by this Agreement and the other Loan Documents, the Borrower confirms that it is acting for its own account and that the foregoing will not involve or lead to contravention of any law, official requirement or other regulatory measure or procedure implemented to combat "money laundering" (as defined in Article 1 of the Directive (91/308/EEC) of the Council of the European Communities).

## ARTICLE VIII

## GUARANTY

SECTION 8.01. Guaranty.  In order to induce the Lender to extend credit to the Borrower hereunder, each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the performance and punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all obligations of the Borrower now or hereafter existing under this Agreement, the Notes and any other Loan Document, whether for principal, interest, fees, expenses or otherwise (collectively the "Guaranteed Obligations") due or owing to the Lender, and agrees to pay any and all expenses (including, without limitation, counsel fees and expenses) incurred by the Lender in enforcing any rights under this Guaranty.  Each of the Guarantors hereby unconditionally and irrevocably agrees to indemnify the Lender immediately on demand against any cost, loss or liability suffered by the Lender (i) if any Guaranteed Obligation is or becomes unenforceable, invalid or illegal, or (ii) by operation of law.  The amount of the cost, loss or liability shall be equal to the amount which the Lender would otherwise have been entitled to recover.  The obligations of the Guarantors under this Article VIII are in addition to and shall not in any way be prejudiced by any other guaranty or security now or subsequently held by the Lender.

SECTION 8.02. Obligations Absolute.  Each of the Guarantors guarantees that the Guaranteed Obligations will be performed and paid to the Lender strictly in accordance with the terms of any applicable agreement, express or implied, with the Borrower, regardless of any law, regulation or order of any jurisdiction affecting any term of any Guaranteed Obligation or the rights of the Lender with respect thereto, including, without limitation, any law, rule or policy which is now or hereafter promulgated by any governmental authority (including, without limitation, any central bank) or regulatory body any of which may adversely affect the Borrower's ability or obligation to make, or right of the Lender to receive, such payments, including, without limitation, any sovereign act or circumstance which might otherwise constitute a defense to, or a legal or equitable discharge of, the Borrower.

SECTION 8.03. Guaranty Unconditional.  The liability of each Guarantor under this Guaranty shall be unconditional irrespective of (i) any amendment or waiver or consent to departure from the terms of any Guaranteed Obligation, including any extension of the time or change of the manner or place of payment, (ii) any exchange, release, or non-perfection of any collateral securing payment of

19101732 v3

any Guaranteed Obligation, (iii) any change in the corporate existence, structure or ownership of the Borrower, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or its assets or any resulting release or discharge of any of the Guaranteed Obligations, (iv) the existence of any claim, set-off or other rights which any of the Guarantors may have at any time against the Borrower, the Lender or any other corporation or person, whether in connection herewith or any unrelated transactions, and (v) any other circumstance whatsoever that might otherwise constitute a defense available to, or a legal or equitable discharge of, the Borrower.

SECTION 8.04. <u>Waiver of Subrogation; Contribution</u>. Notwithstanding any other provision of this Guaranty, until payment in full of the Guaranteed Obligations in cash after termination of any of the Lender's commitments with respect thereto, (i) each of the Guarantors hereby irrevocably waives any right to assert, enforce, or otherwise exercise any right of subrogation to any of the rights, security interests, claims, or liens which the Lender have against the Borrower in respect of the Guaranteed Obligations, (ii) none of the Guarantors shall have any right of recourse, reimbursement, contribution, indemnification, or similar right (by contract or otherwise) against the Borrower in respect of the Guaranteed Obligations, and (iii) each of the Guarantors hereby irrevocably waives any and all of the foregoing rights and also irrevocably waives the benefit of, and any right to participate in, any collateral or other security given to the Lender to secure payment of the Guaranteed Obligations.

SECTION 8.05. <u>Reinstatement</u>. This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Lender.

SECTION 8.06. <u>Waiver</u>. Each of the Guarantors waives promptness, diligence, notice of acceptance, presentment, demand, protest and notice of dishonor with respect to any Guaranteed Obligation and this Guaranty and any requirement that the Lender exhaust any right or take any action against the Borrower or any other entity or any Collateral.

SECTION 8.07. <u>Payments; No Reductions</u>. (a) All payments under this Guaranty shall be made in accordance with Section 5.04 of this Agreement (concerning payments) free and clear of and without deduction for any and all present or future Taxes. If any Guarantor shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this paragraph) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Guarantor shall make such deductions and (iii) such Guarantor shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. In addition, each of the Guarantors agrees to pay any Other Taxes which arise from any payment made hereunder or from the execution, delivery or registration by the Guarantors of, or otherwise with respect to, this Agreement. Each of the Guarantors will indemnify the Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this paragraph) paid by the Lender and any liability (including, without limitation, penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within 45 days from the date the Lender makes written demand therefor. Within 30 days after the date of any payment of Taxes the Guarantors will furnish to the Lender the original or a certified copy of a receipt evidencing payment thereof. If no Taxes are payable in respect of any payment, the Guarantors will furnish to the Lender a certificate from each appropriate taxing authority, or an opinion of counsel acceptable to the Lender, in either case stating that such payment is exempt from or not subject to Taxes. Without

19101732 v3

prejudice to the survival of any other agreement contained herein, the agreements and obligations of the Guarantors contained in this Section shall survive the payment in full of the Guaranteed Obligations and principal and interest hereunder and any termination or revocation of this Guaranty.

SECTION 8.08. Set-Off. If any of the Guarantors shall fail to pay any of its obligations hereunder when the same shall become due and payable, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the Guarantor's credit or account against any and all of the Guaranteed Obligations, whether or not the Lender shall have made any demand under this Guaranty. The Lender agrees promptly to notify the relevant Guarantor after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Lender under this paragraph are in addition to any other rights and remedies (including, without limitation, other rights of set-off) which the Lender may have.

SECTION 8.09. Continuing Guarantee. This Guaranty is a continuing guaranty, is joint and several with any other guarantee given in respect of the Guaranteed Obligations, and shall remain in full force and effect until the later of the termination of any commitment of the Lender under this Agreement and the payment in full of the Guaranteed Obligations and all other amounts payable hereunder and shall be binding upon each of the Guarantors, and their respective successors and permitted assigns. The obligations of each of the Guarantors under this Guaranty shall rank pari passu with all other unsecured obligations of such Guarantor.

SECTION 8.10. Right of Contribution. At any time a payment in respect of the Guaranteed Obligations is made under this Guaranty, the right of contribution of each Guarantor against each other Guarantor shall be determined as provided in the immediately following sentence, with the right of contribution of each Guarantor to be revised and restated as of each date on which a payment (a "Relevant Payment") is made on the Guaranteed Obligations under this Guaranty. At any time that a Relevant Payment is made by a Guarantor that results in the aggregate payments made by such Guarantor in respect of the Guaranteed Obligations to and including the date of the Relevant Payment exceeding such Guarantor's Contribution Percentage (as defined below) of the aggregate payments made by all Guarantors in respect of the Guaranteed Obligations to and including the date of the Relevant Payment (such excess, the "Aggregate Excess Amount"), each such Guarantor shall have a right of contribution against each other Guarantor who has made payments in respect of the Guaranteed Obligations to and including the date of the Relevant Payment in an aggregate amount less than such other Guarantor's Contribution Percentage of the aggregate payments made to and including the date of the Relevant Payment by all Guarantors in respect of the Guaranteed Obligations (the aggregate amount of such deficit, the "Aggregate Deficit Amount") in an amount equal to (x) a fraction the numerator of which is the Aggregate Excess Amount of such Guarantor and the denominator of which is the Aggregate Excess Amount of all Guarantors multiplied by (y) the Aggregate Deficit Amount of such other Guarantor. A Guarantor's right of contribution pursuant to the preceding sentences shall arise at the time of each computation, subject to adjustment to the time of each computation; provided that no Guarantor may take any action to enforce such right until the Guaranteed Obligations have been paid in full in cash, it being expressly recognized and agreed by all parties hereto that any Guarantor's right of contribution arising pursuant to this Section 8.10 against any other Guarantor shall be expressly junior and subordinate to such other Guarantor's obligations and liabilities in respect of the Guaranteed Obligations and any other obligations under this Guaranty. As used in this Section 8.10: (i) each Guarantor's "Contribution Percentage" shall mean the percentage obtained by dividing (x) the Relevant Net Worth (as defined below) of such

19101732 v3

Guarantor by (y) the aggregate Relevant Net Worth of all Guarantors; (ii) the "Relevant Net Worth" of each Guarantor shall mean the greater of (x) the Net Worth (as defined below) of such Guarantor and (y) zero; and (iii) the "Net Worth" of each Guarantor shall mean the amount by which the fair saleable value of such Guarantor's assets on the date of any Relevant Payment exceeds its existing debts and other liabilities (including contingent liabilities, but without giving effect to any Guaranteed Obligations arising under this Guaranty) on such date. All parties hereto recognize and agree that, except for any right of contribution arising pursuant to this Section 8.10, each Guarantor who makes any payment in respect of the Guaranteed Obligations shall have no right of contribution or subrogation against any other Guarantor in respect of such payment until all of the Guaranteed Obligations have been irrevocably paid in full in cash. Each Guarantor recognizes and acknowledges that the rights to contribution arising hereunder shall constitute an asset in favor of the party entitled to such contribution. In this connection, each Guarantor has the right to waive its contribution right against any Guarantor to the extent that after giving effect to such waiver such Guarantor would remain Solvent, in the determination of the Lender.

SECTION 8.11. Limitation of Liability. Each Guarantor and the Lender hereby confirms that it is its intention that the Guaranteed Obligations not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar Federal or state law. To effectuate the foregoing intention, each Guarantor and the Lender hereby irrevocably agrees that the Guaranteed Obligations guaranteed by each Guarantor shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Guarantor that are relevant under such laws and after giving effect to any rights to contribution pursuant to any agreement providing for an equitable contribution among such Guarantor and the other Guarantors, result in the Guaranteed Obligations of such Guarantor in respect of such maximum amount not constituting a fraudulent transfer or conveyance.

ARTICLE IX

DEBT SERVICE RESERVE ACCOUNT

SECTION 9.01.        Debt Service Reserve Account. So long as the Term Loan shall be outstanding, the Borrower will maintain with the Lender an account (the "Debt Service Reserve Account"), under the Lender's sole dominion and control, on the following terms and conditions, and the Borrower hereby grants to the Lender a security interest in all monies and property from time to time in the Debt Service Reserve Account and the proceeds thereof:

(a)        Commencing on the first Payment Date and until such time as the Term Loan shall have been paid in full, the Borrower will cause same day funds to be deposited into, and shall maintain a credit balance in, the Debt Service Reserve Account in an amount at all times not less than the aggregate amount of the amount of the installment of principal and interest payable on the next succeeding Payment Date (the "Debt Service Reserve Amount").

(b)        The credit balance of the Debt Service Reserve Account shall bear interest on such terms and conditions as the Lender's Loan Management Committee shall determine from time to time for similar accounts and customers.

19101732 v3

(c)     The Borrower will cause to be deposited into the Debt Service Reserve Account from time to time same day funds representing the Letter of Credit Margin Amount relating to any Letter of Credit.

(d)     Subject to clause (f) below, on each Payment Date, the Lender shall debit from the Debt Service Reserve Account the amount, if any, by which the credit balance of the Debt Service Reserve Account exceeds the sum of the Debt Service Reserve Amount and the Letter of Credit Margin Amounts relating to all outstanding Letters of Credit, and the Lender shall pay such excess to the Borrower or its order.

(e)     Subject to clause (f) below, upon any Letter of Credit ceasing to be effective (whether by a Drawing for the Stated Amount thereof, expiration or cancellation), and the Lender having received payment in full of all amounts payable to it in respect of any Drawing under such Letter of Credit, the Lender the Lender shall pay the Letter of Credit Margin Amount relating to such Letter of Credit to the Borrower or its order.

(f)     Upon the occurrence of an Event of Default, and so long as the same shall be continuing, and the Lender shall be entitled to withdraw all moneys then held in the Debt Service Reserve Account, and to apply the same in such order and in such manner as the Lender in its sole discretion may elect (i) to the payment or reimbursement of any expenses or liabilities incurred by the Lender in connection with the ascertainment or protection of its rights and the pursuance of its remedies under any of the Loan Documents (including, without limitation, the reasonable fees and disbursements of counsel), (ii) to the payment of any sum which the Borrower has agreed to pay pursuant hereto, or pursuant to any of the Loan Documents and which has not been paid, (iii) to the payment or satisfaction of any claims or demands of any person or entity whomsoever in respect of either of the Vessels or in respect of any of the Collateral, and (iv) to the payment of all amounts payable in respect of the Notes or otherwise hereunder or under the other Loan Documents, whether or not then due.  No such application of funds shall relieve the Borrower from any default or shall diminish any obligation of the Borrower in respect thereof.

ARTICLE X

COVENANTS OF THE BORROWER

SECTION 10.01. Affirmative Covenants.  So long as the Term Loan or any Revolving Advance shall remain unpaid, any Letter of Credit shall remain outstanding, or the Lender shall have any Commitment hereunder, each of the Obligors shall:

(a)     Compliance with Laws, Etc.  Comply with all applicable laws, rules, regulations and orders, including Environmental Laws, the ISM Code and the ISPS Code in all material respects.

(b)     Compliance with Agreements.  Comply with, observe and perform all of the terms, covenants and provisions of the Loan Documents to which it is a party.

(c)     Preservation of Corporate/Company Existence, Etc.  Preserve and maintain its corporate or company existence, as the case may be, as well as its material rights and franchises.

19101732 v3

(d)         <u>Visitation Rights</u>.  Permit at any reasonable time and from time to time, upon reasonable prior notice, the Lender or its representatives, at the Lender's risk and cost, to the extent reasonably requested, to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, such Obligor and to discuss the affairs, finances and accounts of such Obligor with any of its officers or representatives and with its independent certified public accountants.

(e)         <u>Keeping of Books</u>.  Keep, and cause to be kept, proper books of record and account, in which full and correct entries shall be made in accordance with GAAP of all financial transactions and the assets and business of such Obligor to the extent necessary to permit the preparation of the financial statements required to be delivered hereunder.

(f)         <u>Maintenance of Properties, Etc</u>.  Maintain and preserve all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(g)         <u>Approvals and Other Consents</u>.  Obtain all such governmental licenses, authorizations, consents, permits and approvals as are required, by applicable law or otherwise, for (a) such Obligor to perform its obligations under this Agreement and all other Loan Documents and (b) the operation of the Vessels.

(h)         <u>Reporting Requirements</u>.  Furnish, or cause to be furnished, to the Lender:

(i)         as soon as available and in any event within 180 days after the end of each fiscal year of the Borrower and its Subsidiaries, the consolidated balance sheet of Borrower and its Subsidiaries as of the end of such year, and the related consolidated statements of profit and loss, and changes in financial position of the Borrower and its Subsidiaries for the fiscal year then ended, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year, and in each case certified by Grayson & Bock or by another independent public or chartered accountant satisfactory to the Lender stating that in making the examination necessary for the audit of such financial statements it has obtained no knowledge of the existence of any condition, event or act which constitutes a Default or Event of Default, or if it has obtained knowledge of the existence of any such condition, event or act, specifying the same;

(ii)         as soon as available and in any event within 45 days after the close of each of the first three quarterly accounting periods in each fiscal year of the Borrower, the consolidated balance sheet of Borrower and its Subsidiaries as of the end of such quarterly period, and the related consolidated statements of profit and loss, and changes in financial position of the Borrower and its Subsidiaries for the period then ended, setting forth in each case in comparative form the corresponding figures for the corresponding periods in the preceding fiscal year, all of which shall be certified by an officer of the Borrower and subject only to normal year-end adjustments;

(iii)         simultaneously with the delivery of each set of financial statements referred to in clauses (i) and (ii) above, a certificate of an officer of the Borrower stating whether any Default or Event of Default exists on the date of such certificate and, if any Default or Event of Default then exists, setting forth the details thereof and the action which the Borrower is taking or proposes to take with respect thereto;

(iv) promptly upon the Borrower becoming aware of (A) the occurrence of a Default or Event of Default, or (B) the commencement of any action, suit, litigation or proceeding of the kind described in Section 7.01(g), a statement of an officer of the Borrower setting forth the details thereof and the action which the Borrower is taking or proposes to take with respect thereto; and

(v) from time to time such additional information regarding the financial position, results of operations, business or prospects of the Borrower and its Subsidiaries as the Lender may reasonably request.

(i) <u>Payment of Obligations</u>.  Pay and discharge at or before maturity, all its material obligations and liabilities, including, without limitation, tax liabilities, except where the same may be contested in good faith by appropriate proceedings, and maintain in accordance with GAAP appropriate reserves for the accrual of any of the same.

(j) <u>Use of Proceeds</u>.  Use the proceeds of the Term Loan and Revolving Advances solely for the purposes set forth in the Preliminary Statements hereof.

(k) <u>Maintenance of Insurance</u>.  Maintain insurance on any of its properties other than the Vessels, payable in Dollars, with responsible companies, in such amounts and against such risks as is usually carried by owners of similar businesses and properties in the same general areas in which it operates, and as shall be satisfactory to the Lender.

(l) <u>Vessel Value Maintenance</u>.

(i) Ensure that the aggregate Fair Market Value of the Vessels subject to a Mortgage (plus the market value of any additional security for the time being actually provided to the Lender pursuant to this Section 10.01(l)(i)) is at all times not less than one hundred twenty-five percent (125%) of the sum of the aggregate outstanding principal amount of the Term Loan and Revolving Advances and the Stated Amounts of all outstanding Letters of Credit.  If the Obligors at any time shall not be in compliance with the preceding sentence, and in any event within ninety (90) days of being notified by the Lender of such noncompliance (which notification shall be conclusive and binding on the Obligors), the Obligors shall either:  (1) provide the Lender with, or procure the provision to the Lender of, such additional security as shall in the opinion of the Lender be adequate to make up such deficiency, which additional security shall take such form, be constituted by such documentation and be entered into between such parties as the Lender in its absolute discretion may approve or require (and, if the Obligors do not make proposals satisfactory to the Lender in relation to such additional security within five (5) days of the date of the Lender's notification to the Obligors aforesaid, the Obligors shall be deemed to have elected to repay in accordance with (2) below); or (2) repay (subject to, and in accordance with Section 2.04(a) and (d)) such part of the Term Loan as will ensure compliance with this Section 10.01(l)(i).

(ii) For purposes of this Section 10.01(l), the Obligors at their expense shall cause a valuation of each Vessel to be made by an Approved Broker indicating the Fair Market Value of such Vessel on August 1 of each year and at any time the Lender may request upon not less 5 days' prior written notice from the Lender to the Borrower.  The Obligors shall supply to the Lender and to any relevant Approved Broker such information concerning the

Vessels and their condition as such Approved Broker may require for the purpose of making valuations of the Vessels.

(m)     "Know Your Customer" Documentation.  The Borrower will produce such documents and evidence as the Lender shall from time to time require, based on applicable law and regulations from time to time and the Lender's own internal guidelines from time to time relating to the Lender's knowledge of its customers.

SECTION 10.02. Negative Covenants. So long as the Term Loan or any Revolving Advance shall remain unpaid, any Letter of Credit shall remain outstanding, or the Lender shall have any Commitment hereunder, none of the Borrower or the Owners shall:

(a)     Liens, Etc.  Create, incur, assume or suffer to exist any Lien on any of its properties whether now owned or hereafter acquired, or sign or file, under the Uniform Commercial Code (or analogous statute or law) of any jurisdiction, a financing statement that names it as debtor, or sign any security agreement authorizing any secured party thereunder to file such financing statement, or assign any right to receive income, other than: (i) Liens on Collateral in favor of the Lender, (ii) Liens permitted by the Loan Documents, (iii) Permitted Encumbrances, and (iv) in the case of the Borrower, Liens incurred in the ordinary course of its business.

(b)     Consolidations, Mergers.  Consolidate or merge with or into any other Person; provided, however, that the Borrower may consolidate or merge with any other Person if (A) at the time of such transaction and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, and (B) the surviving entity in such consolidation or merger shall be the Borrower or, with the prior consent of the Lender (which consent shall be subject to such conditions as the Lender may reasonably require including the execution of amendments or supplements to this Agreement and the other Loan Documents in form satisfactory to the Lender on or before the effectiveness of such consolidation or merger), another Person, and such surviving entity shall have assumed all liabilities and obligations of the parties thereto, and the Borrower shall have provided the Lender, not less than ten (10) Business Days in advance of such consolidation or merger, (1) a certificate declaring that no Default or Event of Default exists or would result from the intended consolidation or merger, and (2) pro forma financial statements of the surviving entity together with a certificate of the Borrower executed by its chief financial officer demonstrating the compliance of the Borrower with all the covenants under this Agreement.

(c)     Sales, Etc. of Assets.  Sell, transfer or otherwise dispose of any assets or grant any option or other right to purchase or otherwise acquire any Collateral or other assets  other than in the ordinary course of its business;  provided, however, the Borrower may, in one or more transactions during any fiscal year, dispose of assets having a value in the aggregate not in excess of $1,000,000.

(d)     Restrictions on Chartering.  Except pursuant to the Bareboat Charters and the Time Charters, without the consent of the Lender,  which consent shall not unreasonably be withheld (i) let any Vessel on demise charter for any period; (ii) enter into any time or consecutive voyage charter in respect of any Vessel for a term which exceeds, or which by virtue of any optional extensions may exceed, 13 months; (iii) de-activate or lay up any Vessel; or (iv) put any Vessel into the possession of any Person for the purpose of work being done upon her in an amount exceeding or likely to exceed $1,000,000 (or the equivalent in any other currency) unless that Person has first given to the Lender and in terms satisfactory to it a written undertaking not to exercise any Lien on such Vessel or her earnings for the cost of such work or for any other reason.

19101732 v3

(e)     Change in Nature of Business.  Engage in any line of business other than directly or indirectly owning and operating the Vessels.

(f)     Debt.  Create, incur, assume or suffer to exist any Debt other than (i) Debt under the Loan Document, (ii) Debt for (x) trade payables and expenses accrued in the ordinary course of business and that are not overdue, or (y) customer advance payments and customer deposits received in the ordinary course of business, and (iii) Debt owing to Affiliates provided that such Debt is subordinated on terms and conditions acceptable to the Lender and subject in right of payment to the prior payment in full of all amounts outstanding under this Agreement and the Notes.

(g)     Dividends.  Declare or pay any dividend of any kind or make any purchase or redemption of or distribution on any stock, limited liability company interest or other equity interest without the prior written consent of the Lender except that (i) any Owner may make distributions to the Borrower, and (ii) the Borrower may pay a dividend, if and so long as both immediately before and after the declaration and payment of such dividend, no Default or Event of Default shall have occurred and be continuing.

(h)     Loans, Investments.  Make any loan or advance to, make any investment in, or enter into any working capital maintenance or similar agreement with respect to any Person whether by acquisition of stock or indebtedness, by loan, guarantee or otherwise, except loans to another Obligor to the extent such Obligor is permitted to incur such Debt under Section 10.02(f).

(i)     Capital Expenditures.  Make any capital expenditures (other than to acquire the Vessels) outside the ordinary course of its business;  provided, however, the Borrower may make capital expenditures during any fiscal year in an aggregate amount not in excess of $1,000,000.

(j)     Constitutive Document Amendments.  Permit any amendment of its articles of incorporation and by-laws, or certificate of formation or limited liability company agreement, as the case may be, without giving the Lender prior written notice of such proposed amendment.

(k)     Transactions with Shiptrade.  The Borrower and/or the Owners may enter into commercial agency arrangements with Shiptrade so long as the agency fee payable to Shiptrade in the aggregate does not exceed five percent (5%) of total freight revenues.

(l)     Place of Business.  Establish or change any place of business in the United States of America, the District of Columbia, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States of America unless sixty (60) days' prior written notice of such establishment is given to the Lender.

(m)     Approved Manager.  Employ a manager of a Vessel other than an Approved Manager, or change the terms and conditions of the management of such Vessel in any material respect other than upon such terms and conditions as the Lender shall approve.

(n)     Net Worth.  Permit the Net Worth of the Borrower to fall below $5,000,000.

19101732 v3

# ARTICLE XI

## EVENTS OF DEFAULT

SECTION 11.01. <u>Events of Default</u>. If any of the following events ("<u>Events of Default</u>") shall occur and be continuing:

(a) The Borrower shall fail to pay any principal of the Term Loan, any Revolving Advance, any Note or any Drawing when due and payable; or

(b) The Borrower shall fail to pay any interest on any Term Loan, any Revolving Advance, any Note, any Unpaid Drawing or any fee payable to the Lender hereunder, or the Borrower shall fail to make any other payment hereunder, in each case within five (5) Business Days after the same becomes due and payable; or

(c) Any representation or warranty made by any Obligor under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made or deemed made or confirmed; or

(d) (i) Any Obligor shall fail to perform or observe any term, covenant or agreement contained in Sections 10.01(h), 10.01(l) and 10.02 to be observed by it, or (ii) any Obligor shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied (A) beyond the expiration of any applicable notice and/or grace period or (B) if there is no applicable notice and/or grace period, for fifteen (15) days after written notice thereof shall have been given to the Borrower by the Lender; or

(e) Any Obligor shall fail to pay any principal of or premium or interest on any Debt (in the case of either GCL or Shiptrade, any Debt in which is outstanding in an aggregate principal amount of $500,000) which such Obligor is liable to pay, when the same becomes due and payable (in the case of either GCL or Shiptrade, within forty-five (45) days after the same becomes due and payable) (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or any such Debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof; or

(f) Any Obligor shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Obligor seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of forty-five (45) days, or any of the actions sought

19101732 v3

in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur; or any Obligor shall take any corporate or company action to authorize any of the actions set forth above in this Section 11.01(f); or

(g)     In the reasonable determination of the Lender, it becomes impossible or unlawful for any Obligor to fulfill any of the covenants and obligations required to be fulfilled as contained in any Loan Document or any of the instruments granting or creating rights in any of the Collateral in any material respect, or for the Lender to exercise any of the rights or remedies vested in it under any Loan Document, any of the Collateral or any of such instruments in any material respect; or

(h)     Any judgment or order shall be rendered against any Obligor that is reasonably likely to result in a Material Adverse Effect with respect to such Obligor, and there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect unless such judgment or order shall have been vacated, satisfied, discharged or bonded pending appeal; or

(i)     Any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against any Borrower or any such Borrower shall so state in writing; or

(j)     Any Collateral Document after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien on the Collateral purported to be covered thereby, or there shall be a material diminution in value of any of the Collateral; or

(k)     An "Event of Default" as defined in any Deed of Covenant shall occur; or

(l)     Any event occurs or any other circumstances arise or develop which in the judgment of the Lender would result in a Material Adverse Effect on the Borrower and its Subsidiaries; or

(m)     A Change in Control shall occur;

then, and in any such event, the Lender may, by notice to the Borrower, (i) declare the Commitments terminated, whereupon the same shall forthwith terminate, (ii) declare the principal of and accrued interest on the Term Loan, the Revolving Advances, the Notes, and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the same shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower, (iii) terminate any Letter of Credit which may be terminated in accordance with its terms, (iv) direct the Borrower to pay (and the Borrower agrees that upon receipt of such notice, or upon the occurrence of an Event of Default specified in Section 11.01(f), it will pay) to the Lender such additional amount of cash, to be held as security by the Lender, as is equal to the aggregate Stated Amounts of all Letters of Credit issued for the account of the Borrowers and then outstanding less any Letter of Credit Margin Amounts then credited to the Debt Service Reserve Account; provided, however, that, in the event of an actual or deemed entry of an order for relief with respect to any of the Obligors under the Federal Bankruptcy Code, (A) the Commitments shall automatically be terminated and (B) principal of and accrued interest on the Term Loan, the Revolving Advances, the Notes, and all other amounts payable under this Agreement shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

19101732 v3

MISCELLANEOUS

SECTION 12.01. <u>Amendments, Etc</u>. No amendment or waiver of any provision of this Agreement or the Notes, nor consent to any departure by any Obligor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 12.02. <u>Notices, Etc</u>. Except as otherwise provided for in this Agreement, all notices or other communications under or in respect of this Agreement to any party hereto shall be in writing (that is by letter or telefacsimile) and shall be deemed to be duly given or made when delivered (in the case of personal delivery or letter) and when dispatched (in the case of telefacsimile) to such party addressed to it at the address appearing below (or at such address as such party may hereafter specify for such purpose to the other by notice in writing):

(a) if to any Obligor:

> c/o Shiptrade, Inc.
> 100 Quentin Roosevelt Boulevard
> Garden City, New York 11530
>
> Attention: Bijan Paksima
>
> Facsimile No: +1516 222 0377

(b) if to the Lender:

> National Bank of Pakistan
> New York Branch
> 100 Wall Street
> New York, New York 10005
>
> Attention: General Manager
>
> Facsimile No: +1 212 809 4720

A notice or other communication received on a non-working day or after business hours in the place of receipt, shall be deemed to be served on the next following working day in such place.

SECTION 12.03. <u>No Waiver, Remedies</u>. No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder or under the Notes shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 12.04. <u>Costs; Expenses</u>. (a) Whether or not any Term Loan or Revolving Advance is made or the transactions contemplated by this Agreement are consummated (including the proposed execution and delivery of the other Loan Documents), the Borrower agrees to pay on demand all reasonable out-of-pocket costs and expenses of the Lender in connection with the preparation,

execution, delivery, administration, modification and amendment of the Loan Documents and the other documents to be delivered hereunder including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Lender with respect thereto, and for advising the Lender as to its rights and responsibilities, or the protection or preservation of rights or interests, under the Loan Documents. The Borrower further agrees to pay on demand all reasonable out-of-pocket costs and expenses of the Lender in connection with the enforcement of the Loan Documents and the other documents to be delivered hereunder, whether in action, suit, litigation, any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally or otherwise (including, without limitation, the reasonable fees and reasonable expenses of counsel for the Lender with respect thereto) and expenses in connection with the enforcement of rights under this Section 12.04(a).

(b)     If any payment of principal of any installment of the Term Loan (or any relevant portion thereof) is made by the Borrower to the Lender other than on a Payment Date, as a result of a payment pursuant to Section 2.04, acceleration of the maturity of the Term Loan Note pursuant to Section 11.01 or for any other reason, the Borrower shall, upon demand by the Lender pay to the Lender any amounts required to compensate such Lender for any additional losses, costs or expenses which it may reasonably incur as a result of such payment, including, without limitation, any loss, cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Lender to fund or maintain the Term Loan (or any relevant portion thereof).

(c)     Each of the Obligors jointly and severally agrees to indemnify and hold harmless the Lender and each of its Affiliates, and their respective officers, directors, employees, agents, advisors and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party, arising out of or in connection with or relating to (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the making of the Term Loan or the Revolving Advances or consummation of any other transaction contemplated hereby, (ii) the Term Loan or the Revolving Advances or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Environmentally Sensitive Material on or from any property owned or operated by any Obligor, or any Environmental Action related in any way to any Obligor, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnified Party is a party thereto, except, with respect to any particular Indemnified Party, to the extent such claim, damage, loss, liability or expense is either admitted to by such Indemnified Party or found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct, provided that the foregoing exceptions to the liability of the Obligors with respect to such Indemnified Person shall not limit or affect the liability of the Obligors to any other Indemnified Party. Each of the Obligors jointly and severally further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Obligor or any of their respective shareholders, members or creditors for or in connection with the transactions contemplated hereby, except, with respect to any particular Indemnified Party, to the extent such liability is either admitted to by such Indemnified Party or found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. The indemnities of this Section 12.04(c) shall survive the termination of this Agreement, the Notes and the other Loan Documents.

19101732 v3

SECTION 12.05. <u>Right of Set-off</u>. Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower to the Lender now or hereafter existing under this Agreement and the Notes held by the Lender, whether or not the Lender shall have made any demand under this Agreement or the Notes and although such obligations may be unmatured. The Lender agrees promptly to notify the Borrower after any such set-off and application shall be made by the Lender, <u>provided</u> that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Lender under this Section 12.05 are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Lender may have.

SECTION 12.06. <u>Assignments and Participations</u>. (a) This Agreement shall be binding upon and inure to the benefit of the Lender and the Borrower and their respective successors and permitted assigns.

(b)     The Borrower may not assign or transfer all or any part of its rights and/or obligations under this Agreement.

(c)     The Lender may, at its expense, assign or transfer all or any part of its rights or obligations under this Agreement, the Notes and the Loan Documents without the consent of the Borrower. The Lender shall notify the Borrower promptly following any such assignment or transfer, and the Borrower shall take all reasonable actions requested by the Lender to effect such assignment or transfer.

(d)     The Lender may change its lending office without the consent of the Borrower provided that the Lender shall notify the Borrower promptly following any such change of lending office and such change of lending office shall not result in a Material Adverse Effect with respect to the Borrower and its Subsidiaries, taken as a whole.

(e)     The Lender may, at its own expense, sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement (including without limitation, all or a portion of its Commitments, the Term Loan, any Revolving Advance and the Notes); <u>provided</u>, <u>however</u>, that (i) the Lender's obligations under this Agreement (including, without limitation, its Commitments to the Borrower hereunder) shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Lender shall remain the holder of the Notes for all purposes of this Agreement, (iv) the Borrower shall continue to deal solely and directly with the Lender in connection with this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by the Borrower therefrom, except to the extent that such amendment, waiver or consent would reduce or postpone any date fixed for payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation.

(f)     The Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 12.06, disclose to the assignee or participant or proposed assignee or participant, any information relating to the Obligors to be furnished to the Lender by or on behalf of the Borrower.

19101732 v3

SECTION 12.07. <u>Judgment</u>. (a) If for the purposes of obtaining judgment in any court it is necessary to convert a sum due hereunder or under a Note in Dollars into another currency, the parties hereto agree, to the fullest extent that they may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures the Lender could purchase Dollars with such other currency on the Business Day preceding that on which final judgment is given.

(b)     The obligation of each Obligor in respect of any sum due from it to the Lender hereunder or under the Notes or any other Loan Document shall, notwithstanding any judgment in a currency other than Dollars, be discharged only to the extent that on the Business Day following receipt by the Lender of any sum adjudged to be so due in such other currency the Lender may in accordance with normal banking procedures purchase Dollars with such other currency; if the Dollars so purchased are less than the sum originally due to the Lender in Dollars, such Obligor agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Lender against such loss, and if the Dollars so purchased exceed the sum originally due to the Lender in Dollars, the Lender agrees to remit to such Obligor such excess.

SECTION 12.08. <u>Governing Law; Submission to Jurisdiction</u>. (a) This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York.

(b)     Each Obligor hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each Obligor hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State Court or, to the extent permitted by law, in such Federal court. Each Obligor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Subject to the foregoing and to paragraph (c) below, nothing in this Agreement shall affect any right that any party hereto may otherwise have to bring any action or proceeding relating to this Agreement against any other party hereto in the courts of any jurisdiction.

(c)     Each Obligor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State or Federal court and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any immunity from jurisdiction of any court or from any legal process with respect to itself or its property.

(d)     Each Obligor agrees that service of process may be made on it by personal service of a copy of the summons and complaint or other legal process in any such suit, action or proceeding, or by registered or certified mail (postage prepaid) to its address specified in Section 12.02, or by any other method of service provided for under the applicable laws in effect in the State of New York.

SECTION 12.09. <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

19101732 v3

SECTION 12.10. <u>WAIVER OF JURY TRIAL</u>. EACH OF THE OBLIGORS AND THE LENDER IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE TERM LOAN, THE REVOLVING ADVANCES OR THE ACTIONS OF THE LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

SECTION 12.11. <u>Entire Agreement</u>. This Agreement, the Notes and the other Loan Documents embody the entire agreement between the parties relating to the subject matter hereof and supersede all prior agreements, representations and understandings, if any, relating to such subject matter.

SECTION 12.12. <u>Severability of Provisions</u>. Any provision of the Loan Documents that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or enforceability without invalidating the remaining provisions thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 12.13. <u>USA PATRIOT Act Notice</u>. The Lender hereby notifies each Obligor that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.: 107-56 (signed into law October 26, 2001)) (the "<u>PATRIOT Act</u>"), it may be required to obtain, verify, and record information that identifies each Obligor, which information includes the name of each Obligor and other information that will allow the Lender to identify each Obligor in accordance with the PATRIOT Act, and each Obligor agrees to provide such information from time to time to the Lender.


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

19101732 v3

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

GCL SHIPPING CORP.

By: _____
Name: Bijan Paksima
Title: Attorney-in-Fact

GLOBAL CONTAINER LINES LIMITED

By: _____
Name: Bijan Paksima
Title: Attorney-in-Fact

SHIPTRADE, INC.

By: _____
Name: Bijan Paksima
Title: Attorney-in-Fact

GLOBAL PROGRESS LLC

By: _____
Name: Bijan Paksima
Title: Attorney-in-Fact

GLOBAL PROSPERITY LLC

By: _____
Name: Bijan Paksima
Title: Attorney-in-Fact

NATIONAL BANK OF PAKISTAN

By: _____
Aslam Boolani
Executive Vice President & General Manager

By: _____
Ishtiaque Ahmed
Senior Vice President & Chief Financial
Officer