CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 357-3700
Matthew G. Roseman, Esq. (MR 1387)
C. Nathan Dee, Esq. (CD 9703)
Bonnie Pollack, Esq. (BP 3711)

Proposed Attorneys for Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                              Chapter 11

GLOBAL CONTAINER LINES LTD., et al.,                Case Nos. 09-78585 (AST)
                                                              09-78584 (AST)
                                                              09-78589 (AST)
                                                              09-78586 (AST)
                                                              09-78587 (AST)
                                                              09-78588 (AST)
                                                              09-78590 (AST)

                           Debtors.
------------------------------------------------------------x

TO THE HONORABLE ALAN S. TRUST
UNITED STATES BANKRUPTCY JUDGE:

Pursuant to 11 U.S.C. §§ 105, 108, 363, 364 of the United States Bankruptcy Code (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedure 2002, 6004, 9006 and 9014 (the "Bankruptcy Rules"), and Local Bankruptcy Rules 9006-(1)(a) and 9014-1 (the "Local Rules"), Container Lines, Ltd. ("Global"), Shiptrade, Inc. ("Shiptrade"), GCL Shipping Corp. ("GCL"), Redstone Shipping Corp. ("Redstone"), Gilmore Shipping Corp. ("Gilmore"), Global Progress LLC ("Progress") and Global Prosperity LLC ("Prosperity"; collectively, the "Debtors"), debtors and debtors-in-possession herein, by and through their proposed counsel, Cullen and Dykman LLP, hereby reply (the "Reply") to the objections of Container Applications Limited

("CAI"), Seacastle Container Leasing LLC ("Seacastle) and TAL International Container Corp ("TAL" and collectively with CAI and Seacastle, the "Container Lessors)[1] to the Debtors' motion for entry of a final order authorizing the Debtors, among other things, to enter into a debtor in possession financing agreement with National Bank of Pakistan ("NBP") and for use of cash collateral (the "DIP Motion"). In further support hereof, the Debtors aver as follows:

## I. Preliminary Statement

Importantly, the Court should note that the Container Lessors do not object to the substantive provisions of the DIP Motion regarding the Debtors entry into the DIP facility with NBP. Instead, without advancing any post-petition financing to the Debtors to justify their request, the Container Lessors simply seek to elevate their post-petition administrative claims into super priority administrative claims above NBP's claim, and every other administrative creditors claim, without any basis in law or fact.

The Court should be advised that the Debtors have used the proceeds from the emergency DIP financing that the Court approved at the November 12, 2009 hearing to pay critical vendors, to release Maritime Liens on the vessels and to transport cargo for the UN. In turn, the UN has paid the Debtors the sum of Two Hundred Thirty Thousand One Hundred Eighty Nine Dollars ($230,189.00) since the hearing date and further approved for payment the sum of One Million Three Hundred Eighty Three Thousand Two Hundred and Twenty Three Dollars and Thirty Nine cents ($1,383,223.39) that the Debtors anticipate receiving in the near future to be used for working capital purposes to pay their administrative expenses.

---

[1] In its pleading, TAL simply joins in the argument arguments raised by Seacastle and CAI in their opposition to the DIP Motion. Accordingly, the Debtors will not separately address any of the arguments raised by TAL in its pleading other than to note that any post petition amounts due and owing TAL under its lease agreement have yet to become due and owing pursuant to the terms of that agreement since TAL invoices the Debtors on a monthly basis beginning on the first of each month.

2

In their opposition, Seacastle and CAI assert (i) that the Court should deny the DIP Motion because their respective leases with the Debtors were allegedly terminated pre-petition and (ii) that the Court should grant the Container Lessors a super-priority administrative claim over the NBP and all the other creditors of the Debtors because the Debtors "transportation cannot be done without ocean containers" which presumably mean the Container Lessors' containers.[2] The Container Lessors' allegations seriously lack merit and are factually misleading for the following reasons:

- In their opposition, the Container Lessors disingenuously assert that they are entitled to a superpriority administrative claim over all other claimants in the Debtors' collateral even though they are not extending post-petition credit to the Debtors as required by Section 364 (c)(1) of the Bankruptcy Code because absent the use of their containers, the Debtors cannot fulfill their UN contracts. The Container Lessors are wrong. The Debtors are currently not using a single container of the Container Lessors in their UN or project business and do not anticipate using any in the future. The Debtors project and UN business, around which the Debtors intend to reorganize, does not require the use containers of the Container Lessors because the armored personnel carries, water trucks, tankers and prefabricated housing, bagged, bulk, and palletized foodstuffs etc that the Debtors transport as part of their UN and project business do not require containers for transport since they are transported either "roll on, roll off" or in "break bulk" or "bulk" by the Debtors.

- Seacastle failed to comply with the clear, plain and unambiguous language of Seacastle Agreements (defined later herein) that required all written notices to the Debtors, including any purported termination letter, to be <u>sent via registered or certified mail</u>. Instead, Seacastle's general counsel sent the Debtors a purported termination letter <u>via electronic mail</u> on September 23, 2009. Consequently, the Seacastle Agreements were not terminated by Seacastle prior to the Petition Date because of Seacastle's failure to comply with the notice provisions of its own agreement. Additionally, the Debtors assert that substantial equity exists in the Seacastle containers that should be realized for the benefit of the Debtors' estates and respective creditors should the Debtors decide to exercise their rights to purchase the containers according to the terms of the Seacastle Agreements.

- CAI failed to comply with the clear, plain and express language of the CAI Agreement (defined later herein) that requires sixty (60) days prior written notice

---

[2] The Debtors reserve all their rights to assume or reject any executory lease or conditional sales contract they may have with the Container Lessors or any other party to such an agreement at a later date pursuant to Section 365 of the Bankruptcy Code.

3

of CAI's intention to terminate the CAI Agreement. On November 9, 2009, one day prior to the Petition Date, CAI sent a termination letter to the Debtors seeking to terminate the CAI Agreement. Accordingly, the CAI Agreement has not been terminated pursuant to the plain terms of that particular agreement and Sections 108 and 362 of the Bankruptcy Code.

The Court should overrule the Container Lessors' opposition to the DIP Motion because the Container Lessors are improperly seeking a super priority administrative claim over the claims of NBP, which is making a multimillion DIP loan to the Debtors, and all other post-petition creditors based upon a false premise i.e. absent use of the Container Lessor's containers, the Debtors will be unable to fulfill their UN contracts. The Court should also overrule the Container Lessor's objections because their respective leases and installment purchase contracts with the Debtors were not terminated prior to the Petition Date.

### I. JURISDICTION

1. The Court has jurisdiction over this application under 28 USC §1334, which is a core proceeding with the meaning of 28 USC §157(b)(2). Venue of this proceeding is proper pursuant to 28 USC §1408 and 1409

### II. INTRODUCTION

2. On November 10, 2009 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court and an order for relief under section 301 of the Bankruptcy Code was entered in the cases (the "Chapter 11 Cases").

3. The Debtors have been authorized to remain in possession of their property and to continue in the operation and management of their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4. Pursuant to an Order of the Court, the Debtors Chapter 11 Cases are being jointly administered pursuant to pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5. No official committee of unsecured creditors has yet been appointed by the Office of the United States Trustee for the Eastern District of New York in these Chapter 11 Cases.

6. Simultaneously with the filing of their petitions, the Debtors filed the Affidavit of Bijan Paksima pursuant to Local Bankruptcy Rule 1007-4 (the "Paksima Affidavit").

7. As discussed in more detail in the Paksima Affidavit, the Debtors operate in a highly competitive global industry that has been severely impacted by the sustained global recession that has caused the Debtors' business fundamentals to deteriorate.

8. The Debtors anticipate utilizing the Chapter 11 process to restructure their operations. Accordingly, Debtors have made plans to retrench and introduce changes into their business models seeking to streamline their operations to achieve greater profitability. A major component of this reorganization will be placing a greater emphasis on GCL's profitable "projects" business with the United Nations (the "UN") and reducing GCL's "liner service" until such time as the current shipping market environment improves. The Debtors anticipate that the post petition financing sought in their DIP Motion will enable them to sustain their business operations as a going concern based upon their UN projects side of the business until such time as global shipping outlook improves for their "liner" side of their business.

9 On November 12, 2009, the Debtors filed their DIP Motion. On November 16, 2009, after notice and a hearing, the Court entered an Order granting the Debtors' request for emergency relief and authorized the Debtors to use approximately $2.6 million in cash collateral

from the proceeds of the NBP DIP loan facility to avoid immediate and irreparable harm to the Debtors' respective estates.

10. At the hearing, the Court also scheduled a final hearing on the DIP Motion for December 1, 2009. At that hearing, the Debtors will seek final approval of the NBP DIP facility which includes an additional $1.4 million dollars in credit and/or advances by NBP to be used for post-petition working capital purposes in accordance with the terms of the Fifth Amendatory Agreement.[3]

### III. Response

11. On November 27, 2009, Seacastle and CAI filed their joint opposition to the DIP Motion. On November 30, 2009, TAL joined in the Seascastle/CAI opposition. As the basis for the Opposition, the Container Lessors assert that (i) the Court should not grant the DIP Motion without granting them a superpriority adminstrative claim because (i) the Seacastle Agreement and CAI Agreement were terminated pre-petition and (ii) the Debtors will be unable to fulfill their contractual obligations to the UN and others absent the use of the Container Lessors' containers.[4] As set forth further herein, both of the Container Lessors' arguments are unsupported by the law or the facts of these cases and their Opposition should be denied.

12. The Court should overrule the Container Lessor's opposition because it is an impermissible attempt to transform post-petition administrative claims in the ordinary course of

---

[3] Capitalized terms not otherwise defined herein shall have the same meaning as is ascribed to such terms in the DIP Motion. To the extent of any conflict between the terms of this Response and the terms of the DIP Motion, the terms of the DIP Motion shall control.

[4] The Container Lessors' Opposition also contains somewhat inflammatory accusations against the Debtors of trespass, theft and conversion of their personal property; however, both the CAI Agreement and the Seacastle Agreement provide specific mechanisms for calculating any losses incurred by the Container Lessors for the loss or alleged conversion of their respective containers. The Debtors submit that such language was inserted into the Seacastle Agreement and CAI Agreement by sophisticated business parties who understood that in the ordinary course of the international shipping business containers are lost, misplaced or inadvertently sold for a variety of reasons. It is the Debtors intention to treat any such claims arising under the Seacastle Agreement and CAI Agreement in the context of the Debtors' plan of reorganization.

the Debtors business under Section 364 (a) and 503(b)(1) of the Bankruptcy Code into superpriority claims under Section 364 (c)(1) of the Bankruptcy Code without a statutory or factual basis for such claims.

13. In their opposition, the Container Lessors fail to cite to a single legal authority either statutory in case law in support of their position that the Court should elevate their claims to a superpriority administrative priority over the claims of NBP and the Debtors other secured and post-petition administrative creditors.

14. Ironically, the only statutory predicate cited by the Container Lessors in their opposition is Section 365 of the Bankruptcy Code which the Debtors may use at a later date to support their motion to assume the lease purchase agreements with Seacastle in order to realize the equity in the Seacastle containers for the benefit of their respective estates and creditors. In that regard, the Debtors had paid Seacastle approximately eighty (80) percent of the value of their containers prior to the Petition Date and the Seacastle Agreement contains a $1.00 purchase option for the benefit of the Debtors. In that regard, based upon the $800,000 valuation place upon the containers in Seacastle and CAI's opposition, approximately $640,000 in equity exists in the containers for the benefit of the Debtors' creditors and their estates.

15. The Seacastle Agreements were not been terminated because Seacastle did not comply with the notice and termination provisions of its own agreement prior to the Petition Date. The clear, plain and unambiguous language of Article 17 of the Seacastle Agreement provides, in relevant part, that "all notices required to be given in writing shall be given either by hand delivery, by mail or by telex. <u>Such mail shall in all cases be by registered or certified mail</u>"[5] On September 23, 2009, Seacastle sent a letter to the Debtors purportedly terminating the

---

[5] True and accurate copies of the March 25, 2008 master lease agreement, the March 25, 2005 lease purchase agreement and the December 13, 2005 lease purchase agreement (the "Seacastle Agreements") between the Debtors

7

Seacastle Agreements via electronic mail.[6] Consequently, the Seacastle Agreement were never terminated by Seacastle prior to the Petition Date pursuant to the clear, express and unambiguous language of its own document. In that regard, the Debtors assert that substantial equity exists in the Seacastle containers that they intend to realize for the benefit of the Debtors' estates and respective creditors.

16. CAI also failed to terminate the CAI Agreement prior to the Petition Date. The clear, plain and express language of the CAI Agreement[7] provides, in relevant part, that the Debtors must have sixty (60) days prior written notice of CAI's intention to terminate the CAI Agreement. On November 9, 2009, one day prior to the Petition Date, CAI sent a termination letter to the Debtors seeking to terminate the CAI Agreement. Accordingly, the CAI Agreement was not terminated pursuant to the plain terms of that particular agreement and Sections 108 and 362 of the Bankruptcy Code. The Debtors have not yet made a business decision whether or not they intend to assume the CAI Agreement.

17. Finally, and perhaps most importantly, in their opposition, the Container Lessors disingenuously assert that they are entitled to a superpriority administrative claim over all other claimants in the Debtors' collateral because absent the use of their containers, the Debtors cannot fulfill their UN contracts. Seacastle's and CAI's counsel is an experienced maritime lawyer who should realize that this particular argument lacks a basis in fact. The Debtors' UN and project business, around which the Debtors intend to reorganize, does not require the use containers of the Container Lessors because the armored personnel carries, water trucks, tankers and prefabricated housing, bagged, bulk, and palletized foodstuffs etc that the Debtors transport as

---

and Seacastle and/or CAI are attached hereto as Exhibit A.

[6] A true and accurate copy of the electronic mail from Lisa D. Leach, the Vice President and General Counsel of Seacastle that contains the Seacastle Agreements is attached hereto as Exhibit B.

[7] A true and accurate unsigned copy of the February 1, 2008 master lease agreement between CAI and the Debtors is

part of the UN and project business do not require containers for transport since they are transported either "roll on, roll off" or in "break bulk" or "bulk" by the Debtors.

18. The reason that the Debtors' ships and logistical expertise is so highly valued by the UN is because the Debtors have a multi modal ability to transport the UN cargo using "roll on, roll off" and "break bulk". The roll on, roll off shipping of cargo is exactly as it sounds, the tanks, armored personnel carriers, trucks, tankers and water trucks simply roll on to the ramp up into the cargo vessel and roll off at their destination. No container is needed or used by the Debtors in the transportation of UN vehicles despite the Container Lessors' assertions to the contrary. The term "break bulk" means the transportation of a cargo that is not placed inside of a shipping container. The Debtors do use a limited number of containers in their UN and project business; however, the Debtors maintain their own pool of containers for use in the UN and project side of their business. The Debtors also purchase their containers locally at the point of origin destination port when transporting UN cargo when such purchases are more cost effective than using their own containers. Finally, the Court should be advised that the Debtors, from current account receivables intended to and have the wherewithal to meet their current obligations to administration creditors including the Container Lessors.

19. For all the reasons and arguments set forth above, the Debtors respectfully request that the Court overrule the Opposition and grant the DIP Motion.

## WAIVER OF MEMORANDUM OF LAW

---

attached hereto as Exhibit C.

9

20. The Debtors submit that no new or novel issue of law is presented with respect to the matters contained herein, and respectfully requests that the requirement of a memorandum of law, pursuant to LBR 9013-1(b) be waived.

**WHEREFORE**, the Debtors respectfully request that this Court enter an Order:

- A. Overruling the Opposition of the Container Lessors;
- B. Granting the DIP Motion and related Final Order; and
- C. Granting such further relief as is just and proper.

Dated: Garden City, New York
December 1, 2009

CULLEN AND DYKMAN LLP

By: s/Matthew G. Roseman
Matthew G. Roseman (MR 1387)
C. Nathan Dee (CD 9703)
Proposed Attorneys for Debtor and Debtors-in-Possession
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 296-9106