**Exhibit A**

```
1                    UNITED STATES BANKRUPTCY COURT
                     EASTERN DISTRICT OF NEW YORK
2

3       --------------------------------X
                                        :
4       In Re:                          :    09-78585 (AST)
                                        :
5         GLOBAL CONTAINER LINES LIMITED, :
                                        :    Central Islip, New York
6                           Debtor.     :    December 22, 2009
                                        :
7       --------------------------------X

8                    TRANSCRIPT OF VARIOUS MOTIONS
                   BEFORE THE HONORABLE ALAN S. TRUST
9                    UNITED STATES BANKRUPTCY JUDGE

10
        APPEARANCES:
11

12      For the Debtor:            MATTHEW G. ROSEMAN, ESQ.
                                   Cullen & Dykman, LLP
13                                 100 Quentin Roosevelt Boulevard
                                   Garden City, New York   11530
14
        For Sea Castle:            J. STEPHEN SIMMS, ESQ.
15                                 Simms, Showers, LLP
                                   20 S. Charles Street
16                                 Baltimore, Maryland   21201

17
        For TAL Int'l. Cont.:      MICHAEL L. SCHEIN, ESQ.
18                                 Vedder, Price, Kaufman & Kammholz
                                   1633 Broadway
19                                 New York, New York   10019

20      For Key Bank and:          PAUL A. LEVINE, ESQ.
          Key Equipment            Lemery, Greisler LLC
21                                 50 Beaver Street
                                   Albany, New York   12207
22

23                                 (Appearances continued on next page)

24

25


        Proceedings recorded by electronic sound recording, transcript
        produced by transcription service
```

APPEARANCES CONTINUED:

For Textainer Equipment:    BRUCE WEINER, ESQ.
                            Rosenberg, Musso & Weiner LLP
                            26 Court Street
                            Brooklyn, New York   11242

For U.S. Trustee:           Office of the United States Trustee
                            BY:   STAN YANG, ESQ.
                            Assistant United States Attorney
                            560 Federal Plaza
                            Central Islip, New York   11722

Court Transcriber:          SHARI RIEMER
                            TypeWrite Word Processing Service
                            211 N. Milton Road
                            Saratoga Springs, New York   12866

1          THE CLERK: -- 3, 4, 5, 6, 7 and 8, Case Number 09-
2   78585, Global Container Lines Ltd.

3          THE COURT: I'll take appearances, please.  First in
4   the courtroom.

5          MR. ROSEMAN:  Good afternoon, Your Honor.  Matthew
6   Roseman, Cullen and Dykman, counsel to the debtor.

7          MR. SCHEIN:  Good afternoon, Your Honor.  Michael
8   Schein, Vedder Price on behalf of TAL International Container
9   Corp.

10          MR. LEVINE:  Paul Levine, Your Honor, for Key Bank
11   National Association.

12          MR. DEE:  Nathan Dee, Cullen and Dykman for the
13   debtor.

14          MR. WEINER:  Bruce Weiner, Rosenberg, Musso & Weiner
15   for Textainer Equipment Manager U.S. Limited.

16          MR. SIMMS:  Steve Simms, Sea Castle and CAI.

17          MR. YANG:  Stan Yang, U.S. Trustee, Your Honor.

18          THE COURT: Very well.  Mr. Roseman.

19          MR. ROSEMAN: Good morning -- good afternoon, Your
20   Honor.  We have a number of matters on.  I think probably the
21   most expeditious way to handle this is to deal with the sale
22   motion of Global Precision and then the Key Bank motion
23   because they're interrelated and I think we have a general
24   understanding with Key Bank, and then we can deal with the
25   truly contested matters between -- regarding the rejection of

1  leases and the Sea Castle issue if that is amenable to the
2  Court.

3         THE COURT: All right.  That would be fine.

4         MR. ROSEMAN: Before the Court today is an emergency
5  motion to consider the sale of the Global Precision.  That's a
6  vessel owned by Gilmore Shipping, a debtor in this case, and
7  subject to the First Ship mortgage of Key Bank as well as the
8  retention of Maguire Shipbrokers Ltd. to effectuate the sale.

9         The Global Precision is currently anchored off the
10  Port of Sharjah in the United Arab Emirates.  It's
11  incapacitated and cannot move under its own power.  However,
12  as a matter of international maritime safety and law we have
13  to keep this boat -- keep this vessel manned with a crew and
14  this crew is -- encompasses approximately 20 sailors and we're
15  spending roughly $1,039.00 a day in crew wages and costs to
16  keep these people in water, food and maintain power to the
17  vessel.

18         Currently, the crew is owed approximately
19  $254,000.00 in wages and we expect to spend approximately
20  $10,000.00 through the estimated date of sale of 1/10/10 to
21  effectuate the sale of this vessel.  The broker, proposed
22  broker, Maguire Ship Broker, has canvassed 758 parties.  Of
23  those 758 parties, nine parties have inspected the vessel.  We
24  have eight offers.  These offers range which would range in a
25  result in a net sales proceed after their commission between

1   $1,463,000.00 to approximately $1,250,000.00.   In

2   conversations with Key Bank's counsel, those estimates of the

3   value of the vessel comport approximately with what they were

4   anticipating.   This vessel is going to be scrapped.   The cost

5   to repair the engine damage is between $2 and $3 million and

6   it's not economically feasible.   The scrap price is predicated

7   upon the ship weight and a few other variables.   So it's a

8   pretty much a known quantity and we're dealing with known

9   parties in the region.

10          Key Bank has raised certain concerns in their

11  response to the motion.   Probably the most important and most

12  pressing to Key Bank, and Key Bank is here to address this, is

13  the assurance that they'll have time to conduct whatever

14  investigations they need to pursue claims under the hull and

15  machinery policy and we believe and the debtor has been

16  assisting both Key Bank and on its own right the documentation

17  and prosecution of the claims on this policy.   We believe that

18  this is not a real issue because there have been multiple

19  inspections of the vessel, documents -- volumes of documents

20  have been turned over to the insurance broker and insurance

21  parties.   So we don't have a real concern there and I'm

22  confident that by the anticipated sale date we can address all

23  of those concerns.

24          I think as a matter of law the crew wages are

25  entitled to a maritime lien and a priority over the ship

1 mortgage and as a matter of basic fairness I think it's
2 imperative that we get the crew paid.  These people are on the
3 vessel. We need to pay them and repatriate them back to their
4 countries of origin so that we can effectuate the final sale
5 of the vessel.  In our response to Key Bank's response we cite
6 Desnick v. Sealift to support this proposition.

7 　　　　　We believe this sale and this transaction is
8 absolutely necessary and in the best interests of the estate.
9 Primarily it reduces the claim of Key Bank and the ultimate
10 claims to the non Gilmore debtors on the guarantees and
11 secondly Sharjah is our home port.  It's very important to our
12 business reputation that we deal with problems efficiently and
13 fairly.  We want to make sure that the marketplace has no
14 concerns that Global Container Lines, whether it be their Ship
15 Global Precision or their ship's Global progress and
16 prosperity are able to transport cargo efficiently and
17 maintain their obligations to the industry in general.

18 　　　　　THE COURT: What portions of the motion, if any,
19 remain contested by Key Bank?

20 　　　　　MR. ROSEMAN: Just possibly the exact timing of the
21 sale.

22 　　　　　THE COURT: All right.  Then as far as the retention
23 of the broker, is there any objection to Maguire Shipbrokers
24 being retained at the 1.5 percent commission?

25 　　　　　MR. LEVINE: No, Judge.

1          THE COURT: Mr. Yang.

2          MR. YANG: No objection, Your Honor.

3          THE COURT: Then let me hear from Mr. Levine on what

4   remain to be the contested portions of the sale motion.

5          MR. LEVINE: Thank you, Judge. I think the debtor's

6   reply that was filed last night overstated our position a

7   little bit. It wasn't really an objection. It was a

8   response. We understand very well the gravity of the

9   situation and appreciate the debtor's cooperation in working

10   with Key throughout this difficult process to try to realize

11   upon our collateral which obviously will benefit the estate by

12   substantially reducing our unsecured claim in the case.

13          I understand from counsel that the crew wages and --

14   will be approximately $250,000.00. Key Bank has had a very

15   unfortunate experience in a similar situation with the Red

16   Stone case and the Global Patriot in South Africa where --

17   against a $8.5 million debt. We'll be lucky to recover about

18   half a million dollars due to a number of priming liens, crew

19   wages, many other sorts of liens that the South African court

20   has determined prime are lien.

21          It would be helpful if we could have something in

22   the order that caps what the debtor can pay out without coming

23   back to this Court first as far as sort of at least a fail

24   safe or a safety amount such that if the priming liens are

25   more than I would suggest $300,000.00 I think that gives the

1  debtor a little bit of room.  Then they have to come back to

2  this Court for approval of any additional amounts before we

3  argue about it here.

4        THE COURT: Are these a mixture of pre and post-

5  petition wages?

6        MR. ROSEMAN: Yes, Your Honor.

7        THE COURT: So on the pre portion if we limited those

8  to the 507(a)(4) and 507(a)(5) per employee or per worker, do

9  you see any issue there?

10        MR. ROSEMAN: Yes, Your Honor, because we won't be

11  able to transfer the title to the vessel because the crew

12  won't leave the vessel.

13        THE COURT: I mean from a dollars and sense

14  standpoint is there any crew member on the vessel that

15  incurred more in unpaid pre-petition wages than the $10,800.00

16  and some limit for the property petition priority.

17        MR. ROSEMAN: We haven't done the analysis but it

18  could very well be so.

19        THE COURT: I recognize the bank's concern is they

20  don't want sort of a blanket pay whatever it is and have the

21  debtor then held hostage if you will in a bad sense that

22  there's an open ended amount that the debtor can pay and

23  perhaps those claims become unnecessarily inflated.  Would it

24  make sense to go ahead and set a limitation within an adequate

25  range of what the debtor currently estimates so that you have

1  an order that limits the wage amounts to -- whether

2  $300,000.00 is the right number or not.

3            MR. ROSEMAN: We have no problem with setting a

4  limit.  We think the limit -- I just conferred with my

5  client -- should be approximately $375,000.00 because we may

6  have some port charges that we're going to have to clear up as

7  well.

8            MR. LEVINE: These have a way of kind of increasing

9  as we speak.

10           THE COURT: We used to call that the claims getting

11  pregnant.

12           MR. LEVINE:  Your Honor, I won't object to that but

13  if that could be the number in the order and if we're going to

14  exceed that we got to come back and talk to Your Honor.

15           MR. DEE:  We have no problem with that, Your Honor.

16           THE COURT: There was an issue raised in the papers

17  about getting access, getting onto this ship for inspection or

18  other purposes.  Has that now been resolved so that these

19  other potential bidders can do such diligence as they need or

20  is this really just a scrap value sale so they don't really --

21           MR. DEE: Its' a scrap value sale but part of the

22  factoring in the scrap value is the equipment that's on the

23  ship.  Nine parties have inspected.  The crew is getting a

24  little aggressive.  We think potentially with this bankruptcy

25  court order which says there's going to be a sale and you're

1  going to get paid we may be able to address their concerns and
2  we're certainly going to do our best efforts to insure as much
3  access to the ship as possible.  But, again, it's a little bit
4  out of our control and we are in the United Arab Emirates.  So
5  the -- while the jurisdiction of this court is recognized I'm
6  not sure how enforceably or the steps we can take to enforce
7  it over there.

8  THE COURT: We've heard that before.

9  MALE VOICE:  Your Honor, as I understand from
10 counsel that the sale -- there would be a provision in the
11 order that the sale would not close before January 10th.

12 THE COURT: I heard January 10, 2010.  Was that for
13 the auction to close or the sale to close?

14 MALE VOICE:  Is there any way we can push that up a
15 little bit more?

16 MR. DEE:  Your Honor, I think the issue would be how
17 do you pay the crew in the interim.  When it comes to the
18 Gilmore entity the vessel for the seven months prior to being
19 brought into the port didn't generate any revenue. Because of
20 the [inaudible] facility we can't really use money from the
21 other debtors to pay the wages.  So if we can push it for more
22 two weeks -- I mean it's literally -- it's food, water and the
23 fuel.  It burns like a ton-and-a-half a fuel a day.  You have
24 to have electricity run the pipes and everything for safety
25 and humanitarian reasons.

1    THE COURT: Well, but ultimately we're not

2 determining lien perfection here today but I don't hear there

3 really being a challenge to Key Bank's lien.  We will get into

4 lien validity issues perhaps later in the case but if it takes

5 another week or so aren't you essentially eating into the

6 proceeds available to Key Bank?

7    MR. DEE: I think it's more an issue of the crew

8 hasn't been paid and trying to get this sale done as quickly

9 as possible so they can get paid.

10    MR. ROSEMAN:  Your Honor --

11    MR. DEE: We had to sell -- we had to agree to sell

12 some of the bunkers to the local port authorities to get the

13 agent to front some of the crew wages to prevent a mutiny the

14 first time to let [inaudible] to do the inspection.  I mean it

15 really is -- it's a somewhat contentious situation and while

16 we are all here and we understand that we're going to get a

17 court order and be able to promise the crew they're going to

18 get paid again, some of these people have been at sea for

19 seven months.

20    THE COURT: Is it possible though to stagger the sale

21 date from the possession date?  In other words, if the auction

22 is going to close on January 10th but if it turns out that your

23 client needs a few more days -- if it turns out they need a

24 few more days to further inspect the vessel, is that going to

25 interfere with the sale process to stagger the auction date

1  from the possession date?

2  MR. DEE: Your Honor, this is something we would talk

3  to Key Bank.  If they'd be willing to advance the funds

4  protected in the order so that we could pay and feed the crew

5  then we could extend the date to give them more time.

6  MR. ROSEMAN:  One of the problems we have is under

7  our Bank of Pakistan financing order we're not permitted to

8  spend any money from that facility on the Key Bank collateral.

9  Now Gilmore has no money in the estate.  The only liquidable

10  assets Gilmore has are the bunkers which is the fuel on the

11  ship that we've been selling to meet these current

12  requirements.  Our concern is we're going to run out of money

13  for food and water and electricity we're going to have a

14  terrible situation on our hands and be left with the

15  unenviable position of violating the court order and our

16  obligation to Bank of Pakistan to protect Key Bank.

17  MR. LEVINE:  Your Honor, I will tell my client to

18  live with the 10th and if --

19  THE COURT: Well, tell them they can have until the

20  11th because that's a Monday.  That's the business day unless

21  you're going to be -- maybe you can close on a Sunday there. I

22  don't know but it would seem in terms of bank funds clearing

23  that you need to close on a business day anyway.

24  MR. ROSEMAN:  I agree, Your Honor.

25  THE COURT: We'll set the sale date at January 11,

1 2010. We'll set a limit in the sale order of $375,000.00 to

2 be paid for past due wages, port charges, things that fall

3 within the maritime lien laws. If either the debtor needs to

4 come back to increase that limit on an expedited basis or, Mr.

5 Levine, if the bank needs to come back and seek to extend that

6 date then we can take that up on an expedited basis once you

7 find -- if either of you find yourself in that situation.

8 Presumably though to go beyond January 11th it would be

9 probably seem appropriate to then shift the holding cost over

10 to Key Bank but we may or may not get there.

11 Mr. Yang, any issue from your office on either of

12 the sale itself, the retention of the broker or these

13 conditions on the sale?

14 MR. YANG: No, Your Honor. I think this is probably

15 the best judgment that this is using in terms of [inaudible]

16 together this equipment because it's really just costing

17 additional -- incurring I should say, incurring additional

18 expenses to the estate. Essentially this case from what I was

19 told is talking about some of the factors in my amount. The

20 debtor has no prospect of any reorganization with respect to

21 Gilmore. So by giving of this ship probably it would save the

22 debtor a lot of unnecessary expenses on a going basis.

23 MR. LEVINE: Your Honor, if I could just have another

24 point. With regard to the date, I do wish to acknowledge that

25 the debtor has been cooperative in working -- Key Bank did

1  hire a UAE or an international firm with an UAE presence and a

2  UAE national to assist and we have been on the ship at least

3  once.  So we have been working together on that point.

4       My final point that I would like -- well, final two

5  points is I hear from counsel that the range of offers that

6  we're getting are between $1.2 and $1.4 million.  If we could

7  just have a floor that the debtor would not accept a bid below

8  $1.2 million.

9       MR. ROSEMAN: I have no problem with that, Your

10  Honor.

11       MR. LEVINE: I assume the debtor has every reason to

12  accept the highest responsible bid.

13       MR. ROSEMAN: Absolutely.

14       THE COURT: In the response the debtor had no

15  objection.  If Key Bank wants to credit bid they can go over

16  and participate in the 363(k) --

17       MR. ROSEMAN:  I think we'd rather have the U.S.

18  green backs, Your Honor.

19       THE COURT: What we'll do is we'll have the funds --

20  the net proceeds will be held in a protected debtor-in-

21  possession account.  Certainly after the sale, Mr. Levine, if

22  the bank -- if there's a disagreement about -- the validity or

23  perfection today that there's a disagreement about whether or

24  not those funds constitute the proceeds of the bank's

25  collateral then we'll try to get a hearing down to determine

1  the disposition of those.  It would seem that the interest the

2  debtor will earn on those funds will be somewhat slim but if

3  there's a disagreement after the dust settles about what's to

4  happen with those funds then I'll take those up at a

5  subsequent hearing.

6          MR. ROSEMAN:  Assuming that there is no

7  disagreement, Your Honor, would the parties just be able to

8  submit a further order authorizing the net to be paid to Key

9  Bank?

10          THE COURT: That should be noticed out and I"ll treat

11  it more in the nature of an agreed order lifting stay for

12  those purposes. So that would be on what used to be fifteen

13  days.  Now I think it's -- I think fifteen became fourteen

14  under the new rules.  So that would be a fourteen plus three

15  notice.

16          So now I'll look for an order, Mr. Roseman, that

17  authorizes the sale -- authorizes, expressly authorizes the

18  retention of Maguire Shipbrokers, sets the floor at the

19  auction of no less than $1.2 million U.S.  Set the sale date

20  of no earlier than January 11, 2010, sets a limit on the

21  amount the debtor can expend for wages, port charges at

22  $375,000.00 and then provides that either the debtor or Key

23  Bank can seek expedited relief from the Court in terms of the

24  need for inspection or if necessary to increase the amount

25  that can be paid on wages and port charges.

1    MR. ROSEMAN: Thank you, Your Honor.

2    MR. LEVINE: Thank you, Judge.

3    THE COURT: Very well. Thank you.

4    MR. ROSEMAN: If we can address Key Bank's motion.

5    We've resolved that motion whereby, and we'll be submitting a

6    stipulation today or tomorrow whereby the debtor will consent

7    to the vacation of the stay so that Key Bank can pursue its

8    rights and remedies under the insurance policies both with the

9    Gilmore vessel and the Red Stone vessel. The portion of the

10   motion concerning adequate protection for their liens on

11   containers and Steve Adoring [Ph.] equipment has been settled

12   in principle. We're going -- I believe we're going to have to

13   make a 9019 motion for that because it involves basically a

14   recasting of that debt so the debtor can retain possession of

15   that equipment on a going forward basis.

16   THE COURT: Mr. Levine.

17   MR. LEVINE: That's accurate, Your Honor. We have

18   exchanged a stipulated and agreed to order which actually I'd

19   like to take another look at given the outcome of today's

20   hearing on the sale motion before it gets submitted.

21   THE COURT: So then on the Key Bank motion for

22   adequate protection or to lift stay what we'll look for is

23   since there are parts of it or unopposed stay relief, the

24   parts of it are compromises let's just treat the whole thing

25   as a 9019 motion noticed as a Rule 9019 compromise. I take

those by presentment. So if you want to notice it by presentment then if there's an objection we'll set it down for hearing or by the end of today I may be assigning you another date for other hearings. So we may just be able to calendar it. Why don't we come back to that before we conclude today?

MR. LEVINE: Your Honor, I would just like to confirm though on the record that no party has an objection to Key proceeding with its insurance claim while that procedural process is underway. I don't think there's any dispute as to --

MR. ROSEMAN: The debtor has no objection.

THE COURT: Well, that portion of the motion was -- that part of the motion was unopposed. There's no opposition -- there's nobody here today opposing the Key Bank motion.

Then I'll note for record purposes that to the extent that Key Bank continues prosecuting his claims against the funds held in South Africa the stay is lifted for those purposes. That is so ordered on the calendar today and then we'll look for the larger motion that resolves the other issues.

MR. ROSEMAN: Thank you, Judge.

THE COURT: Thank you.

MR. ROSEMAN: Your Honor, I think it make sense now to address the debtor's motion and the opposition to the

1  debtor's motion to reject certain leases and abandon the

2  property pursuant to U.S.C. Sections 105, 365(a) and

3  Bankruptcy Rule 6006.

4         It's in the debtor's business judgment that it's in

5  the best interests of these estates to reject the container

6  leases contained in Exhibit A of our motion as amended to

7  include all of the Trighten [Ph.] leases.  Textron and TAL

8  have interposed certain objections but there's been no

9  challenge to the rejection of the leases and no challenge to

10 the debtor's business judgment.

11        The issue being raised is really threefold.  One,

12 that TAL and Textron are entitled to post-petition payments,

13 and I believe this issue has been discussed and addressed by

14 the Court in our December 1st hearing where the Court was

15 inclined to agree with the debtor's position that there's no

16 predicate for the relief they're seeking.  What's really

17 happening here is they're looking for a disguised super

18 priority claim.  They're saying you got a paper all of these

19 expenses that are ancillary to the debtor's leases with the

20 storage companies and the repair companies and that really

21 relates to their claim and we'll get to a point where claims

22 will be -- claims bar date will be set.  They'll file their

23 claims, what they think is appropriate, and if we think

24 there's an issue we'll object to those claims and we'll have

25 claims litigation but I don't think it needs to take place

1 | today and I don't think it has any bearing on the rejection of
2 | these contracts. These are clearly a debtor's business
3 | judgment. 365(a) contemplates the debtor rejecting contracts
4 | that are owners. Nobody said hey, these contracts aren't
5 | owners. What they're saying is for you to reject them you
6 | should have to make these payments and we disagree.

7 | The only case cited in support of that position is
8 | an Eastern District Pennsylvania case, In re: Hur, which
9 | really is distinguishable and not on point. In that case a
10 | bankruptcy trustee rejected a lease and physically retained
11 | possession of the property for six or nine months and at that
12 | point the leaseholders came in and said hey, you deprived us
13 | of the benefit of our bargain and you should have to pay our
14 | post-petition rental claims. Here, the debtor isn't doing
15 | anything. If third parties are controlling the equipment and
16 | property well, that's something that was implicit in their
17 | bargain. These container leases all contain provisions for
18 | circumstances where the containers or lost or stolen or
19 | rendered out of people's control. There's a liquidated damage
20 | clause per container in all of these leases. I think it's
21 | really a red herring and, in fact, a disguised priority claim.
22 | And going backwards again the time for that fight is not today
23 | in a rejection motion but in a response to an objection to
24 | their claims when they're filed.

25 | Within our motion --

1     THE COURT: There was some discussion about whether

2  the debtor has -- debtors have identified where they believe

3  the containers to be.

4     MR. ROSEMAN: Your Honor, on three separate occasions

5  we've emailed the locations of the containers were the latest

6  time this morning, updated container locations.  The fact of

7  the matter is from the date of the filing of this case to the

8  beginning of the case very few containers have been moved.

9  Now, we're talking about a handful that were on a single ship,

10  fourteen or fifteen.  We've continually updated these

11  containers and we continue to assist to the extent we can the

12  release of these containers upon the grantor -- granting of

13  this motion.

14     Once these leases are rejected then we have no

15  desire to continue to retain possession of this property and

16  within our motion we also requested a thirty day bar date and

17  we're willing to work with the leasing companies for a

18  mutually convenient bar date or we're -- or, in fact, we're

19  going to submit a separate bar date order for all cases so

20  we'll withdraw that portion of our motion.

21     THE COURT: I was going to ask.  I don't think we

22  have yet received a bar date order application.  I take those

23  ex parte.

24     MR. ROSEMAN: We will be submitting it shortly.

25     THE COURT: All right.  Then I'm not sure who wants

1  to be up first.  Mr. Schein.

2         MR. SCHEIN: Thank you, Your Honor.  Michael Schein,

3  Vedder Price on behalf of TAL.

4         As to the container list, we never received -- I

5  personally never received an email which is what the debtor

6  states in his record on December 15th.  I even had my entire IT

7  search through every email with Cullen and Dykman's suffix on

8  and nothing was ever -- so we don't believe any report was

9  ever provided other than what was provided just prior at the

10  bankruptcy and not in conjunction with the request that was

11  made at the last hearing. In fact, we only finally received an

12  email three hours prior to this hearing.  I'm not sure why if

13  the debtors believe they did send it out on the 15th, they got

14  our objection on that Friday.  Once we made that known they

15  could have just sent it out again or made note of it.  I don't

16  know why they waited to file a response and say we did it.

17  They should have just sent it but they only waited until three

18  hours before.  So I can't comment on the scope, accuracy,

19  veracity, whether it addresses all the things we requested

20  previously at the last hearing and put in our papers.  So I

21  reserve judgment on whether that list is complete, updated,

22  addresses the issues for purposes of my client and it makes

23  relevance, Your Honor, when I get to my objection about the

24  issue we have here.

25         Obviously I'll -- on the bar date side since they've

1  withdrawn I won't bother making any commentary as I understand

2  it.  We'll just have one standard bar date in the case.

3          Your Honor, they cite to a transcript of Your

4  Honor's commentary.  First of all, the way I read it because I

5  only have this page of the transcript, the transcript

6  doesn't -- the Court's statement didn't address the issue that

7  I raised, Your Honor, at the last hearing.  In the beginning

8  of the transcript it talks about the issues of property and

9  stay relief and the use of property and whether that was

10  entitled to further claim.

11          This is a very specific narrow issue.  I don't

12  believe the Court made any judgment on it at the last hearing

13  and reserved its rights to address it at the -- once the

14  debtor put forth their rejection papers.  We know what

15  rejection damages is and my client is quite capable of filing

16  a proof of claim for its rejection damages and we'll deal with

17  that another day.  But this is ransom damages.  This is a

18  circumstance which doesn't happen in the U.S. because of a

19  federal court order.  It's when a debtor rejects a lease for

20  personal property.  There's never an issue generally for the

21  third party to get its property back.  Landlords, anyone, they

22  don't look to be in contempt of a federal bankruptcy court's

23  order but we're not talking about being in the United States.

24  We're talking about being in foreign jurisdictions and we're

25  talking about circumstances where we have an absolute right

1 under our agreement. Rejection didn't terminate that
2 agreement. It gives us a right to exercise those remedies to
3 take back our property. We can't take back our property. We
4 gave the Court a clear example based on the email where we're
5 being -- our property is currently being held ransom by the
6 depot saying the debtor owes me money. Unless the debtor pays
7 me my money for warehousing that I'm not releasing your
8 containers and I don't really care about any court order. I'm
9 out here in a foreign jurisdiction and I'm not going to give
10 you your property unless you, third-party, my client, TAL,
11 pays the claims that the debtor owes.

12          Why should -- sorry.

13          THE COURT: But the rejection allowing the debtor to
14 reject the lease -- I've not yet heard that there's a dispute
15 on the debtor's business judgment.

16          MR. SCHEIN: We have none. We said in our papers we
17 have no issue with the rejection. We want to get back our
18 containers.

19          THE COURT: So the rejection is just authorizing the
20 debtor to lawfully breach the pre-petition contract.

21          MR. SCHEIN: Correct.

22          THE COURT: So then at that point there's an arm
23 wrestle between who has to bear the expense of returning the
24 leased equipment if the debtor either chooses not to do it or
25 can't do it, doesn't have the funds to do it and the lessor

1 opts to go get its equipment, doesn't that just create a claim
2 against the estate?

3 MR. SCHEIN: No, because it's more than return. We
4 aren't asking the debtor to pay for us to get the containers
5 and move them or do whatever or keep them at that port if we
6 decide and we pay going forward. That's return. That's
7 taking our property back. We will file a rejection claim for
8 that. We're talking about being able just to get our property.
9 As the emails make clear, that port isn't allowing us to do
10 anything with the property. We can't access the property
11 unless we pay claims that have nothing to do with us. It's
12 still property interest of the debtor. During the time that
13 this port is asking for payment the debtor had the right to
14 use it under the lease. So it was their property interest
15 even though we owned the underlying property.

16 It's just getting access to take the property and
17 move it wherever where we want to move it. What we didn't
18 include in this email chain, Your Honor, which I have a
19 subsequent letter, is according to the email which the debtor
20 misreads the party -- the debtor's reps told the port party
21 that we want to take all the containers and it says it in
22 there. We want to take all the containers including my
23 client's containers and move them somewhere else. We didn't
24 understand why. So what we told the port is my client already
25 has some containers there and we want to leave -- and this is

just one example.  We want you to leave our containers there
and we'll pay for going forward for storage because it's now
getting our property.  It's not the debtor's obligation.

The third party said okay, send us a letter right
away indicating that you would be willing to pay charges going
forward because the debtor has told us they will pay all
charges because they want to move all the containers,
including ours, and they couldn't stop the debtor from doing
that once they paid and it didn't make sense for us that those
containers get moved to some place else just to come back to
where they would be in the first place.

Unfortunately we've heard nothing in that response.
In fact, we heard nothing from the debtor's agents which is a
further concern we had is there's been zero cooperation by the
debtor's foreign agents, either responding, returning calls,
communication.  We're being told they've just hunkered down
and no response.  So our issue is two-fold. It's first, we
can't get a hold of our property to do whatever we want with
it because we're being held for ransom just like the email
says.  You pay us the debtor's claims, we'll let it go.
That's different than paying the cost of moving our property
out of a landlord space.  In that situation that's rejection
damages to take the property, go bring a mover and take it out
of the space but the landlord is not stopping you from taking
it out of the space.  He's not holding back because he sees

1 | there's a federal court order that says release the property
2 | and let him take it.

3 | THE COURT: But then what in your scenario is the
4 | alternative? If what you're arguing is I can't let the debtor
5 | reject the lease unless it pays what's required to -- for your
6 | client to retrieve the property then is the remedy simply to
7 | require the debtor to continue performing a lease it doesn't
8 | need any more?

9 | MR. SCHEIN: No, no. It's must simpler than that.
10 | The debtor can reject the lease. The Court can authorize the
11 | rejection and the debtor should be authorized and directed to
12 | pay its claims to that port to allow us -- as it relates to at
13 | least our property to allow us to come in and take our
14 | property.

15 | THE COURT: Or simply let your client decide if it's
16 | worth paying whatever those charges are and then filing a
17 | claim for them.

18 | MR. SCHEIN: But then we put the risk of --

19 | THE COURT: Your analysis burdens the estate with a
20 | cost they decided it can't bear. If it wanted to pay the
21 | charges associated with maintaining the equipment or
22 | maintaining the containers it would seek to assume the lease
23 | obligations and then sell the equipment.

24 | MR. SCHEIN: But the code never contemplated ransom
25 | charges being held out there. The debtors don't cite to a

1 single case where a court says it's the third party's
2 responsibility to pay the ransom. Why? Because we're in a
3 foreign jurisdiction where unfortunately as we said before
4 this Court's order unfortunately doesn't have a lot of weight.

5 THE COURT: Well, all my order does is allow the
6 debtor to lawfully breach the agreement.

7 MR. SCHEIN: But you could add to this order, give
8 the debtor the authority and direct the debtor to pay that
9 portion of the claims that hold back. It's not having -- it's
10 paying whatever it takes to release those claims as against
11 our property so that we can take back what we're rightfully
12 entitled to as a result of rejection. It's not the same --
13 we're not asking them to pay the shipping charges to move the
14 containers. There are claims for storing that property that
15 relate to our containers that are our property. The debtor
16 didn't pay those and as the email makes quite clear the depot
17 manager is not going to let us unless we pay.

18 There's nothing in the code in 365(g) and no case
19 law we found directs that a third party should be forced to
20 pay good ransom charges and then take the risk later on that
21 maybe this Court finds it to be an administrative claim or
22 not. The Court has the ability under its powers to authorize
23 the debtor to pay these pre-petition claims and probably a
24 portion of its post-petition so that we -- all we want to do
25 is take our property.

1       THE COURT: How is this any different that if these

2   containers were in Kansas?

3       MR. SCHEIN: Because there the landlord is not -- is

4   going to listen to the order.  Otherwise they'll be in

5   contempt and there's ability to enforce that order because

6   we're within the United States.  This is a unique circumstance

7   where we're in a foreign jurisdiction that doesn't provide for

8   a lot of recognition of U.S. orders.  The bottom line, the

9   deport party only cares about cash as it was made clear in

10  that email chain.  And the debtor did state originally that

11  they were going to pay it.  Their statement in the email says

12  the debtor is going to pay everything and then we just

13  heard -- it went radio silent and we've had no cooperation or

14  any response from the debtor's representatives.

15      THE COURT: And if the debtor doesn't have any

16  unencumbered funds to pay these charges with then what, then I

17  hold the debtor in contempt?

18      MR. SCHEIN: Well, first of all, the debtor hasn't

19  made a statement it doesn't have any monies under the DIP or

20  otherwise to use the funds to do so.  It has authority under

21  DIP or ordinary course. The debtors made representations that

22  all these monies were coming in from UN contracts and -- we're

23  not talking about right now hundreds of thousands of dollars

24  here but we should have the ability whether it's a pot of

25  money put aside to be able to be used by the container lessors

1  but it's unfair that we're basically going to be paying good
2  money after bad and taking the risk that this Court may or may
3  not find it to be a benefit to move. It's not what 365
4  contemplated and yes, there is no case out there because there
5  aren't that many foreign maritime cases that have faced this
6  issue but the example is there. Last time I said it was a
7  hypothetical -- we believed it would happen and here is the
8  proof and this is just one port.

9        THE COURT: Has anyone yet contacted -- I guess
10 you're saying this has already happened. You've contacted the
11 location, the locations where the containers are. They've
12 said we're owed storage charges. If the storage charges aren't
13 paid we're not releasing your containers.

14       MR. SCHEIN: And we couldn't contact any of the
15 others because while the debtors gave us a list a while back
16 we asked the debtor from the last hearing we needed contact
17 parties. A port is a large place. There are a lot of people.
18 You need to know who the right person and that's why all this
19 time has gone by where we could have made those
20 communications, could have reached out and found out what
21 economics we were talking about but I can't give the Court
22 that information because we didn't get the list until three
23 hours ago.

24       THE COURT: Once the leases or the contracts are
25 rejected, are these containers property of the estate?

1       MR. SCHEIN: No, because it's their -- they relieved
2   all obligation and right.  It's ours.  We'll take them or do
3   whatever we want.  They have no more -- in fact, we offered in
4   a separate letter that I could give the Court.  We offered to
5   pay from the moment -- the debtors pay going forward we would
6   take on all obligation for storage.
7       THE COURT: It's that point which, Mr. Schein, I'm
8   not sure whether it matters that these containers are in
9   Darfur or Kansas. Once they're no longer property of the
10  estate -- all my order has allowed is the debtor to breach the
11  equipment, to breach the lease.  The equipment is no longer
12  property of the estate.  There's a stay violation.  If the
13  landlord in Kansas says you can't have the equipment back
14  until you pay the warehouse charge.  So I'm not following why
15  this matters whether it's in Kansas or Darfur.
16      MR. SCHEIN: Well, right now it's still property
17  stayed.  It's still stayed.  We can't take any action on that
18  property right now.  It's all been -- it's still under the
19  stay.  We couldn't have taken any action to go forward.  We
20  weren't about to pay the debtor's claims. That's not my
21  client's responsibility but when this Court enters an order
22  authorizing the refection of that lease as part of that order
23  this Court can say in connection with rejecting the lease and
24  removing the stay we also direct the debtor to pay what's
25  appropriate to give access.  We're asking for access to our

1 property so we can take it away, and that is completely within

2 the Court's jurisdiction and there's nothing in the code and

3 there's no cases out there like I said that says this is not

4 transport or moving charges. This is access charges or what

5 we've called ransom charges because we are being held for

6 ransom. We are being held hostage by a third party and the

7 only reason is because the debtor didn't pay them. It raises

8 to -- it is an equitable situation. It seems inequitable and

9 not contemplated anywhere by the code that we should have to

10 pay more with the likelihood of never collecting against the

11 debtor's estate.

12 Now is the time where we need this to be addressed

13 because afterwards fine, we file a claim. What if this case

14 is administratively insolvent or otherwise. Then we're out of

15 luck and in the meantime we paid for the debtor's claims.

16 We're not paying our claims. We're paying the debtor's

17 claims.

18 THE COURT: All right. Mr. Simms, Mr. --

19 MR. SCHEIN: One further thing, Your Honor, and a

20 point. What we also ask for besides whatever the Court rules

21 on this is we ask the Court to direct the debtor to -- and its

22 foreign representatives to cooperate and provide reasonable

23 cooperation with -- I assume all the container lessors would

24 be on this, in getting our containers released from third

25 parties. We would need some language in the order to put

those third parties on notice to the extent there are places
where there are no claims maybe for storage and we just want
it in the order appropriate language that their foreign
representatives are going to cooperate with us to get access
to take back. We're not asking to incur costs but like I said,
their representatives have shut down.  They have not responded
to our foreign reps.  We've had no communication. We need the
debtor's cooperation in removing our property once rejection
is effective and we ask for language, notice something we put
in the order so we can advise also these third parties to let
them know that the stay has been lifted, that they can
cooperate with us for those that are concerned about the
order.  So we'd want those basic protections to be put in an
order so that we can get cooperation.

          THE COURT: I would take it that the debtor would
have no opposition to the stay -- to the extent that the stay
is in effect following rejection that it's lifted to allow any
of the container lessors to exercise their remedies.

          MR. ROSEMAN: We have no objection to that, Your
Honor.  I have to say that we really tried to bend over
backwards with all of our creditors and whenever we do
something for the container companies it's always not enough.
In fact, when we provided addresses for container companies we
had to rush to our various ports looking for a turnover of
those containers prior to any motions being made.

1          Judge, and I'll respond to his arguments at the
2   appropriate time, but I resent the fact that there's been
3   intimations that we haven't been cooperative because we have.
4   The email chains that's referenced in this motion with -- not
5   with the debtor, not with current agents of the debtor.
6   They're hearsay upon hearsay. This debtor cooperated with the
7   banks, continues to cooperate with all of the parties to the
8   extent their requests are reasonable and will continue to be
9   reasonable.
10          MR. SCHEIN: Your Honor, I don't --
11          THE COURT: Ultimately though it's boiling down to
12   somebody in some location is saying you can't have it unless
13   you pay me $50,000.00 or $5 million or whatever the number is.
14   The issue for -- well, the issue is who pays that amount now
15   if it's really necessary to obtain a release of the
16   containers.   I mean the cooperation side, the identifying of
17   where it is --
18          MR. ROSEMAN: We have no problem with that.
19          THE COURT:  -- lifting the stay to the extent it's
20   in effect upon rejection, I don't see any of those being an
21   issue.
22          MR. SCHEIN:  Although I'd say we haven't gotten
23   cooperation, Your Honor, because we were told at the last --
24   at the last hearing that we were going to promptly get these
25   lists.  Like I said, we didn't get it.  There was never any

1 email on the 15th sent. They haven't produced evidence to that

2 and we ask also in this order that the Court require the

3 debtor to further cooperate to the extent the list we just got

4 three hours are incomplete or don't have proper contact

5 information or the information doesn't work. We shouldn't

6 have to wait two more weeks. A lot could have been

7 accomplished the last couple of weeks once they filed their

8 motion. We put this out there at the last hearing. It's not

9 a surprise and we did not get cooperation and their foreign

10 agents didn't cooperate with our foreign agents and it could

11 be a he-said, she-said. The bottom line is we're trying to

12 make this as smooth as quickly as possible for everyone's

13 benefit here so we can take our property, the debtor can turn

14 off its spigot and everyone can move on so that the estate can

15 be maximized.

16 THE COURT: Before I hear you, Mr. Roseman, let me

17 see if any of the other -- either of the attorneys want to be

18 heard on this.

19 MR. WEINER: Yes, Your Honor. Bruce Weiner for

20 Textainer. Just first we don't object to the rejection of the

21 leases themselves.

22 We did this morning on the issue of the lists, we

23 did this morning receive a further list. The first two lists

24 that we received from the debtor my client took a look at and

25 told me that the lists were completely useless and did not

1  contain any information -- all the information necessary but I

2  did get the list this morning. I forwarded it onto my client,

3  the vice-president of risk management. He took a look at the

4  list, sent me back an email saying that the list that was

5  received this morning did contain the information that my

6  client needs to recover its containers.

7        On the other issue, I don't want to go in and repeat

8  all the arguments that Mr. Schein made. I joined in his

9  request in my papers and I join in his argument this afternoon

10  for all the reasons that he set forth without belaboring the

11  record.

12        THE COURT: Very well. Thank you. Mr. Simms.

13        MR. SIMMS: Just so we're clear for CAI. What's

14  happening is there's going to be an exchange of claims here.

15  That is the depots would have claims against the estate. It's

16  going to be transferred now to the lessors who have paid what

17  the depot say they're owed by the estate. That's the problem.

18        The detail that the order needs to go to too is any

19  bills that the debtor has gotten from the depots so that we

20  can negotiate those things out and agreements that there are

21  with the depots for charges.

22        MR. ROSEMAN: We have no problem with providing that

23  information. To the extent any agreements were made we'll

24  certainly provide them -- we'll provide them statements we

25  have from each of the depots.

1    THE COURT: And I suppose if necessary I could have a
2  hearing on what's owed but it sounds that there's great doubt
3  that if I had such a hearing the party seeking collection of
4  the charges would be very moved by my determination of what's
5  actually owed by the debtor.

6    MR. SIMMS: No, they wouldn't. That's all that
7  CAI --

8    MR. SCHEIN: Unless you want to have the hearing
9  overseas, Your Honor.

10    THE COURT: My jurisdiction is limited both
11  constitutionally and geographically but the stay extends
12  around the world but where it's honored is another issue.

13    MR. ROSEMAN: Correct, Your Honor. Just briefly in
14  response to the argument for the payment of the -- what he
15  calls the hostage, the ransom charges. What this really is is
16  a revisiting of the request for a super priority claim. They
17  came in and they made the same argument at the first DIP
18  motion and they said it's not fair, we're really forced
19  lenders. They have all these expenses and you should make
20  them pay this. The Court said you had no statutory predicate
21  for a super priority claim.

22    These are deals between sophisticated parties that
23  recognize the risk of this particular business deal. In fact,
24  in these leases there's a provision if the equipment becomes
25  lost or stolen. There's a liquidated damages clause and I

1   submit the reason for that clause being in there is it's very

2   common that this happens and if we can't return it a

3   particular container well, then they have a damage in the

4   amount of $700.00, $800.00, whatever the lease says, for that

5   particular container that can't be returned and that's part of

6   the claim.

7           While Mr. Schein likes to say this is a very unique

8   situation and while the geography may be unique, this is no

9   different than a warehouseman's claim.  I'm a debtor.  I

10  abandon equipment in a warehouse.  The secured party comes to

11  the warehouse and says I have a court order that says pay

12  me -- give me the equipment and I say you can have the

13  equipment when you pay me my warehouse charges.  Now, the only

14  practical difference is you can bring the warehouseman from

15  Kansas into this court but in reality what they're looking to

16  do is reshift the risk of the business deal between business

17  parties.  There's no statutory predicate.  There's no case law

18  which says hey, debtor and our rejection of a lease motion you

19  can be required to make various payments to depots and supply

20  houses.

21          THE COURT: But tell me, Mr. Roseman, from the

22  debtor's perspective let's say that I allow the leases to be

23  rejected, leave the lessors to their contractual remedies and

24  a location where the debtor stored leases says we need

25  $25,000.00 or you can't have your stuff back.  They pay the

1 $25,000.00 to get the stuff back. Is that then an

2 administrative claim?

3       MR. ROSEMAN: I would say no. I'd say it's an

4 unsecured claim. It's part of their rejection damages because

5 then we get into the problem well, what if we say it's not --

6 it shouldn't have been $25,000.00 and one of the reasons we

7 refuse to pay it is because we really think it's $3,000.00 and

8 how do we adjudicate that number with depot in Lahar,

9 Pakistan. What we really stand at risk here doing is making

10 the estate administratively insolvent because we don't know

11 what these numbers are.

12       THE COURT: But if the debtor -- or the debtor having

13 taken the position that it's up to the equipment lessors to

14 retrieve their property, if they make the decision that they

15 have to pay $25,000.00 to get it back, the debtor wants to

16 have the ability to second guess then whether they overpaid?

17       MR. ROSEMAN: Well, what we are -- our primary

18 argument would be there was no benefit conferred to the estate

19 and the evidence of that would be you had a liquidated damages

20 clause, and I"ll make up numbers, that put the value of this

21 collateral at $5,000.00 and you went and paid $25,000.00 and

22 now you want an administrative priority for it. What benefit

23 was conferred upon this debtor's estate? And I would submit

24 that none has been conferred and I think as a matter of law

25 they're entitled to their damage claim. We could litigate

1  over this later whether that damage is an admin claim or an
2  unsecured claim but it certainly isn't appropriate to make
3  that decision in a rejection motion and to incorporate it in
4  an order which could have far reaching effects on the
5  reorganization of this case.

6          THE COURT: As far as the issue though of cooperation
7  between the debtor, the debtor's foreign representatives, the
8  equipment lessors to cooperate in obtaining releases was the
9  word Mr. Schein used of the containers, if that obligation is
10 imposed absent monetary cooperation -- in other words, if I
11 instruct the debtor to do everything reasonably necessary to
12 assist in release of the containers, I take it the debtors
13 have no objection to that as long as I exclude the payment of
14 money.

15         MR. ROSEMAN: I have no objection to that.  I don't
16 believe it needs to be in an order because --

17         THE COURT: I think they'd feel better if it was in
18 an order.

19         MR. ROSEMAN: I have no doubt we're going to be
20 before you on the fight of what's reasonable and that's my
21 concern, Your Honor.

22         THE COURT: All right.  Mr. Yang, do you want in on
23 any of this?

24         MR. YANG: I don't think so, Judge.

25         THE COURT: Well, I'm certainly going to -- what I've

1  not heard -- what I have heard is that there's no dispute that

2  the debtor is probably exercised its business judgment to

3  reject the leases.  I'm going to authorize the debtor to

4  reject each of the leases listed in Exhibit A to the motion.

5      I'm going to reserve on the issue of who pays

6  because frankly if there is simply nothing else out there

7  besides the statute as it now exists and an Eastern District

8  of Pennsylvania case from 1986 I'm not sure if that would --

9  I'm not sure how helpful that is to me in the analysis.  If

10  there are other cases out there I'd like to see them but you

11  all want to move expeditiously to get your stuff back and you

12  would obviously like to know who's going to have to pay for it

13  in the first instance.  So I'm going to reserve on that.

14      I am going though to require the debtor and its

15  foreign representatives to the extent I have jurisdiction over

16  them that's derivative through he debtors, I'm going to direct

17  the debtors and their foreign representatives to cooperate

18  with the container lessors and their foreign representatives

19  as far as identifying to the extent known to the debtor with

20  exercise of reasonable diligence to find out where the

21  containers are so that we avoid the he-said, he-said, and then

22  she said something else disputes.  I'm going to direct that

23  the debtor file as a docket -- as a document docketed with the

24  Court a list of the containers that were leased that are the

25  subject of the rejection motion and the last known location of