```
 1                    UNITED STATES BANKRUPTCY COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3    --------------------------------X
                                      :
 4    In Re:                          :    09-78585 (AST)
                                      :
 5     GLOBAL CONTAINER LINES LIMITED, :
                                      :    Central Islip, New York
 6                       Debtor.       :    December 22, 2009
                                      :
 7    --------------------------------X

 8                    TRANSCRIPT OF VARIOUS MOTIONS
                  BEFORE THE HONORABLE ALAN S. TRUST
 9                 UNITED STATES BANKRUPTCY JUDGE

10
      APPEARANCES:
11

12    For the Debtor:              MATTHEW G. ROSEMAN, ESQ.
                                   Cullen & Dykman, LLP
13                                 100 Quentin Roosevelt Boulevard
                                   Garden City, New York  11530
14
      For Sea Castle:              J. STEPHEN SIMMS, ESQ.
15                                 Simms, Showers, LLP
                                   20 S. Charles Street
16                                 Baltimore, Maryland  21201

17
      For TAL Int'l. Cont.:        MICHAEL L. SCHEIN, ESQ.
18                                 Vedder, Price, Kaufman & Kammholz
                                   1633 Broadway
19                                 New York, New York  10019

20    For Key Bank and:            PAUL A. LEVINE, ESQ.
       Key Equipment               Lemery, Greisler LLC
21                                 50 Beaver Street
                                   Albany, New York  12207
22

23                                 (Appearances continued on next page)

24

25


      Proceedings recorded by electronic sound recording, transcript
      produced by transcription service
```

APPEARANCES CONTINUED:

For Textainer Equipment:    BRUCE WEINER, ESQ.
                            Rosenberg, Musso & Weiner LLP
                            26 Court Street
                            Brooklyn, New York  11242

For U.S. Trustee:           Office of the United States Trustee
                            BY:  STAN YANG, ESQ.
                            Assistant United States Attorney
                            560 Federal Plaza
                            Central Islip, New York  11722

Court Transcriber:          SHARI RIEMER
                            TypeWrite Word Processing Service
                            211 N. Milton Road
                            Saratoga Springs, New York  12866

1        THE CLERK: -- 3, 4, 5, 6, 7 and 8, Case Number 09-

2  78585, <u>Global Container Lines Ltd.</u>

3        THE COURT: I'll take appearances, please.  First in

4  the courtroom.

5        MR. ROSEMAN:  Good afternoon, Your Honor.  Matthew

6  Roseman, Cullen and Dykman, counsel to the debtor.

7        MR. SCHEIN:  Good afternoon, Your Honor.  Michael

8  Schein, Vedder Price on behalf of TAL International Container

9  Corp.

10        MR. LEVINE:  Paul Levine, Your Honor, for Key Bank

11  National Association.

12        MR. DEE:  Nathan Dee, Cullen and Dykman for the

13  debtor.

14        MR. WEINER:  Bruce Weiner, Rosenberg, Musso & Weiner

15  for Textainer Equipment Manager U.S. Limited.

16        MR. SIMMS:  Steve Simms, Sea Castle and CAI.

17        MR. YANG:  Stan Yang, U.S. Trustee, Your Honor.

18        THE COURT: Very well.  Mr. Roseman.

19        MR. ROSEMAN: Good morning -- good afternoon, Your

20  Honor.  We have a number of matters on.  I think probably the

21  most expeditious way to handle this is to deal with the sale

22  motion of Global Precision and then the Key Bank motion

23  because they're interrelated and I think we have a general

24  understanding with Key Bank, and then we can deal with the

25  truly contested matters between -- regarding the rejection of

1  leases and the Sea Castle issue if that is amenable to the

2  Court.

3          THE COURT: All right.  That would be fine.

4          MR. ROSEMAN: Before the Court today is an emergency

5  motion to consider the sale of the Global Precision.  That's a

6  vessel owned by Gilmore Shipping, a debtor in this case, and

7  subject to the First Ship mortgage of Key Bank as well as the

8  retention of Maguire Shipbrokers Ltd. to effectuate the sale.

9          The Global Precision is currently anchored off the

10 Port of Sharjah in the United Arab Emirates.  It's

11 incapacitated and cannot move under its own power.  However,

12 as a matter of international maritime safety and law we have

13 to keep this boat -- keep this vessel manned with a crew and

14 this crew is -- encompasses approximately 20 sailors and we're

15 spending roughly $1,039.00 a day in crew wages and costs to

16 keep these people in water, food and maintain power to the

17 vessel.

18         Currently, the crew is owed approximately

19 $254,000.00 in wages and we expect to spend approximately

20 $10,000.00 through the estimated date of sale of 1/10/10 to

21 effectuate the sale of this vessel.  The broker, proposed

22 broker, Maguire Ship Broker, has canvassed 758 parties.  Of

23 those 758 parties, nine parties have inspected the vessel.  We

24 have eight offers.  These offers range which would range in a

25 result in a net sales proceed after their commission between

1  $1,463,000.00 to approximately $1,250,000.00.  In

2  conversations with Key Bank's counsel, those estimates of the

3  value of the vessel comport approximately with what they were

4  anticipating.  This vessel is going to be scrapped.  The cost

5  to repair the engine damage is between $2 and $3 million and

6  it's not economically feasible.  The scrap price is predicated

7  upon the ship weight and a few other variables.  So it's a

8  pretty much a known quantity and we're dealing with known

9  parties in the region.

10        Key Bank has raised certain concerns in their

11  response to the motion.  Probably the most important and most

12  pressing to Key Bank, and Key Bank is here to address this, is

13  the assurance that they'll have time to conduct whatever

14  investigations they need to pursue claims under the hull and

15  machinery policy and we believe and the debtor has been

16  assisting both Key Bank and on its own right the documentation

17  and prosecution of the claims on this policy.  We believe that

18  this is not a real issue because there have been multiple

19  inspections of the vessel, documents -- volumes of documents

20  have been turned over to the insurance broker and insurance

21  parties.  So we don't have a real concern there and I'm

22  confident that by the anticipated sale date we can address all

23  of those concerns.

24        I think as a matter of law the crew wages are

25  entitled to a maritime lien and a priority over the ship

mortgage and as a matter of basic fairness I think it's
imperative that we get the crew paid.  These people are on the
vessel. We need to pay them and repatriate them back to their
countries of origin so that we can effectuate the final sale
of the vessel.  In our response to Key Bank's response we cite
Desnick v. Sealift to support this proposition.

We believe this sale and this transaction is
absolutely necessary and in the best interests of the estate.
Primarily it reduces the claim of Key Bank and the ultimate
claims to the non Gilmore debtors on the guarantees and
secondly Sharjah is our home port.  It's very important to our
business reputation that we deal with problems efficiently and
fairly.  We want to make sure that the marketplace has no
concerns that Global Container Lines, whether it be their Ship
Global Precision or their ship's Global progress and
prosperity are able to transport cargo efficiently and
maintain their obligations to the industry in general.

THE COURT: What portions of the motion, if any,
remain contested by Key Bank?

MR. ROSEMAN: Just possibly the exact timing of the
sale.

THE COURT: All right.  Then as far as the retention
of the broker, is there any objection to Maguire Shipbrokers
being retained at the 1.5 percent commission?

MR. LEVINE: No, Judge.

1          THE COURT: Mr. Yang.

2          MR. YANG: No objection, Your Honor.

3          THE COURT: Then let me hear from Mr. Levine on what

4  remain to be the contested portions of the sale motion.

5          MR. LEVINE: Thank you, Judge.  I think the debtor's

6  reply that was filed last night overstated our position a

7  little bit.  It wasn't really an objection.  It was a

8  response.  We understand very well the gravity of the

9  situation and appreciate the debtor's cooperation in working

10  with Key throughout this difficult process to try to realize

11  upon our collateral which obviously will benefit the estate by

12  substantially reducing our unsecured claim in the case.

13          I understand from counsel that the crew wages and --

14  will be approximately $250,000.00.  Key Bank has had a very

15  unfortunate experience in a similar situation with the Red

16  Stone case and the Global Patriot in South Africa where --

17  against a $8.5 million debt.  We'll be lucky to recover about

18  half a million dollars due to a number of priming liens, crew

19  wages, many other sorts of liens that the South African court

20  has determined prime are lien.

21          It would be helpful if we could have something in

22  the order that caps what the debtor can pay out without coming

23  back to this Court first as far as sort of at least a fail

24  safe or a safety amount such that if the priming liens are

25  more than I would suggest $300,000.00 I think that gives the

1   debtor a little bit of room. Then they have to come back to

2   this Court for approval of any additional amounts before we

3   argue about it here.

4         THE COURT: Are these a mixture of pre and post-

5   petition wages?

6         MR. ROSEMAN: Yes, Your Honor.

7         THE COURT: So on the pre portion if we limited those

8   to the 507(a)(4) and 507(a)(5) per employee or per worker, do

9   you see any issue there?

10         MR. ROSEMAN: Yes, Your Honor, because we won't be

11   able to transfer the title to the vessel because the crew

12   won't leave the vessel.

13         THE COURT: I mean from a dollars and sense

14   standpoint is there any crew member on the vessel that

15   incurred more in unpaid pre-petition wages than the $10,800.00

16   and some limit for the property petition priority.

17         MR. ROSEMAN: We haven't done the analysis but it

18   could very well be so.

19         THE COURT: I recognize the bank's concern is they

20   don't want sort of a blanket pay whatever it is and have the

21   debtor then held hostage if you will in a bad sense that

22   there's an open ended amount that the debtor can pay and

23   perhaps those claims become unnecessarily inflated. Would it

24   make sense to go ahead and set a limitation within an adequate

25   range of what the debtor currently estimates so that you have

1  an order that limits the wage amounts to -- whether

2  $300,000.00 is the right number or not.

3         MR. ROSEMAN: We have no problem with setting a

4  limit.  We think the limit -- I just conferred with my

5  client -- should be approximately $375,000.00 because we may

6  have some port charges that we're going to have to clear up as

7  well.

8         MR. LEVINE: These have a way of kind of increasing

9  as we speak.

10        THE COURT: We used to call that the claims getting

11 pregnant.

12        MR. LEVINE:  Your Honor, I won't object to that but

13 if that could be the number in the order and if we're going to

14 exceed that we got to come back and talk to Your Honor.

15        MR. DEE:  We have no problem with that, Your Honor.

16        THE COURT: There was an issue raised in the papers

17 about getting access, getting onto this ship for inspection or

18 other purposes.  Has that now been resolved so that these

19 other potential bidders can do such diligence as they need or

20 is this really just a scrap value sale so they don't really --

21        MR. DEE: Its' a scrap value sale but part of the

22 factoring in the scrap value is the equipment that's on the

23 ship.  Nine parties have inspected.  The crew is getting a

24 little aggressive.  We think potentially with this bankruptcy

25 court order which says there's going to be a sale and you're

going to get paid we may be able to address their concerns and
we're certainly going to do our best efforts to insure as much
access to the ship as possible.  But, again, it's a little bit
out of our control and we are in the United Arab Emirates.  So
the -- while the jurisdiction of this court is recognized I'm
not sure how enforceably or the steps we can take to enforce
it over there.

THE COURT: We've heard that before.

MALE VOICE:  Your Honor, as I understand from
counsel that the sale -- there would be a provision in the
order that the sale would not close before January 10th.

THE COURT: I heard January 10, 2010.  Was that for
the auction to close or the sale to close?

MALE VOICE:  Is there any way we can push that up a
little bit more?

MR. DEE:  Your Honor, I think the issue would be how
do you pay the crew in the interim.  When it comes to the
Gilmore entity the vessel for the seven months prior to being
brought into the port didn't generate any revenue. Because of
the [inaudible] facility we can't really use money from the
other debtors to pay the wages.  So if we can push it for more
two weeks -- I mean it's literally -- it's food, water and the
fuel.  It burns like a ton-and-a-half a fuel a day.  You have
to have electricity run the pipes and everything for safety
and humanitarian reasons.

1          THE COURT: Well, but ultimately we're not

2     determining lien perfection here today but I don't hear there

3     really being a challenge to Key Bank's lien.  We will get into

4     lien validity issues perhaps later in the case but if it takes

5     another week or so aren't you essentially eating into the

6     proceeds available to Key Bank?

7          MR. DEE: I think it's more an issue of the crew

8     hasn't been paid and trying to get this sale done as quickly

9     as possible so they can get paid.

10         MR. ROSEMAN:  Your Honor --

11         MR. DEE: We had to sell -- we had to agree to sell

12    some of the bunkers to the local port authorities to get the

13    agent to front some of the crew wages to prevent a mutiny the

14    first time to let [inaudible] to do the inspection.  I mean it

15    really is -- it's a somewhat contentious situation and while

16    we are all here and we understand that we're going to get a

17    court order and be able to promise the crew they're going to

18    get paid again, some of these people have been at sea for

19    seven months.

20         THE COURT: Is it possible though to stagger the sale

21    date from the possession date?  In other words, if the auction

22    is going to close on January 10th but if it turns out that your

23    client needs a few more days -- if it turns out they need a

24    few more days to further inspect the vessel, is that going to

25    interfere with the sale process to stagger the auction date

1  from the possession date?

2      MR. DEE: Your Honor, this is something we would talk

3  to Key Bank.  If they'd be willing to advance the funds

4  protected in the order so that we could pay and feed the crew

5  then we could extend the date to give them more time.

6      MR. ROSEMAN:  One of the problems we have is under

7  our Bank of Pakistan financing order we're not permitted to

8  spend any money from that facility on the Key Bank collateral.

9  Now Gilmore has no money in the estate.  The only liquidable

10  assets Gilmore has are the bunkers which is the fuel on the

11  ship that we've been selling to meet these current

12  requirements.  Our concern is we're going to run out of money

13  for food and water and electricity we're going to have a

14  terrible situation on our hands and be left with the

15  unenviable position of violating the court order and our

16  obligation to Bank of Pakistan to protect Key Bank.

17      MR. LEVINE:  Your Honor, I will tell my client to

18  live with the 10th and if --

19      THE COURT: Well, tell them they can have until the

20  11th because that's a Monday.  That's the business day unless

21  you're going to be -- maybe you can close on a Sunday there. I

22  don't know but it would seem in terms of bank funds clearing

23  that you need to close on a business day anyway.

24      MR. ROSEMAN:  I agree, Your Honor.

25      THE COURT: We'll set the sale date at January 11,

1  2010.  We'll set a limit in the sale order of $375,000.00 to

2  be paid for past due wages, port charges, things that fall

3  within the maritime lien laws.  If either the debtor needs to

4  come back to increase that limit on an expedited basis or, Mr.

5  Levine, if the bank needs to come back and seek to extend that

6  date then we can take that up on an expedited basis once you

7  find -- if either of you find yourself in that situation.

8  Presumably though to go beyond January 11th it would be

9  probably seem appropriate to then shift the holding cost over

10 to Key Bank but we may or may not get there.

11        Mr. Yang, any issue from your office on either of

12 the sale itself, the retention of the broker or these

13 conditions on the sale?

14        MR. YANG: No, Your Honor.  I think this is probably

15 the best judgment that this is using in terms of [inaudible]

16 together this equipment because it's really just costing

17 additional -- incurring I should say, incurring additional

18 expenses to the estate.  Essentially this case from what I was

19 told is talking about some of the factors in my amount.  The

20 debtor has no prospect of any reorganization with respect to

21 Gilmore.  So by giving of this ship probably it would save the

22 debtor a lot of unnecessary expenses on a going basis.

23        MR. LEVINE: Your Honor, if I could just have another

24 point.  With regard to the date, I do wish to acknowledge that

25 the debtor has been cooperative in working -- Key Bank did

1    hire a UAE or an international firm with an UAE presence and a

2    UAE national to assist and we have been on the ship at least

3    once.  So we have been working together on that point.

4              My final point that I would like -- well, final two

5    points is I hear from counsel that the range of offers that

6    we're getting are between $1.2 and $1.4 million.  If we could

7    just have a floor that the debtor would not accept a bid below

8    $1.2 million.

9              MR. ROSEMAN: I have no problem with that, Your

10   Honor.

11             MR. LEVINE: I assume the debtor has every reason to

12   accept the highest responsible bid.

13             MR. ROSEMAN: Absolutely.

14             THE COURT: In the response the debtor had no

15   objection.  If Key Bank wants to credit bid they can go over

16   and participate in the 363(k) --

17             MR. ROSEMAN:  I think we'd rather have the U.S.

18   green backs, Your Honor.

19             THE COURT: What we'll do is we'll have the funds --

20   the net proceeds will be held in a protected debtor-in-

21   possession account.  Certainly after the sale, Mr. Levine, if

22   the bank -- if there's a disagreement about -- the validity or

23   perfection today that there's a disagreement about whether or

24   not those funds constitute the proceeds of the bank's

25   collateral then we'll try to get a hearing down to determine

1  the disposition of those.  It would seem that the interest the

2  debtor will earn on those funds will be somewhat slim but if

3  there's a disagreement after the dust settles about what's to

4  happen with those funds then I'll take those up at a

5  subsequent hearing.

6        MR. ROSEMAN:  Assuming that there is no

7  disagreement, Your Honor, would the parties just be able to

8  submit a further order authorizing the net to be paid to Key

9  Bank?

10       THE COURT: That should be noticed out and I"ll treat

11  it more in the nature of an agreed order lifting stay for

12  those purposes. So that would be on what used to be fifteen

13  days.  Now I think it's -- I think fifteen became fourteen

14  under the new rules.  So that would be a fourteen plus three

15  notice.

16       So now I'll look for an order, Mr. Roseman, that

17  authorizes the sale -- authorizes, expressly authorizes the

18  retention of Maguire Shipbrokers, sets the floor at the

19  auction of no less than $1.2 million U.S.  Set the sale date

20  of no earlier than January 11, 2010, sets a limit on the

21  amount the debtor can expend for wages, port charges at

22  $375,000.00 and then provides that either the debtor or Key

23  Bank can seek expedited relief from the Court in terms of the

24  need for inspection or if necessary to increase the amount

25  that can be paid on wages and port charges.

1    MR. ROSEMAN: Thank you, Your Honor.

2    MR. LEVINE: Thank you, Judge.

3    THE COURT: Very well.  Thank you.

4    MR. ROSEMAN:  If we can address Key Bank's motion.

5  We've resolved that motion whereby, and we'll be submitting a

6  stipulation today or tomorrow whereby the debtor will consent

7  to the vacation of the stay so that Key Bank can pursue its

8  rights and remedies under the insurance policies both with the

9  Gilmore vessel and the Red Stone vessel.  The portion of the

10  motion concerning adequate protection for their liens on

11  containers and Steve Adoring [Ph.] equipment has been settled

12  in principle. We're going -- I believe we're going to have to

13  make a 9019 motion for that because it involves basically a

14  recasting of that debt so the debtor can retain possession of

15  that equipment on a going forward basis.

16    THE COURT: Mr. Levine.

17    MR. LEVINE: That's accurate, Your Honor.  We have

18  exchanged a stipulated and agreed to order which actually I'd

19  like to take another look at given the outcome of today's

20  hearing on the sale motion before it gets submitted.

21    THE COURT: So then on the Key Bank motion for

22  adequate protection or to lift stay what we'll look for is

23  since there are parts of it or unopposed stay relief, the

24  parts of it are compromises let's just treat the whole thing

25  as a 9019 motion noticed as a Rule 9019 compromise.  I take

1   those by presentment.  So if you want to notice it by

2   presentment then if there's an objection we'll set it down for

3   hearing or by the end of today I may be assigning you another

4   date for other hearings.  So we may just be able to calendar

5   it. Why don't we come back to that before we conclude today?

6           MR. LEVINE:  Your Honor, I would just like to

7   confirm though on the record that no party has an objection to

8   Key proceeding with its insurance claim while that procedural

9   process is underway.  I don't think there's any dispute as

10  to --

11          MR. ROSEMAN: The debtor has no objection.

12          THE COURT: Well, that portion of the motion was --

13  that part of the motion was unopposed.  There's no

14  opposition -- there's nobody here today opposing the Key Bank

15  motion.

16          Then I'll note for record purposes that to the

17  extent that Key Bank continues prosecuting his claims against

18  the funds held in South Africa the stay is lifted for those

19  purposes.  That is so ordered on the calendar today and then

20  we'll look for the larger motion that resolves the other

21  issues.

22          MR. ROSEMAN:  Thank you, Judge.

23          THE COURT: Thank you.

24          MR. ROSEMAN:  Your Honor, I think it make sense now

25  to address the debtor's motion and the opposition to the

1   debtor's motion to reject certain leases and abandon the

2   property pursuant to U.S.C. Sections 105, 365(a) and

3   Bankruptcy Rule 6006.

4          It's in the debtor's business judgment that it's in

5   the best interests of these estates to reject the container

6   leases contained in Exhibit A of our motion as amended to

7   include all of the Trighten [Ph.] leases.  Textron and TAL

8   have interposed certain objections but there's been no

9   challenge to the rejection of the leases and no challenge to

10  the debtor's business judgment.

11         The issue being raised is really threefold.  One,

12  that TAL and Textron are entitled to post-petition payments,

13  and I believe this issue has been discussed and addressed by

14  the Court in our December 1st hearing where the Court was

15  inclined to agree with the debtor's position that there's no

16  predicate for the relief they're seeking.  What's really

17  happening here is they're looking for a disguised super

18  priority claim.  They're saying you got a paper all of these

19  expenses that are ancillary to the debtor's leases with the

20  storage companies and the repair companies and that really

21  relates to their claim and we'll get to a point where claims

22  will be -- claims bar date will be set.  They'll file their

23  claims, what they think is appropriate, and if we think

24  there's an issue we'll object to those claims and we'll have

25  claims litigation but I don't think it needs to take place

today and I don't think it has any bearing on the rejection of these contracts. These are clearly a debtor's business judgment. 365(a) contemplates the debtor rejecting contracts that are owners. Nobody said hey, these contracts aren't owners. What they're saying is for you to reject them you should have to make these payments and we disagree.

The only case cited in support of that position is an Eastern District Pennsylvania case, <u>In re: Hur</u>, which really is distinguishable and not on point. In that case a bankruptcy trustee rejected a lease and physically retained possession of the property for six or nine months and at that point the leaseholders came in and said hey, you deprived us of the benefit of our bargain and you should have to pay our post-petition rental claims. Here, the debtor isn't doing anything. If third parties are controlling the equipment and property well, that's something that was implicit in their bargain. These container leases all contain provisions for circumstances where the containers or lost or stolen or rendered out of people's control. There's a liquidated damage clause per container in all of these leases. I think it's really a red herring and, in fact, a disguised priority claim. And going backwards again the time for that fight is not today in a rejection motion but in a response to an objection to their claims when they're filed.

Within our motion --

1      THE COURT: There was some discussion about whether

2 the debtor has -- debtors have identified where they believe

3 the containers to be.

4      MR. ROSEMAN: Your Honor, on three separate occasions

5 we've emailed the locations of the containers were the latest

6 time this morning, updated container locations.  The fact of

7 the matter is from the date of the filing of this case to the

8 beginning of the case very few containers have been moved.

9 Now, we're talking about a handful that were on a single ship,

10 fourteen or fifteen.  We've continually updated these

11 containers and we continue to assist to the extent we can the

12 release of these containers upon the grantor -- granting of

13 this motion.

14      Once these leases are rejected then we have no

15 desire to continue to retain possession of this property and

16 within our motion we also requested a thirty day bar date and

17 we're willing to work with the leasing companies for a

18 mutually convenient bar date or we're -- or, in fact, we're

19 going to submit a separate bar date order for all cases so

20 we'll withdraw that portion of our motion.

21      THE COURT: I was going to ask.  I don't think we

22 have yet received a bar date order application.  I take those

23 ex parte.

24      MR. ROSEMAN: We will be submitting it shortly.

25      THE COURT: All right.  Then I'm not sure who wants

1  to be up first.  Mr. Schein.

2          MR. SCHEIN: Thank you, Your Honor.  Michael Schein,

3  Vedder Price on behalf of TAL.

4          As to the container list, we never received -- I

5  personally never received an email which is what the debtor

6  states in his record on December 15th.  I even had my entire IT

7  search through every email with Cullen and Dykman's suffix on

8  and nothing was ever -- so we don't believe any report was

9  ever provided other than what was provided just prior at the

10  bankruptcy and not in conjunction with the request that was

11  made at the last hearing. In fact, we only finally received an

12  email three hours prior to this hearing.  I'm not sure why if

13  the debtors believe they did send it out on the 15th, they got

14  our objection on that Friday.  Once we made that known they

15  could have just sent it out again or made note of it.  I don't

16  know why they waited to file a response and say we did it.

17  They should have just sent it but they only waited until three

18  hours before.  So I can't comment on the scope, accuracy,

19  veracity, whether it addresses all the things we requested

20  previously at the last hearing and put in our papers.  So I

21  reserve judgment on whether that list is complete, updated,

22  addresses the issues for purposes of my client and it makes

23  relevance, Your Honor, when I get to my objection about the

24  issue we have here.

25          Obviously I'll -- on the bar date side since they've

1  withdrawn I won't bother making any commentary as I understand

2  it.  We'll just have one standard bar date in the case.

3         Your Honor, they cite to a transcript of Your

4  Honor's commentary.  First of all, the way I read it because I

5  only have this page of the transcript, the transcript

6  doesn't -- the Court's statement didn't address the issue that

7  I raised, Your Honor, at the last hearing.  In the beginning

8  of the transcript it talks about the issues of property and

9  stay relief and the use of property and whether that was

10  entitled to further claim.

11         This is a very specific narrow issue.  I don't

12  believe the Court made any judgment on it at the last hearing

13  and reserved its rights to address it at the -- once the

14  debtor put forth their rejection papers.  We know what

15  rejection damages is and my client is quite capable of filing

16  a proof of claim for its rejection damages and we'll deal with

17  that another day.  But this is ransom damages.  This is a

18  circumstance which doesn't happen in the U.S. because of a

19  federal court order.  It's when a debtor rejects a lease for

20  personal property.  There's never an issue generally for the

21  third party to get its property back.  Landlords, anyone, they

22  don't look to be in contempt of a federal bankruptcy court's

23  order but we're not talking about being in the United States.

24  We're talking about being in foreign jurisdictions and we're

25  talking about circumstances where we have an absolute right

under our agreement.  Rejection didn't terminate that

agreement.  It gives us a right to exercise those remedies to

take back our property.  We can't take back our property.  We

gave the Court a clear example based on the email where we're

being -- our property is currently being held ransom by the

depot saying the debtor owes me money.  Unless the debtor pays

me my money for warehousing that I'm not releasing your

containers and I don't really care about any court order. I'm

out here in a foreign jurisdiction and I'm not going to give

you your property unless you, third-party, my client, TAL,

pays the claims that the debtor owes.

Why should -- sorry.

THE COURT: But the rejection allowing the debtor to

reject the lease -- I've not yet heard that there's a dispute

on the debtor's business judgment.

MR. SCHEIN: We have none.  We said in our papers we

have no issue with the rejection.  We want to get back our

containers.

THE COURT: So the rejection is just authorizing the

debtor to lawfully breach the pre-petition contract.

MR. SCHEIN: Correct.

THE COURT: So then at that point there's an arm

wrestle between who has to bear the expense of returning the

leased equipment if the debtor either chooses not to do it or

can't do it, doesn't have the funds to do it and the lessor

1    opts to go get its equipment, doesn't that just create a claim

2    against the estate?

3            MR. SCHEIN: No, because it's more than return.  We

4    aren't asking the debtor to pay for us to get the containers

5    and move them or do whatever or keep them at that port if we

6    decide and we pay going forward.  That's return.  That's

7    taking our property back.  We will file a rejection claim for

8    that. We're talking about being able just to get our property.

9    As the emails make clear, that port isn't allowing us to do

10   anything with the property.  We can't access the property

11   unless we pay claims that have nothing to do with us.  It's

12   still property interest of the debtor.  During the time that

13   this port is asking for payment the debtor had the right to

14   use it under the lease.  So it was their property interest

15   even though we owned the underlying property.

16           It's just getting access to take the property and

17   move it wherever where we want to move it.  What we didn't

18   include in this email chain, Your Honor, which I have a

19   subsequent letter, is according to the email which the debtor

20   misreads the party -- the debtor's reps told the port party

21   that we want to take all the containers and it says it in

22   there.  We want to take all the containers including my

23   client's containers and move them somewhere else.  We didn't

24   understand why.  So what we told the port is my client already

25   has some containers there and we want to leave -- and this is

just one example. We want you to leave our containers there

and we'll pay for going forward for storage because it's now

getting our property. It's not the debtor's obligation.

The third party said okay, send us a letter right

away indicating that you would be willing to pay charges going

forward because the debtor has told us they will pay all

charges because they want to move all the containers,

including ours, and they couldn't stop the debtor from doing

that once they paid and it didn't make sense for us that those

containers get moved to some place else just to come back to

where they would be in the first place.

Unfortunately we've heard nothing in that response.

In fact, we heard nothing from the debtor's agents which is a

further concern we had is there's been zero cooperation by the

debtor's foreign agents, either responding, returning calls,

communication. We're being told they've just hunkered down

and no response. So our issue is two-fold. It's first, we

can't get a hold of our property to do whatever we want with

it because we're being held for ransom just like the email

says. You pay us the debtor's claims, we'll let it go.

That's different than paying the cost of moving our property

out of a landlord space. In that situation that's rejection

damages to take the property, go bring a mover and take it out

of the space but the landlord is not stopping you from taking

it out of the space. He's not holding back because he sees

1   there's a federal court order that says release the property

2   and let him take it.

3          THE COURT: But then what in your scenario is the

4   alternative? If what you're arguing is I can't let the debtor

5   reject the lease unless it pays what's required to -- for your

6   client to retrieve the property then is the remedy simply to

7   require the debtor to continue performing a lease it doesn't

8   need any more?

9          MR. SCHEIN: No, no.  It's must simpler than that.

10  The debtor can reject the lease.  The Court can authorize the

11  rejection and the debtor should be authorized and directed to

12  pay its claims to that port to allow us -- as it relates to at

13  least our property to allow us to come in and take our

14  property.

15         THE COURT: Or simply let your client decide if it's

16  worth paying whatever those charges are and then filing a

17  claim for them.

18         MR. SCHEIN: But then we put the risk of --

19         THE COURT: Your analysis burdens the estate with a

20  cost they decided it can't bear.  If it wanted to pay the

21  charges associated with maintaining the equipment or

22  maintaining the containers it would seek to assume the lease

23  obligations and then sell the equipment.

24         MR. SCHEIN: But the code never contemplated ransom

25  charges being held out there.  The debtors don't cite to a

single case where a court says it's the third party's
responsibility to pay the ransom. Why? Because we're in a
foreign jurisdiction where unfortunately as we said before
this Court's order unfortunately doesn't have a lot of weight.

THE COURT: Well, all my order does is allow the
debtor to lawfully breach the agreement.

MR. SCHEIN: But you could add to this order, give
the debtor the authority and direct the debtor to pay that
portion of the claims that hold back. It's not having -- it's
paying whatever it takes to release those claims as against
our property so that we can take back what we're rightfully
entitled to as a result of rejection. It's not the same --
we're not asking them to pay the shipping charges to move the
containers. There are claims for storing that property that
relate to our containers that are our property. The debtor
didn't pay those and as the email makes quite clear the depot
manager is not going to let us unless we pay.

There's nothing in the code in 365(g) and no case
law we found directs that a third party should be forced to
pay good ransom charges and then take the risk later on that
maybe this Court finds it to be an administrative claim or
not. The Court has the ability under its powers to authorize
the debtor to pay these pre-petition claims and probably a
portion of its post-petition so that we -- all we want to do
is take our property.

1      THE COURT: How is this any different that if these

2 containers were in Kansas?

3      MR. SCHEIN: Because there the landlord is not -- is

4 going to listen to the order.  Otherwise they'll be in

5 contempt and there's ability to enforce that order because

6 we're within the United States.  This is a unique circumstance

7 where we're in a foreign jurisdiction that doesn't provide for

8 a lot of recognition of U.S. orders.  The bottom line, the

9 deport party only cares about cash as it was made clear in

10 that email chain.  And the debtor did state originally that

11 they were going to pay it.  Their statement in the email says

12 the debtor is going to pay everything and then we just

13 heard -- it went radio silent and we've had no cooperation or

14 any response from the debtor's representatives.

15      THE COURT: And if the debtor doesn't have any

16 unencumbered funds to pay these charges with then what, then I

17 hold the debtor in contempt?

18      MR. SCHEIN: Well, first of all, the debtor hasn't

19 made a statement it doesn't have any monies under the DIP or

20 otherwise to use the funds to do so.  It has authority under

21 DIP or ordinary course. The debtors made representations that

22 all these monies were coming in from UN contracts and -- we're

23 not talking about right now hundreds of thousands of dollars

24 here but we should have the ability whether it's a pot of

25 money put aside to be able to be used by the container lessors

but it's unfair that we're basically going to be paying good
money after bad and taking the risk that this Court may or may
not find it to be a benefit to move. It's not what 365
contemplated and yes, there is no case out there because there
aren't that many foreign maritime cases that have faced this
issue but the example is there.  Last time I said it was a
hypothetical -- we believed it would happen and here is the
proof and this is just one port.

THE COURT: Has anyone yet contacted -- I guess
you're saying this has already happened.  You've contacted the
location, the locations where the containers are.  They've
said we're owed storage charges. If the storage charges aren't
paid we're not releasing your containers.

MR. SCHEIN: And we couldn't contact any of the
others because while the debtors gave us a list a while back
we asked the debtor from the last hearing we needed contact
parties.  A port is a large place.  There are a lot of people.
You need to know who the right person and that's why all this
time has gone by where we could have made those
communications, could have reached out and found out what
economics we were talking about but I can't give the Court
that information because we didn't get the list until three
hours ago.

THE COURT: Once the leases or the contracts are
rejected, are these containers property of the estate?

1        MR. SCHEIN: No, because it's their -- they relieved

2   all obligation and right.  It's ours.  We'll take them or do

3   whatever we want.  They have no more -- in fact, we offered in

4   a separate letter that I could give the Court.  We offered to

5   pay from the moment -- the debtors pay going forward we would

6   take on all obligation for storage.

7        THE COURT: It's that point which, Mr. Schein, I'm

8   not sure whether it matters that these containers are in

9   Darfur or Kansas. Once they're no longer property of the

10  estate -- all my order has allowed is the debtor to breach the

11  equipment, to breach the lease.  The equipment is no longer

12  property of the estate.  There's a stay violation.  If the

13  landlord in Kansas says you can't have the equipment back

14  until you pay the warehouse charge.  So I'm not following why

15  this matters whether it's in Kansas or Darfur.

16       MR. SCHEIN: Well, right now it's still property

17  stayed.  It's still stayed.  We can't take any action on that

18  property right now.  It's all been -- it's still under the

19  stay.  We couldn't have taken any action to go forward.  We

20  weren't about to pay the debtor's claims. That's not my

21  client's responsibility but when this Court enters an order

22  authorizing the refection of that lease as part of that order

23  this Court can say in connection with rejecting the lease and

24  removing the stay we also direct the debtor to pay what's

25  appropriate to give access.  We're asking for access to our

property so we can take it away, and that is completely within the Court's jurisdiction and there's nothing in the code and there's no cases out there like I said that says this is not transport or moving charges. This is access charges or what we've called ransom charges because we are being held for ransom. We are being held hostage by a third party and the only reason is because the debtor didn't pay them. It raises to -- it is an equitable situation. It seems inequitable and not contemplated anywhere by the code that we should have to pay more with the likelihood of never collecting against the debtor's estate.

Now is the time where we need this to be addressed because afterwards fine, we file a claim. What if this case is administratively insolvent or otherwise. Then we're out of luck and in the meantime we paid for the debtor's claims. We're not paying our claims. We're paying the debtor's claims.

THE COURT: All right. Mr. Simms, Mr. --

MR. SCHEIN: One further thing, Your Honor, and a point. What we also ask for besides whatever the Court rules on this is we ask the Court to direct the debtor to -- and its foreign representatives to cooperate and provide reasonable cooperation with -- I assume all the container lessors would be on this, in getting our containers released from third parties. We would need some language in the order to put

those third parties on notice to the extent there are places

where there are no claims maybe for storage and we just want

it in the order appropriate language that their foreign

representatives are going to cooperate with us to get access

to take back. We're not asking to incur costs but like I said,

their representatives have shut down.  They have not responded

to our foreign reps.  We've had no communication. We need the

debtor's cooperation in removing our property once rejection

is effective and we ask for language, notice something we put

in the order so we can advise also these third parties to let

them know that the stay has been lifted, that they can

cooperate with us for those that are concerned about the

order.  So we'd want those basic protections to be put in an

order so that we can get cooperation.

          THE COURT: I would take it that the debtor would

have no opposition to the stay -- to the extent that the stay

is in effect following rejection that it's lifted to allow any

of the container lessors to exercise their remedies.

          MR. ROSEMAN: We have no objection to that, Your

Honor.  I have to say that we really tried to bend over

backwards with all of our creditors and whenever we do

something for the container companies it's always not enough.

In fact, when we provided addresses for container companies we

had to rush to our various ports looking for a turnover of

those containers prior to any motions being made.

1    Judge, and I'll respond to his arguments at the
2 appropriate time, but I resent the fact that there's been
3 intimations that we haven't been cooperative because we have.
4 The email chains that's referenced in this motion with -- not
5 with the debtor, not with current agents of the debtor.
6 They're hearsay upon hearsay. This debtor cooperated with the
7 banks, continues to cooperate with all of the parties to the
8 extent their requests are reasonable and will continue to be
9 reasonable.

10    MR. SCHEIN: Your Honor, I don't --

11    THE COURT: Ultimately though it's boiling down to
12 somebody in some location is saying you can't have it unless
13 you pay me $50,000.00 or $5 million or whatever the number is.
14 The issue for -- well, the issue is who pays that amount now
15 if it's really necessary to obtain a release of the
16 containers.  I mean the cooperation side, the identifying of
17 where it is --

18    MR. ROSEMAN: We have no problem with that.

19    THE COURT:  -- lifting the stay to the extent it's
20 in effect upon rejection, I don't see any of those being an
21 issue.

22    MR. SCHEIN:  Although I'd say we haven't gotten
23 cooperation, Your Honor, because we were told at the last --
24 at the last hearing that we were going to promptly get these
25 lists.  Like I said, we didn't get it.  There was never any

email on the 15th sent.  They haven't produced evidence to that

and we ask also in this order that the Court require the

debtor to further cooperate to the extent the list we just got

three hours are incomplete or don't have proper contact

information or the information doesn't work.  We shouldn't

have to wait two more weeks.  A lot could have been

accomplished the last couple of weeks once they filed their

motion.  We put this out there at the last hearing.  It's not

a surprise and we did not get cooperation and their foreign

agents didn't cooperate with our foreign agents and it could

be a he-said, she-said.  The bottom line is we're trying to

make this as smooth as quickly as possible for everyone's

benefit here so we can take our property, the debtor can turn

off its spigot and everyone can move on so that the estate can

be maximized.

        THE COURT: Before I hear you, Mr. Roseman, let me

see if any of the other -- either of the attorneys want to be

heard on this.

        MR. WEINER:  Yes, Your Honor.  Bruce Weiner for

Textainer.  Just first we don't object to the rejection of the

leases themselves.

        We did this morning on the issue of the lists, we

did this morning receive a further list.  The first two lists

that we received from the debtor my client took a look at and

told me that the lists were completely useless and did not

contain any information -- all the information necessary but I

did get the list this morning. I forwarded it onto my client,

the vice-president of risk management. He took a look at the

list, sent me back an email saying that the list that was

received this morning did contain the information that my

client needs to recover its containers.

On the other issue, I don't want to go in and repeat

all the arguments that Mr. Schein made. I joined in his

request in my papers and I join in his argument this afternoon

for all the reasons that he set forth without belaboring the

record.

THE COURT: Very well. Thank you. Mr. Simms.

MR. SIMMS: Just so we're clear for CAI. What's

happening is there's going to be an exchange of claims here.

That is the depots would have claims against the estate. It's

going to be transferred now to the lessors who have paid what

the depot say they're owed by the estate. That's the problem.

The detail that the order needs to go to too is any

bills that the debtor has gotten from the depots so that we

can negotiate those things out and agreements that there are

with the depots for charges.

MR. ROSEMAN: We have no problem with providing that

information. To the extent any agreements were made we'll

certainly provide them -- we'll provide them statements we

have from each of the depots.

1          THE COURT: And I suppose if necessary I could have a

2   hearing on what's owed but it sounds that there's great doubt

3   that if I had such a hearing the party seeking collection of

4   the charges would be very moved by my determination of what's

5   actually owed by the debtor.

6          MR. SIMMS:  No, they wouldn't.  That's all that

7   CAI --

8          MR. SCHEIN:  Unless you want to have the hearing

9   overseas, Your Honor.

10          THE COURT: My jurisdiction is limited both

11   constitutionally and geographically but the stay extends

12   around the world but where it's honored is another issue.

13          MR. ROSEMAN:  Correct, Your Honor.  Just briefly in

14   response to the argument for the payment of the -- what he

15   calls the hostage, the ransom charges.  What this really is is

16   a revisiting of the request for a super priority claim.  They

17   came in and they made the same argument at the first DIP

18   motion and they said it's not fair, we're really forced

19   lenders.  They have all these expenses and you should make

20   them pay this.  The Court said you had no statutory predicate

21   for a super priority claim.

22          These are deals between sophisticated parties that

23   recognize the risk of this particular business deal.  In fact,

24   in these leases there's a provision if the equipment becomes

25   lost or stolen.  There's a liquidated damages clause and I

1  submit the reason for that clause being in there is it's very

2  common that this happens and if we can't return it a

3  particular container well, then they have a damage in the

4  amount of $700.00, $800.00, whatever the lease says, for that

5  particular container that can't be returned and that's part of

6  the claim.

7         While Mr. Schein likes to say this is a very unique

8  situation and while the geography may be unique, this is no

9  different than a warehouseman's claim.  I'm a debtor.  I

10 abandon equipment in a warehouse.  The secured party comes to

11 the warehouse and says I have a court order that says pay

12 me -- give me the equipment and I say you can have the

13 equipment when you pay me my warehouse charges.  Now, the only

14 practical difference is you can bring the warehouseman from

15 Kansas into this court but in reality what they're looking to

16 do is reshift the risk of the business deal between business

17 parties.  There's no statutory predicate.  There's no case law

18 which says hey, debtor and our rejection of a lease motion you

19 can be required to make various payments to depots and supply

20 houses.

21         THE COURT: But tell me, Mr. Roseman, from the

22 debtor's perspective let's say that I allow the leases to be

23 rejected, leave the lessors to their contractual remedies and

24 a location where the debtor stored leases says we need

25 $25,000.00 or you can't have your stuff back.  They pay the

1  $25,000.00 to get the stuff back. Is that then an

2  administrative claim?

3       MR. ROSEMAN: I would say no.  I'd say it's an

4  unsecured claim.  It's part of their rejection damages because

5  then we get into the problem well, what if we say it's not --

6  it shouldn't have been $25,000.00 and one of the reasons we

7  refuse to pay it is because we really think it's $3,000.00 and

8  how do we adjudicate that number with depot in Lahar,

9  Pakistan.  What we really stand at risk here doing is making

10 the estate administratively insolvent because we don't know

11 what these numbers are.

12      THE COURT: But if the debtor -- or the debtor having

13 taken the position that it's up to the equipment lessors to

14 retrieve their property, if they make the decision that they

15 have to pay $25,000.00 to get it back, the debtor wants to

16 have the ability to second guess then whether they overpaid?

17      MR. ROSEMAN: Well, what we are -- our primary

18 argument would be there was no benefit conferred to the estate

19 and the evidence of that would be you had a liquidated damages

20 clause, and I"ll make up numbers, that put the value of this

21 collateral at $5,000.00 and you went and paid $25,000.00 and

22 now you want an administrative priority for it.  What benefit

23 was conferred upon this debtor's estate?  And I would submit

24 that none has been conferred and I think as a matter of law

25 they're entitled to their damage claim.  We could litigate

over this later whether that damage is an admin claim or an
unsecured claim but it certainly isn't appropriate to make
that decision in a rejection motion and to incorporate it in
an order which could have far reaching effects on the
reorganization of this case.

THE COURT: As far as the issue though of cooperation
between the debtor, the debtor's foreign representatives, the
equipment lessors to cooperate in obtaining releases was the
word Mr. Schein used of the containers, if that obligation is
imposed absent monetary cooperation -- in other words, if I
instruct the debtor to do everything reasonably necessary to
assist in release of the containers, I take it the debtors
have no objection to that as long as I exclude the payment of
money.

MR. ROSEMAN: I have no objection to that.  I don't
believe it needs to be in an order because --

THE COURT: I think they'd feel better if it was in
an order.

MR. ROSEMAN: I have no doubt we're going to be
before you on the fight of what's reasonable and that's my
concern, Your Honor.

THE COURT: All right.  Mr. Yang, do you want in on
any of this?

MR. YANG: I don't think so, Judge.

THE COURT: Well, I'm certainly going to -- what I've

1   not heard -- what I have heard is that there's no dispute that

2   the debtor is probably exercised its business judgment to

3   reject the leases.  I'm going to authorize the debtor to

4   reject each of the leases listed in Exhibit A to the motion.

5           I'm going to reserve on the issue of who pays

6   because frankly if there is simply nothing else out there

7   besides the statute as it now exists and an Eastern District

8   of Pennsylvania case from 1986 I'm not sure if that would --

9   I'm not sure how helpful that is to me in the analysis.  If

10   there are other cases out there I'd like to see them but you

11   all want to move expeditiously to get your stuff back and you

12   would obviously like to know who's going to have to pay for it

13   in the first instance.  So I'm going to reserve on that.

14           I am going though to require the debtor and its

15   foreign representatives to the extent I have jurisdiction over

16   them that's derivative through he debtors, I'm going to direct

17   the debtors and their foreign representatives to cooperate

18   with the container lessors and their foreign representatives

19   as far as identifying to the extent known to the debtor with

20   exercise of reasonable diligence to find out where the

21   containers are so that we avoid the he-said, he-said, and then

22   she said something else disputes.  I'm going to direct that

23   the debtor file as a docket -- as a document docketed with the

24   Court a list of the containers that were leased that are the

25   subject of the rejection motion and the last known location of

1    all of those containers, just file that as a public document

2    so there's no dispute as to whether or not and when that

3    information was disclosed.

4         To the extent that the debtors have any bills from

5    any of the depots or other parties asserting storage or other

6    claims against the leased equipment, I'm going to direct also

7    the debtor deliver copies of those bills, invoices, any

8    evidence of payment against those to each of the equipment

9    lessors respective to their equipment.  Again, that sounds to

10   be a sharing of information the debtor has already committed

11   to but it would be I think more helpful to go ahead and

12   memorialize that in an order.

13        With respect to the date for assertion of rejection

14   claim, we'll simply fix that to be the same date to be set by

15   the Court in a general bar date order for the filing of

16   general unsecured claims.

17        Then, Mr. Roseman --

18        MR. SCHEIN:  Your Honor, if I could ask Your Honor

19   to also add in there that to the extent on a non monetary

20   basis that the debtor and the foreign representatives can also

21   cooperate with the container lessors to get access because

22   some of these may not be monetary hold backs but we'd want

23   them -- their cooperation on a non monetary basis until the

24   Court rules to help the container lessors get access to their

25   containers.

1          THE COURT: That is part of my order.

2          Then, Mr. Roseman, if you would take the first crack

3    at revising the form of order you prepared, circulate that to

4    Mr. Schein, Mr. Simms, Mr. Weiner for review and get that to

5    me as quickly as you can.

6          I'll take any other briefing if there is any on the

7    issue of what I've reserved on in rejection context, can the

8    debtor be compelled to pay costs associated with obtaining the

9    release of the property subject to the leases.  That's how I

10   will rephrase the question as I understand it to be.

11         Two weeks.  There being holidays now upon us, is two

12   weeks leave you all enough time to have your well paid

13   associates research Westlaw and Lexus to see if there's

14   anything else out there?

15         MR. SCHEIN: Sure.

16         MR. ROSEMAN: Two weeks is fine, Your Honor.

17         THE COURT: It's always easier to set deadlines that

18   other people have to comply with.  So we'll set that at

19   January the 6th.  Again, it will be a view of the Court to get

20   a ruling out on that aspect of it as quickly as possible.

21         MR. DEE: Excuse me, Your Honor.  One other thing. I

22   got an email from counsel to Trighton that just wanted me to

23   state on the record that the lease rejection motion includes

24   both the equipment lease identified as GLL 42 and GLL 41.

25   When I submit the order I'll submit an amended exhibit to

1  includes that, Your Honor.  Thank you.

2          THE COURT: Very well. Do we have anything else on

3  the calendar today?

4          MR. ROSEMAN:  Yes, we do.  We have Sea Castle's

5  motion for a turnover of their leases and our response to

6  that.

7          THE COURT: Mr. Simms.

8          MR. SIMMS: Let's see if we can --

9          THE COURT: Oh, yes, the battle of the termination

10  notices.

11          MR. SIMMS: That's right.  And the battle of the true

12  lease or no true lease.  I think we can slice through some of

13  this stuff.

14          We're going to have a battle over true lease or no

15  true lease but it really divides into something that's a

16  little bit easier.  The debtor has conceded I think that even

17  if this is not a true lease Sea Castle is a secured creditor

18  for what we call the 3507 containers which is the number of

19  one of the Sea Castle leases.  This is for 400 20-foot

20  containers and 100 40-foot containers.  I think I'm right

21  about that.  400 and 200.  And that begs the question well,

22  what do we do with these 600 containers and part of the motion

23  was to require Global to adequately protect Sea Castle or lift

24  the automatic stay and let us recover.  So I think that's

25  squarely before the Court right now.  We have an agreement

that if it's not a true lease so says the debtor we are

secured with perfected security interests, no problem with

that.  We are -- I think you've had some strong facts about

why we want -- why Sea Castle is unsecured, undersecured,

inadequately protected because the containers are all over

East Africa with depots charging against them.

On the question of the 3531 containers, whether it's

a true lease, whether we're secured, whether we're unsecured,

I think that's what we're going to take up in the adversary

proceeding and knock through that.

To the extent the Court wants to eat a small part of

elephant today, one part of the elephant we can eat is whether

or not if we do have true leases they were properly terminated

and our motion lays out a series of communications from

September up through -- I think it was a week before the

petition filing where we went to the Southern District of New

York, we filed an emergency complaint that was hand served on

the debtor and debtor's counsel and I had a lot of spirited

conversations and emails back and forth about who was supposed

to do what but there's no question that if these are true

leases there was notice properly given including in that

Southern District complaint hand served on the debtor if

that's what we're talking about -- compliance with a lease,

hand service.  That was done.  We were terminated.  So that

issue ought to be out of the way so we can go fight through on

1    3531, true lease/no true lease, secured/unsecured, leaving us

2    back to 3507. What do we do about this secured position and

3    getting us adequately protected.

4          MR. ROSEMAN: Your Honor, within their own papers

5    they valued the collateral, $800,000.00, and they have claims

6    of $360,000.00 something. There's over 100 percent equity

7    cushion for the debtor's collateral and I believe that

8    adequately protects them.

9          Now, assuming there's no argument that the 3531

10   lease is unsecured because there's no UCC filing, we don't

11   need to address adequate protection there but I think the

12   value of the collateral based upon what their claims are

13   adequately protects this debtor. In the alternative, it

14   should be a relatively nominal sum to protect them for the

15   current storage charges as they accrue to the extent if any

16   accrue.

17         THE COURT: All right. Walk me back through this now

18   quickly. There are two leases they refer to as 3531 and 3537

19   [sic]. 3531 there's no recorded UCC.

20         MR. ROSEMAN: Let me back up a little bit. There are

21   two leases, 3507 and 3531. 3501 [sic] there was a filed UCC

22   appropriately in Delaware --

23         THE COURT: 3507.

24         MR. ROSEMAN: 3507 on 5/17/05. There is no such

25   filing in Delaware on 3531. In October of 2009, Sea Castle

1  filed a second UCC in New York.  We believe that has no force

2  or effect.  This is a Delaware corporation.

3          THE COURT: As to both leases?

4          MR. ROSEMAN: As to both leases.  Even if it did have

5  force and effect it was well within the preference period and

6  that's within our adversary complaint to avoid that lien to

7  the extent there is one as of preference.

8          THE COURT: The property to which the $800,000.00

9  value was ascribed, is that the property under both leases?

10          MR. ROSEMAN: Both leases, Your Honor.

11          THE COURT: And the debt of some $400,000.00 or less,

12  is that as to both leases?

13          MR. ROSEMAN: That's as to both leases.

14          THE COURT: Mr. Simms, just to that point, those

15  points, do you have a different view of the facts?

16          MR. SIMMS: Sure.  First, let's consider where it is

17  and who's got it.  The depots have got it.  We don't have it.

18  It's moving around on ships.  We're not adequately protected.

19          THE COURT: This is -- I'm just trying to get the

20  narrow factual chronology.  We've got two leases.  One no UCC

21  in Delaware.  One with the UCC in Delaware and then both with

22  October '09 UCCs in New York.

23          MR. SIMMS: Actually, there is one in Delaware and I

24  don't know why they didn't find it but we had -- the

25  corporation filing service due both New York and Delaware.  So

1   it's there and if it's not then they've got a problem but --

2          THE COURT: On the 3531?

3          MR. SIMMS: On the 3531.

4          THE COURT: So we have a dispute as to whether or not

5   there's a recorded UCC on 3531.

6          MR. SIMMS: That's correct.  But what -- the way I

7   started out was to say all right, we've got some things to

8   take up with the adversary complaint about 3531. There we are.

9   So now the debtor says all right, there's $800,000.00 worth of

10  containers out there that are securing both leases.  I mean I

11  think that what we have to do I guess is to figure out the

12  value of the equipment under each lease.

13         THE COURT: What do I have on that in front of me

14  today?  In other words, what are the amounts owing under each

15  of the leases and what is the value of the property under each

16  of the leases?  What do I have in front of me today on that?

17         MR. SIMMS: You don't have anything.  And our

18  argument as to inadequate protection was this.  That we don't

19  know where the containers are.  They're all over East Africa.

20  We do know that depots are holding onto them. You've already

21  heard that there are charges against those that the debtor is

22  not going to pay.  We know that some of the containers are

23  moving on ships right now going -- we got a call from a nice

24  person in Pakistan that said somewhere on the way with

25  concrete to Zanzibar.

1    But that's why we're adequately protected.  We need

2  to go and get these back.  This is the argument that I made

3  when we were at the emergency hearing.  The containers are

4  being put into far parts of the world.  The debtor is

5  collecting freights from those from the use of the containers.

6  The debtor is able to book cargo by having the containers

7  available but at some point we've heard that the debtor is not

8  going to pay the depots that are holding onto those

9  containers.  That's the problem.

10    THE COURT: The lawsuit that was filed across the

11  East River, is that as to both leases?

12    MR. SIMMS: Yes.

13    THE COURT: As far as the identification of where the

14  containers are that changes week to week, day to day.  Is the

15  debtor providing updated information about where they are and

16  when they are in transit, where they're headed?

17    MR. SIMMS:  We did get a list last week with just

18  city names in it which was -- we've had three lists that have

19  said okay, this container is in Darasalon, this container is

20  in Sharjah, that sort of thing, but that doesn't help us

21  recover but that's part of the cooperation the debtor is going

22  to give for the others. I don't see why --

23    MR. ROSEMAN: The last page of all the lists provided

24  today has contact information for each and every port.

25    MR. SIMMS: We didn't get any today.  I know that.  I

checked my email before I came here.

MR. ROSEMAN: We don't know whether that's good contact information or not since we just got it until reach out and -- that's our last known contact information.

MR. SIMMS: But we will accept that there's a lot of things going on with the debtor and the Court has reminded everybody to do their best and so that's -- the next list we get I'm sure it will be more fullsome.  But that -- but the --

I'll talk about some specific containers that came off the Global Patriot.  They're sitting in Durban, South Africa.  I think there's 20 of them.  They haven't gone any place and so through South African counsel we went to the depot and we said what's the story on these containers, would you release them, and the depot came back and said well, not until we're paid and that's the problem with our inadequate protection because the costs are running up, still running up, and then at some point the debtor is going to say oh, well, you go and get them.  Now, what good is our security interest at that point.  No good at all.  I mean we just have to go back and pay for something we should have gotten months earlier.

If the debtor is willing to release the containers now and say yes, okay, we reject the lease over these containers and we'll fight over what we ought to get as post-petition expenses but we have to be able to go and get these

1    containers back right now because the expenses are just going

2    through the roof.

3            THE COURT: It seems, Mr. Roseman, that on these

4    which the debtor either hasn't made a decision or -- well, on

5    rejection or assumption the debtor's decision is apparently to

6    litigate as to true sale or lease so that that on these leaves

7    the container lessor or vendor in somewhat of a limbo but it

8    would seem that they should be in no worse position by the

9    time we get to a determination of whether or not they're going

10   to get their containers back than they are today if they're --

11   they are being used but I appreciate Mr. Simms point if that

12   three months from now or six months from now I decide that no,

13   these really were leases and the debtor says okay, reject them

14   and $20,000.00 or $80,000.00 of new charges have run up, it

15   would seem that at least in the interim until I can get or

16   whoever is going to try the issue of what these leases are

17   that between now and then Sea Castle should be put in no worse

18   position than they are today.

19           MR. ROSEMAN: Your Honor, in my presentation I said

20   that if you believe -- if the Court determines that the value

21   that they subscribe to these containers of over $800,000.00

22   isn't sufficient adequate protection the on a current going

23   forward basis as an adequate protection we would propose to

24   pay the current storage charges on a going forward basis.

25           THE COURT: I do agree with Mr. Simms.  This is a

different adequate protection analysis than when I went

through it with Mr. Schein on equipment sitting in Kansas

where they could go get it.  If there's a warehouseman's lien

they pay it and they get it.  This is a bit different analysis

on equipment that the debtor wants to keep retained and

generate rather than from.

So it would seem on an interim basis that -- I'll

call it adequate protection today even though we're not

determining that these are leases or sales contracts, that in

an interim basis the debtor has to pay any charges that

accumulate from the storage of the equipment while it's using

it to generate post-petition revenue.  That seems to be the

immortal words of the bankruptcy code fair.

The remainder of it though are scheduling issues.

I'm not going to determine today that they are leases, that

they're not leases, that if they were leases they were

terminated.  For that we need the immortal words of the

bankruptcy code evidence.  So we're going to need to get to an

evidentiary hearing.

It would seem appropriate to the Court to join the

balance of your motion, Mr. Simms, with the adversary

proceeding unless you all want to try that somewhere else

which doesn't hurt my feelings but --

MR. SIMMS: That's fine.

THE COURT: Then issue you a scheduling order in the

combined motion and adversary so that we can get down to trial

and ultimately determine these issues.  Does that make sense

to you all?

MR. ROSEMAN: That makes sense, Your Honor.

MR. SIMMS: That makes sense.  We need to make sure

we understand what we mean by use though.  That is --

THE COURT: You all on that side of the courtroom.

MR. SIMMS: In other words, we should work it out

or --

THE COURT: No.  What I want you all to do -- what

all the attorneys to do is get together and work on a schedule

for how much discovery time you need, how much trial time you

need, and then file -- normally in an adversary proceeding

once an answer is filed they issue a scheduling order, direct

the parties to meet and confer, to file a proposed joint

discovery control plan that says we need 90 days for

discovery, we need six months for discovery, we need hours for

trial, we need three days for trial.  File the discovery

control plan and tell me how much time you need for discovery,

how much in court time you need for trial.  I then issue a

scheduling order that sets your discovery cutoff and then sets

the trial date akin to a federal district court discovery

control plan.

So you all in the prior statement was for you and

Mr. Roseman or your firms to confer, meet and confer to come

1  up with a proposed discovery control plan and then I'll issue

2  a scheduling order setting the adversary down for trial.

3          I'm going to join the issues, the remaining issues

4  in the motion with that adversary proceeding but essentially

5  you just need to plead into the adversary the issues that are

6  in the motion that are before me today and then I'll just give

7  you a trial date and a discovery schedule for that.

8          MR. SIMMS:  In the interim, what does happen to

9  paying the depots?

10         THE COURT: In the interim the debtor has adequate

11  protection, has to keep the -- any storage charges that accrue

12  from here forward has to pay them on a current basis so that

13  again the equipment subject to the Sea Castle leases that the

14  debtor continues to utilize so that Sea Castle is in no worse

15  position at the time of trial on the adversary or surrender of

16  the equipment than they are today.

17         MR. SIMMS: That's fine.  I just wanted to make sure

18  though continue to utilize is co-extensive with what they

19  have. In other words, it doesn't help any if they say oh,

20  well, this particular container moved on this particular ship,

21  we define that as use, we'll pay for that one.  As far as the

22  South African ones go, we're not going to pay for that.

23  Because in the container operation use is the containers that

24  you have.

25         THE COURT: Well, until they -- until the debtor

1  files a motion to reject, surrender or abandon any of the

2  containers if they're sitting somewhere in the world where the

3  debtor can use them the debtor has to protect Sea Castle

4  against any incurred storage charges whether they're -- I

5  appreciate your point where they're actually being utilized or

6  not.  Until you have the right to go get them back, the debtor

7  has to pay the storage charges.

8           MR. SIMMS: Okay.

9           MR. ROSEMAN: I understand that, Your Honor.

10          THE COURT: So then if you -- if -- it doesn't matter

11  to the Court who takes the first draft of an order.  If you

12  all can craft an interim order based upon what I've ruled

13  today and then with the same two week period work to come up

14  with a discovery control plan, or do you need more time for

15  that?

16          MR. SIMMS: Better make it three.

17          THE COURT: That would actually involve the two of

18  you rather than others who can shepherd to the task.

19          MR. ROSEMAN: I have a few days vacation in between

20  then and now.

21          THE COURT: All right.  So by January 13th then I'll

22  look for a proposed discovery control plan for the adversary.

23  09-8602.  Again, it's the contemplation of the Court that in

24  that adversary we're going to try the balance of the matters

25  raised in the motion for adequate protection filed by Sea

1 Castle.  Mr. Simms, you'll need to plead those into the
2 adversary so there's no dispute later about what was actually
3 tried.

4          Then based upon that I'll issue a scheduling order.

5          MR. ROSEMAN: Thank you, Your Honor.

6          MR. SIMMS: Thank you, Your Honor.

7          THE COURT: Any other matters on for today on --

8          MR. ROSEMAN: I think we're finished.

9          THE COURT: I want to give you all a case status
10 hearing in February before you go today.  So bear with me one
11 more moment.

12                    [Pause in proceedings.]

13          THE COURT: While Ms. Mills is looking for that, let
14 me just let you all know particularly directed to the
15 adversary because generally my practice in adversary
16 proceedings and any contested matters that are going to take
17 more than about an hour is I try them with all direct
18 testimony being submitted in advance by affidavits and then
19 the parties whose affidavit testimony is presented need to be
20 in court live for cross-examination.  I found that that
21 expedites the trial time and also helps the parties better
22 educate each other on what their cases are going to be.

23          So when you're fashioning your discovery control
24 plan in the adversary and also just contemplating future
25 contested matters just keep in mind that, again, direct

testimony of the witnesses under your respective control will
be by affidavit filed in advance and then they'll be here for
live cross-examination.  That includes expert witnesses.

[Pause in proceedings.]

THE COURT: February 24th at 2:00.  February 24, 2010
at 2:00 will be a general case status in each of the debtor's
cases.  So, Mr. Roseman, if your office will file a -- whether
it's letter or pleading form on line and give notice to all
parties in interest in each of the cases.  February 24th at
2:00 for general case status.

MR. ROSEMAN: Yes, Your Honor.

THE COURT: Very well.  Then we'll be adjourned on
the various Global Container related cases.  Happy Holidays to
each of you.

* * * * *

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                              _____

6                                        Shari Riemer

7   Dated:   December 30, 2009

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25