CULLEN AND DYKMAN LLP
Attorneys for Debtors
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 357-3700
Matthew G. Roseman, Esq. (MR 1387)
C. Nathan Dee, Esq. (CD 9703)

Counsel for Debtor and Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:                                                      Chapter 11

GLOBAL CONTAINER LINES LIMITED,      Case No. 09-78585 (AST)

                          Debtor.
-------------------------------------------------------x

## DISCLOSURE STATEMENT FOR DEBTOR'S
## CHAPTER 11 PLAN OF REORGANIZATION

## IMPORTANT DATES

- Date by which Ballots must be received: _____, 2010 at 5:00 p.m. Eastern Time.

- Date by which objections to Confirmation of the Plan must be filed and served: _____, 2010 at 5:00 p.m. Eastern Time.

- Hearing on Confirmation of the Plan: _____, 2010 at 10:00 a.m. Eastern Time.

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...............................................................................................................3

    A.    General ...................................................................................................3

    B.    Voting .....................................................................................................3

    C.    Confirmation Hearing ...........................................................................5

    D.    Recommendations .................................................................................6

II. HISTORICAL INFORMATION ......................................................................................6

    A.    The Debtor's Business and Events Leading to Filing...........................6

III. THE REORGANIZATION CASE ...................................................................................8

    A.    Overview ................................................................................................8

    B.    Employment of the Debtor's Professionals ...........................................8

    C.    Appointment of the Official Committee of Unsecured Creditors and Employment of Committee Professionals ...........................................8

    D.    Secured Claims/Cash Collateral ...........................................................8

    E.    Claims Administration ..........................................................................11

    F.    Exclusivity .............................................................................................14

    G.    United Nations and Other Project Contracts.........................................14

    H.    Other Administrative Matters ...............................................................14

IV. SUMMARY OF THE PLAN ...........................................................................................16

    A.    General ...................................................................................................16

    B.    Plan Overview........................................................................................16

    C.    Treatment of Claims and Interests ........................................................17

    D.    Treatment of Executory Contracts and Unexpired Leases ...................21

    E.    Summary of Distributions and Claims Resolution Provisions ..............23

V. MEANS OF IMPLEMENTATION OF THE PLAN; EFFECT OF CONFIRMATION ........27

    A.    Funding of the Plan...............................................................................27

    B.    Injunctions.............................................................................................27

C.     Discharge of Debtor ........................................................................................28

D.     Exculpation .....................................................................................................29

E.     Revesting of Assets ........................................................................................29

F.     Officers and Directors of Reorganized Debtor ...............................................30

G.     Issuance of Stock of Reorganzied Debtor .......................................................30

H.     Estate Causes of Action .................................................................................31

I.     The Role of the Committee ............................................................................32

J.     Post-Confirmation Jurisdiction of the Court ..................................................32

VI. CONFIRMATION OF THE PLAN .............................................................................34

A.     Introduction ....................................................................................................34

B.     Conditions to Confirmation and Effective Date .............................................35

C.     Voting Procedures and Standards ...................................................................35

D.     Acceptance ......................................................................................................38

E.     Confirmation and Consummation ...................................................................39

VII. CERTAIN RISK FACTORS TO BE CONSIDERED ................................................44

A.     Risk that Distributions will be Less than Estimated by Debtor .......................45

B.     Bankruptcy Risks ............................................................................................45

VIII. TAX CONSEQUENCES .........................................................................................46

IX. ALTERNATIVES TO PLAN .....................................................................................46

X. CONCLUSION ...........................................................................................................47

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES. ALTHOUGH ADDITIONAL SOLICITATION IS NOT PROHIBITED BY LAW, NO OTHER SOLICITATION HAS BEEN APPROVED BY THE COURT AND ANY SUCH SOLICITATION IS THEREFORE NOT SUBJECT TO THE SAFE HARBOR PROVISIONS OF THE BANKRUPTCY CODE. IF ANY SUCH OTHER SOLICITATION IS FALSE OR MISLEADING, IS NOT PRESENTED IN GOOD FAITH OR PROPOSES AN ALTERNATIVE PLAN, IT IS IMPROPER AND THE PARTY MAKING SUCH SOLICITATION MAY BE SUBJECT TO LIABILITY. IN ADDITION, THE DEBTOR WOULD HAVE THE RIGHT TO SEEK TO DISQUALIFY A VOTE WHICH WAS BASED UPON AN IMPROPER SOLICITATION.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN, AND IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN, BUT TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN. IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN. ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO CAREFULLY READ THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE

STATEMENT DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

# I. INTRODUCTION

## A.    General

Global Container Lines Limited ("Global" or the "Debtor") files this Disclosure Statement (the "Disclosure Statement") with respect to its Chapter 11 Plan of Reorganization dated July 9, 2010 (the "Plan").

This Disclosure Statement is provided pursuant to section 1125 of the Bankruptcy Code to all the known creditors of the Debtor.  The purpose of this Disclosure Statement is to provide sufficient information to enable creditors who are entitled to vote to make an informed decision on whether to accept or reject the Plan.

Most words or phrases used in this Disclosure Statement shall have their usual and customary meanings.  Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.

**THE DEBTOR IS THE PROPONENT OF THE PLAN AND SUPPORTS CONFIRMATION OF THE PLAN.  IT URGES CREDITORS TO VOTE TO ACCEPT THE PLAN.**

## B.    Voting

With respect to Claims in Classes that are "impaired" (as defined below) under, but not deemed to have rejected, the Plan, each holder of a Claim in such Classes will receive a copy of this Disclosure Statement, a Ballot for the acceptance or rejection of the Plan, and other related voting materials.  Any creditor or Interest holder whose legal, contractual or equitable rights are

altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered "impaired."

Under the Plan, holders of Allowed Claims in Classes 2 (NBP Secured Claim) and 3 (General Unsecured Claims) (the "Voting Classes") are or may be impaired, and are therefore entitled to vote on the Plan. Holders of Interests in Class 4 will receive no Distributions under the Plan and are deemed to reject the Plan. For a description of the Classes of Claims and Interests and their treatment under the Plan, see Section IV(C) below.

The date of entry of an order approving this Disclosure Statement is fixed as the "Voting Record Date." Only Persons who hold Claims on the Voting Record Date are entitled to receive a copy of this Disclosure Statement and all of the related materials. Only Persons who hold Claims on that date that are impaired under the Plan and are not deemed to reject the Plan are entitled to vote on the Plan.

In voting on the Plan, please use only the Ballot sent to you with this Disclosure Statement. Please complete and sign your Ballot and return it in the enclosed pre-addressed envelope to the Balloting Agent:

> Cullen and Dykman LLP
> Attn: Bonnie L. Pollack, Esq.
> 100 Quentin Roosevelt Boulevard
> Garden City, NY 11530

ALL PROPERLY COMPLETED BALLOTS RECEIVED BY THE BALLOTING AGENT PRIOR TO _____, 2010 AT 5:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH CLASS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN HAS ACCEPTED THE PLAN. <u>ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY</u>

COURT. The Balloting Agent will prepare and file with the Court a certification of the results of the balloting with respect to the Plan.

Your vote on the Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired under a plan vote to accept such plan, unless the "cramdown" provisions of the Bankruptcy Code are employed. The Debtor reserves its right to seek to "cramdown" the Plan on non-accepting Classes of creditors and Interest holders. See Section VI below.

## C.    Confirmation Hearing

**The Court will hold the Confirmation Hearing commencing at _____ \_.m. (Eastern Time), on _____, 2010 at the United States Bankruptcy Court for the Eastern District of New York, 290 Federal Plaza, Central Islip, New York 11722, before the Honorable Alan S. Trust, United States Bankruptcy Judge.** The Confirmation Hearing may be adjourned from time to time without further notice. At the Confirmation Hearing, the Court will (i) determine whether the requisite vote has been obtained from the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, (iv) determine whether to confirm the Plan, and (v) grant such other and further relief as the Court deems reasonable and appropriate.

Any objection to confirmation of the Plan must be in writing and filed with the Court and served in a manner so as to be received on or before on or before _____, 2010 at 5:00 p.m. Eastern Time by: (1) counsel to the Debtor, Cullen and Dykman LLP, 100 Quentin Roosevelt Boulevard, Garden City, New York 11530, Attn: Matthew G. Roseman, Esq. and C. Nathan Dee, Esq.; (2) the Office of the United States Trustee for the Eastern District of New York, 560

Federal Plaza, Central Islip, New York 11722; (3) counsel to the Committee, LaMonica, Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, New York 11793, Attn: Gary Herbst, Esq. and Adam Wofse, Esq.; and (4) counsel to NBP, Watson, Farley & Williams LLP, 1133 Avenue of the Americas, New York, New York 10036, Attn: Alfred E. Yudes, Jr., Esq.

**D.    Recommendations**

**THE DEBTOR RECOMMENDS THAT ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES VOTE TO ACCEPT THE PLAN.**

## II. HISTORICAL INFORMATION

**A.    The Debtor's Business and Events Leading to Filing**

The Debtor was established in 1985 to service the trade between East Africa, the Indian Ocean and the Persian Gulf, and offers a worldwide service for movement of containers, rolling stock, general cargo, project cargo and bulk cargo. The Debtor operates services in North America, the Mediterranean, the Middle East, East, South and West Africa, the Persian Gulf, India, Pakistan, Mozambique and Major Indian Ocean Islands. The Debtor's project teams have extensive specialized experience in multi-modal shipment (combination of land, sea and air transportation) including project and humanitarian relief cargo. The Debtor works closely on these projects with governmental and international organizations including the United Nations Peacekeeping Missions, U.S. Military Sealift Command, United Nations World Food Program, United States Agency for International Development and other humanitarian relief agencies.

The Debtor was selected for the carriage of the first shipment of humanitarian relief cargo to the people of Iraq as well as to the people of Afghanistan. The Debtor transports cargo of any size and nature including heavy construction equipment, tractors, cement mixers, heavy duty trailers, relief for trailers, P.O.V.s, sedans, jeeps and automobiles. It also carries dry freight

cargo, forest products, steel products and agricultural products. Finally, the Debtor handles hazardous cargo and dangerous goods of all types.

During the years 2008 and the first half of 2009, the worldwide economic recession led to a complete collapse of the shipping market in general and the container liner shipping business in particular. Trade and cargo volumes plunged by unprecedented levels and the container trade experienced a significant downturn. Dwindling cargo volumes and huge over capacity in the liner trade pushed down the rates for freight and charter hires to unprecedented levels worldwide and particularly in the regions of the Indian Ocean, Persian Gulf and East Africa-areas where the Debtor had operated profitably since the early 1980s. The decreased shipping rate levels were insufficient to offset rising fuel and related vessel operating costs. However, the Debtor's logistical expertise allowed them to expand their project business with the United Nations during the difficult economic times.

The business outlook for the shipping industry is improving. As stimulus programs are filtering through the world economy, the Debtor expects a resurgence of business activity and cargo movement worldwide. Accordingly, the Debtor, together with the Affiliated Debtors, made plans to retrench and introduce changes into their business models seeking to streamline their operations to achieve greater profitability.

As a result, the Debtor and the Affiliated Debtors all filed for chapter 11 bankruptcy protection on the Petition Date with an intention to reorganize and restructure their obligations by placing greater emphasis on the profitable "projects" business with the United Nations and reducing their liner operations.

## III. THE REORGANIZATION CASE

### A.    Overview

As of the Petition Date, actions and proceedings against the Debtor and acts to obtain property from the Debtor were stayed under section 362 of the Bankruptcy Code.  During the administration of the Chapter 11 Case, the Debtor managed its business and affairs as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, subject to the control and supervision of the Court.  The Debtor's case was procedurally consolidated with that of the Affiliated Debtors.  However, the only Debtor to which this Plan pertains is Global.

### B.    Employment of the Debtor's Professionals

The Debtor retained the law firm of Cullen and Dykman LLP as its counsel in connection with the Chapter 11 Case, and Farber, Blicht, Eyerman & Herzog, LLP as its accountants.

### C.    Appointment of the Official Committee of Unsecured Creditors and Employment of Committee Professionals

On December 29, 2009, the United States Trustee appointed the Committee, which is comprised of the following entities:  Blue Sea Capital, Briarcliff Ltd. and Key Equipment Finance, Inc.  The Committee retained the law firm of LaMonica, Herbst & Maniscalco LLP as its counsel in the Debtor's case, and Bederson & Company, LLP as its accountants.

### D.    Secured Claims/Cash Collateral

The Debtor is a guarantor under a loan facility with NBP, the borrower under which is GCL Shipping Corp., one of the Affiliated Debtors[1].  The NBP loan facility was renewed on October 22, 2008 and had a credit limit of $17,500,000, structured as follows:

---

[1] The Debtor is the only entity obligated to NBP with assets or an ongoing business capable of satisfying NBP's claims.

1.    Term Loan Facility – to the extent of $12,000,000. The purpose of this facility was the purchase of the two vessels previously owned by Affiliated Debtors Progress and Prosperity. The balance due on the term loan facility as of the Petition Date was $12,000,000 plus interest.

2.    Revolving Facility – to the extent of $5,000,000. The purpose of the revolving facility was to finance 85% of the Debtor's receivables from the United Nations. The balance due on the revolving facility as of the Petition Date was $1,591,967.66.

3.    Standby Letter of Credit in the amount of $500,000 to guaranty payment of the Debtor's performance obligations under certain United Nation contracts and as a surety bond for United States Customs. As of the Petition Date, there had been no draw down on the letter of credit, but there was an unfunded outstanding obligation of $225,000.

The NBP loan facility was subsequently amended on February 3, 2009 to change the terms of the term loan facility, and was again amended as part of the Debtor's request for use of cash collateral and debtor-in-possession financing at the commencement of the Chapter 11 Case.

Since the Debtor and the Affiliated Debtors lacked sufficient working capital to operate their businesses in the ordinary course, the Debtor reached an agreement with NBP whereby NBP agreed to provide the Debtor group with up to $4,000,000 in debtor-in-possession financing (the "DIP Facility"). The DIP Facility was approved by the Court by Orders dated November 17, 2009, December 7, 2009 and March 1, 2010. The DIP Facility was made available to the Debtor group in the following advances: $2,600,000 on or about November 17, 2009, which funds were used for payment of certain maritime liens to prevent the imminent arrest and seizure

of certain ships owned by the Affiliated Debtors and the payment of certain critical pre-petition vendors necessary to avoid arrest and seizure of the Debtor's ships; and $1,400,000 on or about December 7, 2009 for use as working capital by the Debtor.

NBP, pursuant to the DIP Facility, was granted super-priority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, as well as replacement liens in the Debtor's post-petition assets. NBP's liens and claims were subject to a carve out for U.S. Trustee fee expenses and $400,000 for the Debtor's and Committee's professional fees. The $400,000 carve out has been held by Debtor's counsel in escrow and was exhausted as a result of interim fee applications filed by the professionals and granted by the Court.

As of the Petition Date, the NBP Secured Claim amounted to $13,777,000 plus interest. The NBP term loan facility was increased during the administration of the Chapter 11 Case by virtue of the DIP Facility. However, also during the Chapter 11 Case, the NBP term loan facility was reduced by payments received by Affiliated Debtors Prosperity and Progress from the sale of their wholly-owned vessels against which NBP had a first priority ship mortgage, and the NBP revolving facility was fully satisfied by payments to NBP from account receivable collections. Thus, only the NBP term loan facility remains outstanding, and the NBP Secured Claim amounts to approximately $8,959,522 as of the date of the filing of the Disclosure Statement, together with an unfunded Letter of Credit obligation of $150,000 (which may or may not be drawn upon in whole or part before it expires August 31, 2010).

The principal amount of the NBP Secured Claim is subject to further reduction by up to $909,692, which amount was held in reserve by NBP for the account of the Debtor from the sale

of the shipping vessels owned by Affiliated Debtors Progress and Prosperity, in respect of any Maritime Lien Claims having priority to NBP's mortgages against the vessels. The Debtor believes that any Maritime Lien Claims are subordinate to the NBP Secured Claim. The only Maritime Lien Claims which would prime the NBP Secured Claim are claims for liens which arose prior to the granting of the first priority ship mortgage to NBP or claims for necessaries being provided to a vessel in a port in the United States. Any Maritime Lien Claims filed against Progress and Prosperity's vessels fit neither of those categories and, as a result, all such Maritime Lien Claims are subordinate to NBP's lien in the vessels. To the extent any Maritime Lien Claims are ultimately determined by the Court to be superior liens to that of NBP, holders of such Maritime Lien Claims shall be paid their Ratable share of the reserve held by NBP, and the principal amount of the NBP Secured Claim will be reduced by any reserve amounts remaining thereafter.

In addition to the NBP Secured Claim, sixteen (16) claims were scheduled and/or filed as Secured Claims in the total amount of $9,018,932.87. The Debtor believes that all such Claims will be reclassified to General Unsecured Claims as a result of objections to be filed because such Claims were either filed against the wrong Debtor, no assets exist which secure the Claims in question or the Claims were previously paid through the debtor-in-possession financing discussed above. As such, those Claims are treated as General Unsecured Claims in the Plan.

E.      **Claims Administration**

1.      **Filing of Schedules and Statements and Section 341 Meeting**

On November 30, 2009, the Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs and, on April 16, 2010, filed amendments to its Schedules F and

G. On December 18, 2009, the United States Trustee conducted the meeting of the Debtor's creditors under section 341 of the Bankruptcy Code.

## 2.    Bar Date for Pre-Petition Claims

In accordance with Bankruptcy Rule 3003(c)(3), on February 5, 2009, the Court entered the Bar Date Order, establishing March 12, 2009 as the Bar Date for filing proofs of claim against the Debtor incurred prior to the Petition Date, except that the following entities were not required to file proofs of claim by the Bar Date:  (a) Claims already evidenced by a proof of claim filed in the Chapter 11 Case; (b) any Claim listed in the Schedules, unless such Claim was listed as disputed, contingent, or unliquidated; (c) Claims for which specific deadlines had been previously fixed by order of the Court, in which event such prior order governed the time within which such Claims must have been filed; (d) Claims previously allowed or paid pursuant to order of the Court; and (e) Administrative Claims.

## 3.    Bar Date for Post-Petition Claims

*Administrative Claims*

**Under the Plan, all holders of Administrative Claims arising subsequent to November 10, 2009 and before the Confirmation Date (not including Fee Claims (described below)), and not paid prior to the Confirmation Date, must file with the Court proper requests for payment of such Administrative Claims, and serve copies upon the parties listed in Section 13.14 of the Plan, on or before the Administrative Bar Date.  Parties not complying with this deadline shall be forever barred from seeking payment of those Claims including, without limitation, against the Debtor, the Estate, Reorganized Debtor or their property, or commencing or continuing any action, employment of process or act to collect, offset or recover any such Administrative Claim.**  The notice of Confirmation of the Plan and

the Effective Date to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will include notice of the Administrative Bar Date.

*Fee Claims*

All parties requesting compensation or reimbursement of Fee Claims pursuant to section 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered or expenses incurred on behalf of the Debtor or the Committee prior to the Confirmation Date must file applications with the Court, with copies to the parties listed in Section 13.14 of the Plan, on or before the Fee Claims Bar Date or shall be forever barred from seeking payment of those Fee Claims. The notice of Confirmation of the Plan and the Effective Date to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will include notice of the Fee Claims Bar Date.

**4.      Claim Objections and Status of Claims**

The Debtor was a party to three (3) omnibus claim objection motions filed in May 2010 by which it sought to expunge (a) certain claims as being late filed, (b) certain claims as being owed by an Affiliated Debtor but not Global itself, and/or (c) certain claims listed as disputed in its Schedules for which no subsequent claim was filed by the claimant. All of the Debtor's claim objections were granted except the objection to the claim of Arthur Weis (which objection sought to expunge duplicative claims filed by Mr. Weis), the hearing on which was adjourned. Taking into the account the claim objections, as of the filing of this Disclosure Statement, there are approximately 66 Claims either filed or scheduled by the Debtor aggregating approximately $32,127,975 excluding the NBP Secured Claim. The Debtor believes that many of those Claims are still objectionable. For a description of the treatment of Allowed Claims, see Section IV(C) below.

**F.     Exclusivity**

The Debtor's initial exclusive period during which only it could file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code expired on March 10, 2010.  The Debtor sought and obtained an extension of the exclusive period to July 10, 2010 and filed the Plan within that time.  The exclusive period to obtain acceptances of the Plan expires on September 10, 2010.

**G.     United Nations and Other Project Contracts**

The vast majority of the Debtors business consists of contracts performed for the United Nations and other agencies.  As discussed above, the Debtor provides carriage of humanitarian relief cargo for the United Nations and other various organizations.  At this time, the Debtor continues to perform a charter contract in West Coast Africa with the ship, M/V Caterina.  The Debtor has historically been an approved United Nations vendor in the United Nations vendor database able to participate in procurement exercises.

Shortly after the Petition Date, the Vendor Review Committee of the United Nations recommended that the Debtor be placed on hold in the U.N. Vendor Database until such time as the Vendor Review Committee was presented with a detailed Plan by the Debtor to emerge from bankruptcy which had the support of its creditors.  Although the Vendor Review Committee was provided with such a plan (which is, indeed, the Plan), the Vendor Review Committee will not reinstate the Debtor to the U.N. Vendor Database until Court approval of the Plan.

The Debtor has been assured by the Vendor Review Committee that once the Plan is confirmed it will be reinstated to the database and its contracts with the U.N. will continue unaffected.

**H.     Other Administrative Matters**

During the pendency of its bankruptcy case, the Debtor also dealt with several

administrative matters and complied with its obligations as a debtor-in-possession under the Bankruptcy Code. The Debtor moved to reject various executory contracts and unexpired leases, specifically with container lessors including without limitation Seacastle Container Leasing LLC, Textainer Equipment Management Ltd., TAL International Container Corp., Container Applications Ltd., TransAmerica Leasing and Triton Container International Ltd. (collectively the "Container Lessors"). The leases of the Container Lessors were rejected by Order of the Court dated January 12, 2010. The Bar Date Order provided that any Person that held a Claim arising from the rejection of a contract or unexpired lease as to which the order authorizing such rejection was dated on or before the entry of the Bar Date Order must file a proof of claim based on such rejection on or before the Bar Date. Since the Order authorizing the rejection of the Container Leases predated entry of the Bar Date Order, any Claims based upon such rejection must have been filed on or before the Bar Date.

The Debtor also significantly participated in the sale of three (3) vessels owned by Affiliated Debtors Gilmore, Progress and Prosperity. The proceeds of the sale of those vessels paid down NBP (as to Progress and Prosperity) and KeyBank (as to Gilmore) and resulted in the satisfaction of approximately an additional $1,000,000 in Maritime Lien Claims against those vessels.

The Debtor also negotiated the resolution of various disputes with the United Nations concerning accounts receivable and successfully negotiated the Plan subject to this Disclosure Statement, which is supported by the Committee.

## IV. SUMMARY OF THE PLAN

### A. General

SET FORTH IN THIS SECTION IS A SUMMARY OF CERTAIN OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH CONFIRMATION OF THE PLAN. THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND CAREFUL READING OF THE PLAN. STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS OR DISTRIBUTIONS (OR THE VALUE OF SUCH DISTRIBUTIONS) ARE ESTIMATES BY THE DEBTOR BASED ON AVAILABLE INFORMATION AND ARE NOT A REPRESENTATION AS TO THE ACCURACY OF THESE AMOUNTS.

### B. Plan Overview

A principal goal of a chapter 11 bankruptcy case is to reorganize or liquidate a debtor's business for the benefit of itself and its creditors and interest holders. The plan of reorganization or liquidation is the blueprint by which these goals are accomplished. It provides the rules and procedures pursuant to which a debtor's creditors and interest holders will be paid and lists the steps a debtor will take to either reorganize or wind up its business.

The Plan proposed by the Debtor calls for reorganization of the Debtor. The Plan proposes to pay all Administrative, Fee, and Priority Claims in full on the Effective Date, to pay the NBP Secured Claim in accordance with negotiated terms, and to pay General Unsecured Claims a percentage of the Debtor's Available Cash Flow for a period of six (6) years together with certain fixed payments.

C. **Treatment of Claims and Interests**

The Plan separates Claims and Interests into three (3) unclassified categories and four (4) Classes. A Claim or Interest is placed in a particular unclassified category or Class only to the extent that the Claim or Interest falls within the description of that category or Class. A Claim is also placed in a particular category or Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that category or Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Fee Claims and Priority Tax Claims have not been classified and, subject to compliance with the Administrative Bar Date and Fee Claims Bar Date set forth in Article III of the Plan, will be paid in full in Cash to the extent such Claims are Allowed. All other Claims and Interest have been classified.

1. **Administrative Claims – Not Classified**

An Administrative Claim is an unsecured Claim, other than a Fee Claim, for payment of costs or expenses of administration specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation: (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to section 1930 of title 28 of the United States Code ("United States Trustee Fees"). Administrative Claims, other than United States Trustee fees, have been paid by the Debtor in the ordinary course of business. As of the date of the filing of this Disclosure Statement, claims by two Administrative Claimants in the total amount of $362,962.11 remain unpaid, but will be paid in the ordinary course of business. Additionally, while certain Container Lessors may assert Administrative Claims, the Debtor does

not believe that any such Administrative Claims exist since all Container Lessors were either paid amounts due to them for the period subsequent to the Petition Date or the containers subject to their leases were not used subsequent to the Petition Date, and that no such Claims will therefore exist.  The Debtor therefore believes that Claims in this class will only amount to United States Trustee Fees in a *de minimis* amount.

Each holder of an Allowed Administrative Claim shall receive 100% of the amount of such Allowed Administrative Claim in Cash on or as soon as reasonably practicable after the Effective Date, or such less favorable treatment as the Debtor and the holder of such Allowed Administrative Claim may agree upon.

Estimated Percentage Recovery:      100%

### 2.      Fee Claims – Not Classified

Fee Claims are defined under the Plan as Claims for compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with the Chapter 11 Case, which are subject to the approval by the Court after appropriate fee application.  The Fee Claims in this case consist of costs and expenses incurred by counsel and accountants to the Debtor and the Committee, in connection with this Plan and Disclosure Statement, together with the Debtor's *pro rata* share of fees incurred in connection with the various administrative matters and motions filed jointly with the Affiliated Debtors. The professionals previously filed interim fee applications pursuant to which Fee Claims were Allowed to the extent of the $400,000 carve-out created by NBP.  The Debtor estimates that additional Fee Claims, together with prior Fee Claims not yet Allowed, will total approximately $350,000 and will be paid out of operations by agreement with the professionals.

Each holder of an Allowed Fee Claim shall receive 100% of the amount of such Allowed Claims in Cash on or as soon as reasonably practicable after the Effective Date, or such less favorable treatment as may be agreed to by such holder and the Debtor.

Estimated Percentage Recovery: 100%.

3.      **Priority Tax Claims – Not Classified**

A Priority Tax Claim is defined as a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

Each holder of an Allowed Priority Tax Claim shall receive Cash in the full amount of its Allowed Claim on or as soon as reasonably practicable after the Effective Date, or such less favorable treatment as the Debtor and the holder of such Allowed Priority Tax Claim may agree upon.

No Priority Tax Claims have been filed or scheduled, and no taxes are due and owing by the Debtor.

Estimated Percentage Recovery: N/A

4.      **Priority Non-Tax Claims – Class 1**

Class 1 consists of any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; (b) a Priority Tax Claim; or (c) a Fee Claim.

Each holder of an Allowed Priority Non-Tax Claim shall receive Cash in the full amount of its Allowed Claim, on or as soon as reasonably practicable after the Effective Date, or such less favorable treatment as the Debtor and the holder of such Allowed Priority Non-Tax Claim may agree upon.

No Priority Non-Tax Claims have been filed or scheduled, and no such Claims are due and owing by the Debtor.

Estimated Percentage Recovery: N/A

**5.      NBP Secured Claim – Class 2**

Class 2 consists of the NBP Secured Claim in the outstanding principal amount of $8,959,522, subject to further reduction as described above.  Commencing on July 1, 2010 and continuing through December 31, 2010, NBP shall be paid interest only at the current prime rate plus 1.75% per annum on the outstanding principal balance of the NBP Secured Claim.  For the period of January 1, 2011 through June 30, 2011, NBP shall be paid interest only at the current prime rate plus 2.5% per annum on the outstanding principal balance of the NBP Secured Claim. Beginning July 31, 2011, and ending on October 31, 2013, NBP shall receive 28 equal monthly installments of principal, together with interest on the outstanding principal balance of the NBP Secured Claim at the current prime rate plus 3.5% per annum.  In addition, NBP shall be paid a restructuring fee by the Debtor of $250,000 on June 30, 2014, June 30, 2015 and June 30, 2016.

The terms of the repayment of the NBP Secured Claim as set forth in the Plan shall be memorialized in an Amended and Restated Agreement to be executed by and between the Debtor and NBP on or after the Effective Date of the Plan.

Class 2 is impaired and is entitled to vote to accept or reject the Plan.

Estimated Percentage Recovery: 100%

**6.      General Unsecured Claims – Class 3**

Class 3 consists of any Claim that is not: (a) an Administrative, Priority Non-Tax, or Priority Tax Claim; (b) a Secured Claim; (c) a Fee Claim; or (d) a Claim included within any other Class of Claims or Interests.  There are 50 General Unsecured Claims filed or scheduled in

the total amount of $23,109,402.09, and 16 claims which the Debtor believes will be reclassified from Secured Claims to General Unsecured Claims in the amount of $9,018,932.87, for total filed or scheduled Claims of $32,127,975. The Debtor believes that after further objections to such Claims, General Unsecured Claims will amount to $22,875,403.

On each Unsecured Distribution Date, each holder of an Allowed General Unsecured Claim shall receive its Ratable share of (a) the Fixed Unsecured Distribution attributable to the preceding calendar year and (b) 32.5% of Available Cash Flow for the preceding calendar year, up to 100% of the Allowed amount of such Claims. As an additional distribution, holders of General Unsecured Claims will receive their Ratable share of recoveries from Estate Causes of Action as discussed in Section V(H) below. The holder of an Allowed Class 3 Claim may receive such less favorable treatment as the Debtor and the holder of such General Unsecured Claim may agree upon.

Class 3 is impaired and is therefore entitled to vote to accept or reject the Plan.

Estimated Percentage Recovery: 26%

### 7.     Interests – Class 4

Class 4 includes equity securities, within the meaning of section 101(16) of the Bankruptcy Code, in the Debtor, including but not limited to stock in the Debtor.

Holders of Interests shall receive no Distribution of any kind under the Plan on account of such Interests. As of the Effective Date, all Interests in the Debtor shall be deemed canceled. Holders of Interests are deemed to have rejected the Plan.

Estimated Percentage Recovery: 0%

### D.     Treatment of Executory Contracts and Unexpired Leases

### 1.     Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release or other

agreement or document entered into subsequent to the Petition Date or in connection with the Plan, each of the executory contracts or unexpired leases to which the Debtor was a party on the Petition Date, to the extent such contracts or leases are executory contracts or unexpired leases, shall, on the Confirmation Date but subject to the occurrence of the Effective Date, be rejected unless such contract or lease (a) previously shall have been assumed or rejected, (b) is the subject of a pending motion to assume or reject or (c) shall have expired or terminated pursuant to its own terms; provided, however, that rejection pursuant to Article IX of the Plan shall not constitute an admission that any such contracts or leases are in fact executory contracts or unexpired leases or that the Debtor had any liability thereunder. The Confirmation Order shall constitute an order of the Court approving the rejections described in Article IX of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Confirmation Date, but subject to the occurrence of the Effective Date.

2.      **United Nations and Briarcliff Contracts**

Notwithstanding anything herein or in the Plan to the contrary, no contracts between the Debtor and the United Nations or any of its organizations or administrative arms, nor the Debtor's agreements with Briarcliff Ltd., which the Debtor believes do not constitute executory contracts, shall be deemed rejected under the Plan. Any such contracts shall neither be assumed nor rejected in the Debtor's case, but shall continue to be performed in accordance with their terms until terminated in accordance with the provisions thereof.

3.      **Bar Date for Rejection Damages**

If the rejection of an executory contract or unexpired lease unexpired lease pursuant to Article IX of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtor, the Debtor's

Estate, or its property unless the party files an original proof of Claim (with supporting documentation) with the Bankruptcy Court **within thirty (30) days after entry of the Confirmation Order.**

There shall be no restriction on the rights of the Debtor to object to any Claims relating to the rejection of executory contracts or unexpired leases, or to assert any defense or counterclaim to any such Claim, notwithstanding that such defenses or counterclaims may not have otherwise been identified in the Plan, Disclosure Statement or otherwise.

Any Allowed Claim arising from the rejection of an executory contract or unexpired lease shall constitute a Class 3 General Unsecured Claim.

**E.      Summary of Distributions and Claims Resolution Provisions**

**1.      Objections to and Estimation of Claims**

From and after the Effective Date, the Reorganized Debtor shall have the exclusive right to object to the allowance of any Claim or compromise or settle such Claim, and may file with the Court any other appropriate motion or adversary proceeding with respect thereto.  All Claim objections shall be filed within 120 days of the Effective Date.  This deadline to object to Claims may be further extended for two (2) additional periods of 90 days each by filing a notice with the Court.

Any Claim filed after any applicable Bar Date shall, unless the Court otherwise directs, be deemed disallowed in full and expunged without further order of the Court.  Filed or Scheduled claims may be amended or reconsidered only as provided in the Bankruptcy Code and Bankruptcy Rules.

In addition, the Reorganized Debtor may, at any time, request that the Court estimate, pursuant to section 502(c) of the Bankruptcy Code and/or Rule 3018(c) of the Bankruptcy Rules,

any Claim that is contingent or unliquidated, regardless of whether the Debtor or Reorganized Debtor previously objected to such Claim or whether the Court has ruled on any such objection. In the event that the Court estimates any contingent or unliquidated Claim, the estimate will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Court.

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which there is insufficient Cash in reserve to provide a recovery equal to that received by other holders of Allowed Claims in the relevant Class, no Claim holder shall have recourse to the Debtor, Reorganized Debtor, the Estate, the Distribution Agent, the Committee and its former and current members, or any of their respective past or present professionals, or their successors or assigns, or the holder of any other Claim, or any of their respective property.  THUS, THE COURT'S ENTRY OF AN ESTIMATION ORDER MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

### 2.    Amendments to Claims

A Claim may be amended prior to the Confirmation Date only as agreed upon by the Debtor and the holder of such Claim, or as otherwise permitted by the Court, the Bankruptcy Rules or applicable law.  After the Confirmation Date, except as otherwise specifically set forth in the Plan, a Claim may not be filed or amended without the authorization of the Court or consent of the Debtor.  Any newly filed Claim filed after any applicable Bar Date shall, unless

the Court otherwise directs, be deemed disallowed in full and expunged without further order of the Court.

**3.    Withholding Taxes and Expenses of Distribution**

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions hereunder. All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes, and the Distribution Agent shall be authorized to withhold Distribution on such Claims until the requisite information is received.

**4.    Disputed Payment**

Notwithstanding anything to the contrary in the Plan, no Distribution shall be made to the holder of any Claim, including by way of setoff or recoupment by any such claimant, if at any time before an otherwise applicable Distribution is issued, (a) the Debtor has taken action to recover, or have given notice to the applicable party of the intent to take such action, on any causes of action or defenses against or with regard to the holder of such Claim (or the direct or indirect transferor to, or transferee of, such holder), or (b) an objection to such Claim has been made, until such cause of action, defense or objection is resolved by Final Order or agreement of the Debtor. In that event, any distribution to which the holder of such Claim is entitled shall be placed into the Distribution Reserve pending resolution of the cause of action, defense or objection.

Additionally, if any dispute arises as to the identity of a holder of an Allowed Claim who is entitled to receive any Distribution, the Distribution Agent may, in lieu of making such Distribution to such Person, make such Distribution into an escrow account until the disposition

thereof shall be determined by Court order or by written agreement among the interested parties to such dispute.

5.  **Setoffs and Recoupment**

Except as otherwise provided in the Plan, the Confirmation Order, or in agreements previously approved by Final Order of the Court, the Debtor or Reorganized Debtor may, pursuant to applicable law, set off or recoup against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made and before any Distribution is made on account of such Claim), any and all of the claims, rights and causes of action of any nature that the Debtor or the Estate may hold against the holder of such Claim.

Neither the failure to effect such a setoff or recoupment, the allowance of any Claim hereunder, any other action or omission of the Debtor or Reorganized Debtor, nor any provision of the Plan shall constitute a waiver or release by the Debtor or Reorganized Debtor of any such claims, rights and causes of action that the Debtor may possess against such holder. To the extent the Debtor or Reorganized Debtor fails to setoff or recoup against a creditor and seeks to collect a claim from such creditor after a Distribution to such creditor pursuant to the Plan, the Debtor or Reorganized Debtor, if successful in asserting such claim, shall be entitled to full recovery against such creditor. The Debtor or Reorganized Debtor may seek periodic Court approval for any such setoff or recoupment.

6.  **Interest on Claims**

Unless otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law, post-petition and post-confirmation interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

## V. MEANS OF IMPLEMENTATION OF THE PLAN; EFFECT OF CONFIRMATION

### A.    Funding of the Plan

The payments required under the Plan shall be made from the Debtor's operations and cash flow.  As set forth above, the Debtor anticipates that Administrative Claims will be paid in the ordinary course of business or will be *de minimis* claims for United States Trustee Fees, which Claims will be paid in full on the Effective Date unless otherwise agreed to.  As shown on the Debtor's cash flow projections for the years 2010 through 2016 (the "Cash Flow Projections") annexed as Exhibit A to this Disclosure Statement, the Debtor will have sufficient cash on hand in order to pay those Administrative Claims at that time.  As also set forth above, the Debtor believes that Allowed Fee Claims will amount to $350,000, which will be paid from operations by agreement with the professionals.  Payments upon the NBP Secured Claim and General Unsecured Claims are to be paid by cash flow as set forth in the Cash Flow Projections.

The Debtor's income projections are based upon its reinstatement to the U.N. Vendor Database and the resumption of the Debtor's participation in U.N. tenders.  As set forth above, the Debtor has been assured by the U.N. Vendor Review Committee that upon Confirmation of the Plan, reinstatement on the vendor database and resumption of U.N. tenders will be effectuated immediately.

### B.    Injunctions

**The Confirmation Order will provide, among other things, that all Persons who have held, hold or may hold Claims against or Interests in the Debtor are, with respect to any such Claims or Interests, permanently enjoined from and after the Confirmation Date from (a) commencing or continuing in any manner any action or proceeding of any kind with respect to any such Claim or Interests, (b) the enforcement, attachment, collection or**

recovery by any manner or means of a judgment, award, decree or order against the Debtor or Reorganized Debtor on account of such Claim or Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtor, Reorganized Debtor or against the property or interests in the property of the Debtor or Reorganized Debtor on account of any such Claim or Interests, (d) taking any action against, or interfering in any respect with, the Cash or property being distributed in accordance with the Plan or the Distribution being effectuated through the Plan (other than actions to enforce any rights or obligations under the Plan); (e) asserting any right of setoff or recoupment of any kind, directly or indirectly, against any obligation due the Estate, except as contemplated or allowed by the Plan; and (f) prosecuting or otherwise asserting any right, claim or cause of action specifically exculpated, released or enjoined pursuant to the Plan. Such injunction shall extend to the successors of the Debtor (including, without limitation, the Reorganized Debtor entity) and their respective property and interests in property.

C.      Discharge of Debtor

The rights afforded herein and the treatment of all Claims and Interests herein shall be in exchange for a complete satisfaction, discharge and release of Claims and Interests of any nature whatsoever, against the Debtor, the Estate or any of their assets or properties. Except as otherwise provided herein, on the Effective Date, all such Claims against and Interests in the Debtor shall be satisfied, discharged and released in full, and all Persons are precluded and enjoined from asserting against the Debtor, Reorganized Debtor, their successors, or their assets or property any other or further Claims or Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred before

the Confirmation Date.

**D.      Exculpation**

**The Exculpation and Released Parties, and any property of or professionals retained by such parties who provided services to the Estate during the Chapter 11 Case, will not have or incur any liability to any Person for any act taken or omission occurring on or after the Petition Date in connection with or related to the Estate, including but not limited to (i) the commencement and administration of the Chapter 11 Case; (ii) the operation of the Debtor during the pendency of the Chapter 11 Case; (iii) formulating, preparing, disseminating, implementing, confirming, consummating or administering the Plan (including soliciting acceptances or rejections thereof); (iv) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken during the administration of the Chapter 11 Case or in connection with the Plan; or (v) any Distributions made pursuant to the Plan.  Nothing in this section shall (i) be construed as a release of such Person's fraud, gross negligence, malpractice or willful misconduct with respect to the matters set forth in this section V(D) or any claims against such Person under chapter 5 of the Bankruptcy Code, or (ii) limit the liability of the Debtor's or Committee's professionals to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.**

**E.      Revesting of Assets**

The property of the Estate and of the Debtor shall revest in the Reorganized Debtor on the Effective Date.  From and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire and dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, but subject to

the continuing jurisdiction of the Bankruptcy Court as set forth in Article XII of the Plan. As of the Effective Date, all property of the Debtor and the Reorganized Debtor shall be free and clear of liens, Claims and Interests except as provided in the Plan or the Confirmation Order.

**F.     Officers and Directors of Reorganized Debtor**

From and after the Effective Date, the officers and directors of the Reorganized Debtor shall consist of the following officers and directors who served the Debtor prior to the Petition Date:

> Kazem Paksima – President, Director
>
> Ali Paksima – Executive Vice President, Director
>
> Hormoz Shayegan – Secretary, Director

**G.     Issuance of Stock of Reorganized Debtor**

On the Effective Date, 100% of the issued and outstanding stock of the Reorganized Debtor shall be issued in the following percentages: Kazem Paksima- 44%; Ali Paksima- 44%; and Hormoz Shayegan- 12% (the "Reorganized Shareholders"). The issuance of stock in Reorganized Debtor to the Reorganized Shareholders is in lieu of the repayment of the cash contributions to the Debtor in the sum of $100,000 required by NBP to be made by the Reorganized Shareholders as part of the DIP Facility approved by the Bankruptcy Court, which funds were used for post-petition working capital. In addition, the Reorganized Shareholders have agreed not to increase their salaries while any Plan payments remain outstanding. The issuance of securities by the Reorganized Debtor is authorized without further act or action under applicable law, regulation, order or rule. The Confirmation Order shall provide that the issuance of the securities in the Reorganized Debtor shall be exempt from the registration requirements of

the Securities Act of 1933, as amended, in accordance with section 1145 of the Bankruptcy Code.

On the Effective Date, all old Interests in the Debtor shall be cancelled and extinguished and the holders thereof shall have no rights and such instruments shall evidence no rights.

**H.     Estate Causes of Action**

In accordance with section 546(a) of the Bankruptcy Code, the Debtor has two years from the Petition Date to file actions or proceedings under Chapter 5 of the Bankruptcy Code, including but not limited to actions to recover preferential transfers, fraudulent conveyances and unauthorized post-petition transfers.  Such Estate Causes of Action will be pursued by the Committee in its sole and absolute discretion.  Entry of the Confirmation Order shall not be deemed or construed as a waiver or release of any Estate Causes of Action, and the Committee shall retain and may (but is not required to) enforce all Estate Causes of Action.  The Committee, in its sole discretion, shall determine whether to bring, settle, release, compromise, or enforce any rights (or decline to do any of the foregoing) with respect the Estate Causes of Action. Failure of the Debtor to specifically list any claim, cause of action, right of action, suit or proceeding in the Schedules, Disclosure Statement or Plan does not, and will not be deemed to, constitute a waiver or release by the Debtor or the Committee of such Estate Causes of Action, and the Committee will retain the right to pursue such causes of action in its sole discretion.  It is anticipated that the Committee's counsel and accountants will incur post-Confirmation costs for their due diligence review of any Estate Causes of Action and for the costs of litigating such actions.  Any and all net proceeds recovered from the pursuit of Estate Causes of Action shall be distributed by Committee counsel to holders of Allowed General Unsecured Claims at such time as all Estate Causes of Action have been completely liquidated.

**I.      The Role of the Committee**

The Committee shall survive the Effective Date and shall continue in existence until

entry of the Final Decree, or such later date as the Court may order, after notice and a hearing,

for all purposes permitted under the Bankruptcy Code.  The Committee shall continue to retain

its current attorneys and accountants from and after the Effective Date.

**J.      Post-Confirmation Jurisdiction of the Court**

Notwithstanding confirmation of the Plan or the occurrence of the Effective Date, the

Court will retain such jurisdiction as is legally permissible, including, without limitation, for the

following purposes:

1.      To determine the allowability, classification, or priority of Claims upon objection

by the Debtor, and the validity, extent, priority and nonavoidability of consensual and

nonconsensual liens and other encumbrances;

2.      To issue injunctions or take such other actions or make such other orders as may

be necessary or appropriate to restrain interference with the Plan or its execution or

implementation by any Person, to construe and to take any other action to enforce and execute

the Plan, the Confirmation Order, or any other order of the Court, to issue such orders as may be

necessary for the implementation, execution, performance and consummation of the Plan and all

matters referred to herein, and to determine all matters that may be pending before the Court in

the Chapter 11 Case on or before the Effective Date with respect to any Person;

3.      To protect the property of the Estate from claims against, or interference with,

such property, including actions to quiet or otherwise clear title to such property or to resolve

any dispute concerning liens, security interest or encumbrances on any property of the Estate;

4.      To determine any and all applications for allowance of Fee Claims;

5.     To determine any Priority Tax Claims, Priority Non-Tax Claims, Administrative Claims or any other request for payment of claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code;

6.     To determine all Estate Causes of Action, applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Case;

7.     To enter a Final Order closing the Chapter 11 Case;

8.     To modify the Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out their intent and purposes;

9.     To issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person, to the fullest extent authorized by the Bankruptcy Code;

10.     To determine any tax liability pursuant to section 505 of the Bankruptcy Code;

11.     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

12.     To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and the making of Distributions thereunder;

13.     To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Case, any Bar Date, the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing or for any other purpose;

14.     To resolve any dispute or matter arising under or in connection with any order of the Court, whether entered in the Chapter 11 Case or after the Confirmation Date;

15. To resolve any disputes concerning any release of a Person hereunder whether or not such Person is one of the Debtor or the injunction against acts, employment of process or actions against such Person;

16. To approve any Distributions, or objections thereto, under the Plan;

17. To approve any Claims settlement entered into or offset exercised by the Debtor or Reorganized Debtor; and

18. To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order, or as may be authorized under provisions of the Bankruptcy Code.

## VI. CONFIRMATION OF THE PLAN

### A. Introduction

The Bankruptcy Code requires the Bankruptcy Court to determine whether a plan of reorganization complies with the technical requirements of chapter 11 of the Bankruptcy Code. It further requires that a plan proponent's disclosures concerning such plan have been adequate and have included information concerning all payments made or promised in connection with the plan.

To confirm the Plan, the Court must find that all of these and certain other requirements have been met. Thus, even if the requisite vote is achieved for each Class of impaired Claims, the Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan. Some of these statutory requirements are discussed below.

**B.     Conditions to Confirmation and Effective Date**

The Plan may not be confirmed unless the Disclosure Statement has been approved by the Court.  The Effective Date may not occur, and thus the Plan will not become effective, unless the Confirmation Order becomes a Final Order.

If the Plan is confirmed, the Debtor expects the Effective Date to occur not later than 10 days after the Confirmation Date.

**C.     Voting Procedures and Standards**

Holders of Claims in Classes that are "impaired" under the Plan (but not deemed to reject the Plan by virtue of receiving no Distributions thereunder) will receive a Ballot with this Disclosure Statement for the acceptance or rejection of the Plan.  Any Claim or Interest whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered "impaired."  Instructions on how to complete a Ballot and the deadline for voting on the Plan are contained in the solicitation materials accompanying this Disclosure Statement and the Plan.

The following procedures for allowance of Claims for purposes of voting on the Plan shall apply to votes upon the Plan:

(a)     <u>Disputed Filed Claims</u>.  With regard to a Claim that is the subject of an objection filed at least twenty (20) days prior to the Ballot Deadline, such Claim will be disallowed provisionally for voting purposes, except to the extent and in the manner that (i) the Debtor agrees that the Claim should be allowed for voting purposes in its objection to such Claim; or (ii) such Claim is allowed temporarily for voting purposes in accordance with Bankruptcy Rule 3018.

(b)     <u>Claims Estimated for Voting Purposes.</u>  With respect to a Claim that has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the amount and classification of such Claim will be that set by the Bankruptcy Court.

(c)     <u>Wholly Unliquidated Claims.</u>  A Claim recorded in the Schedules or in the Clerk's records as wholly unliquidated, contingent and/or undetermined will be accorded one vote, valued at one dollar, for the purposes of section 1126(c) of the Bankruptcy Code, unless the Claim is disputed as set forth in (a) above.

(d)     <u>Late Claims.</u>  With respect to a Claim as to which a proof of claim has not been timely filed (i.e., was filed after the Bar Date), the voting amount of such Claim (subject to any applicable limitations set forth below) will be equal to the amount listed, if any, in respect of such Claim in the Schedules, to the extent such Claim is not listed as contingent, unliquidated, or disputed, unless the Claim is disputed as set forth in (a) above.  If such Claim is either not listed in the Schedules, or is listed as contingent, unliquidated or disputed, then the Claim respecting such proof of claim will be disallowed provisionally for voting purposes.

(e)     <u>Duplicate Claim.</u>  A creditor will not be entitled to vote its Claim to the extent such Claim duplicates or has been superseded by another Claim of such creditor.

(f)     <u>Undisputed Scheduled Claims.</u>  With respect to a Claim that appears on the Schedules as undisputed, noncontingent and liquidated, and as to which no objection has been filed at least twenty (20) days prior to the Ballot Deadline, the amount and classification of such Claim shall be that specified in the Schedules unless superseded by an undisputed proof of claim.

(g)    Court Determined Claims.  With respect to a Claim for which an order has been entered reducing, reclassifying or allowing, the amount and classification of the Claim shall be that specified in such order.

The Ballots of creditors will be tabulated in accordance with the following procedures:

(i)    For the purpose of voting on the Plan, the Balloting Agent will be deemed to be in constructive receipt of any Ballot timely delivered to the address set forth above as designated for the receipt of Ballots cast on the Plan;

(ii)    Any Ballot received by the Balloting Agent after the Ballot Deadline shall not be counted;

(iii)    Pursuant to Bankruptcy Rule 3018(a), whenever a holder of a Claim submits more than one Ballot voting the same Claim prior to the Ballot Deadline, the first such Ballot sent and received shall count unless such holder has sufficient cause within the meaning of Bankruptcy Rule 3018(a) to submit, or the Debtor consents to the submission of, a superseding Ballot;

(iv)    If a Ballot does not include a Claim amount, the Ballot shall be deemed filed in the amount of a filed Claim, and if no Claim has been filed, in the amount of the Claim as specified in the Schedules, as long as the Claim is listed in the Schedules as undisputed, non-contingent or liquidated; otherwise, the Ballot shall not be counted;

(v)    If a holder of a Claim casts simultaneous duplicative Ballots voted inconsistently, then such Ballots shall not be counted;

(vi)    The authority of the signatory of each Ballot to complete and execute the Ballot shall be presumed;

(vii)    Any Ballot that is not signed shall not be counted;

(viii)   Any Ballot received by the Balloting Agent by electronic communication (i.e. email) shall not be counted but signed Ballots received timely by the Balloting Agent by facsimile will be counted;

(ix)   A holder of a Claim must vote all of its Claims within a particular Class under the Plan either to accept or reject the Plan and may not split its vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan, or that indicates both a vote for and against the Plan, will not be counted; and

(x)   Any Ballot that is timely received and executed but does not indicate whether the holder of the relevant Claim is voting for or against the Plan shall be counted as a vote for the Plan.

IF A BALLOT IS DAMAGED OR LOST OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE BALLOTING AGENT.

A VOTE MAY BE DISREGARDED IF THE COURT DETERMINES, AFTER NOTICE AND A HEARING, THAT SUCH ACCEPTANCE OR REJECTION WAS NOT MADE OR SOLICITED OR PROCURED IN GOOD FAITH OR IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE.

Any impaired Class of Claims that fails to achieve the requisite "accepted" vote will be deemed to have rejected the Plan.

## D.   Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired Class of Claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of Claims of that Class that actually vote. Acceptance of the Plan need only be solicited from

holders of Claims whose Claims are "impaired" and not deemed to have rejected the Plan. Except in the context of a "cram down" (i.e., confirmation of a plan that has not been accepted by all impaired classes), as a condition to confirmation of the Plan, the Bankruptcy Code requires that, with certain exceptions, each Class of impaired Claims accepts the Plan.

The Plan is predicated on the Voting Classes voting to accept the Plan. In the event the requisite vote is not obtained, the Debtor has the right, assuming that at least one Class of impaired Claims has accepted the Plan, to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more classes of impaired claims or impaired interests if the Bankruptcy Court finds that the plan does not discriminate unfairly and is "fair and equitable" with respect to the rejecting class or classes. This procedure is commonly referred to in bankruptcy parlance as "cram down."

If any of the Voting Classes vote to reject the Plan, the Debtor will seek a cram down of such Classes at the Confirmation Hearing. The Debtor will, in any event, seek a cram down of the Plan on Classes deemed to reject the Plan by virtue of receiving no Distributions thereunder.

## E.    Confirmation and Consummation

At the Confirmation Hearing, the Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan. Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponents of the plan have complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponents under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in

connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

- The proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponents must have disclosed the identity of any insider that the reorganized debtors will employ or retain, and the nature of any compensation for such insider.

- With respect to each class of impaired claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Each class of claims or interests has either accepted the plan or is not impaired under the plan.

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years from the petition date such claim, of a value, as of the effective date, equal to the allowed amount of such claim.

- If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan.

Subject to receiving the requisite votes in accordance with section 1129(a)(8) of the

Bankruptcy Code and the "cram down" of Classes not receiving any Distribution under the Plan,

the Debtor believes that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the

Bankruptcy Code, (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

### 1.    Best Interests of Holders of Claims and Interests

The "best interests of creditors" test requires that the Bankruptcy Court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim or interest of each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

Annexed hereto as Exhibit B is an analysis of the amounts which would be available for distribution if the Debtor was to be liquidated, totaling $1,343,961. Since NBP alone is owed nearly $9 Million, the Debtor has concluded that a Distribution pursuant to its Plan will result in a greater distribution to creditors than under Chapter 7 since under Chapter 7, no creditors other than NBP would receive a distribution.

### 2.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor unless such liquidation or reorganization is proposed in the plan. As set forth on the Cash Flow Projections annexed as Exhibit A, the Debtor will have sufficient cash flow to make all payments required of it to NBP upon the NBP Secured Claim, as well as the payments required to be made to holders of General Unsecured Claims, and therefore is feasible. Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

### 3. Acceptance by Impaired Classes

A class is "impaired" under a plan unless, with respect to each claim or interest in such class, the plan: (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law which entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based upon such claim or interest. A class that is not impaired under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

### 4. Cram Down

**THE DEBTOR RESERVES THE RIGHT TO CRAM DOWN THIS PLAN AGAINST NON-ACCEPTING CLASSES OF HOLDERS OF CLAIMS OR INTERESTS.**

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code. Under the "cram down" provisions, upon the request of a plan proponent, the Bankruptcy Court will confirm a plan despite the lack of acceptance by an impaired class or classes if the Bankruptcy Court finds that (i) the plan does not discriminate unfairly with respect to each non-accepting impaired class, (ii) the plan is fair and equitable with respect to each non-accepting impaired class, and (iii) at least one impaired class has accepted the plan. These standards ensure that holders of junior interests, such as stockholders, cannot

retain any interest in the debtor under a plan of reorganization that has been rejected by a senior class of impaired claims or interests unless such impaired claims or interests are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. By establishing separate Classes for the holders of each type of Claim and by treating each holder of a Claim in each Class identically, the Plan has been structured so as to meet the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims or interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before any junior class may receive anything under the plan. In addition, case law surrounding section 1129(b) requires that no class senior to a non-accepting impaired class receives more than payment in full on its claims.

With respect to a class of unsecured claims that does not accept the Plan, the Debtor must demonstrate to the Court that either (i) each holder of an unsecured claim in the dissenting class receives or retains under such plan property of a value equal to the allowed amount of its unsecured claim, or (ii) the holders of claims or holders of interests that are junior to the claims of the holders of such unsecured claims will not receive or retain any property under the plan. Additionally, the Debtor must demonstrate that the holders of claims that are senior to the claims

43

of the dissenting class of unsecured claims receive no more than payment in full on their claims under the plan. The Plan is designed to satisfy these standards.

If all the applicable requirements for confirmation of the Plan are met as set forth in sections 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more of Classes of impaired Claims or Interests have failed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code, the Debtor will request that the Bankruptcy Court confirm the Plan over the dissenting votes of such Classes in accordance with section 1129(b) of the Bankruptcy Code. The Debtor believes that the Plan satisfies the "cram down" requirements of the Bankruptcy Code. The Debtor may seek confirmation of the Plan over the objection of dissenting Classes, as well as over the objection of individual holders of Claims or Interests who are members of an accepting Class. In addition, the Debtor intends to seek "cram down" of the Plan on Classes deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code by virtue of receiving no Distributions thereunder.

### 5. Classification of Claims and Interests

The Debtor believes that the Plan meets the classification requirements of the Bankruptcy Code which require that a plan of reorganization place each claim or interest into a class with other claims or interests which are "substantially similar."

## VII. CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS**

**SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

**A.      Risk that Distributions will be Less than Estimated by Debtor**

The Distributions set forth in this Disclosure Statement and the Cash Flow Projections are based on the Debtor's projected income and expenditures after Confirmation and the assumptions for such projections.  There can be no assurance that the Debtor's estimates will prove accurate.

**B.      Bankruptcy Risks**

**1.      Objection to Classifications**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Court would reach the same conclusion.

**2.      Risk of Non-Confirmation of the Plan**

Even if the Voting Classes accept the Plan, the Plan might not be confirmed by the Court.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  The Debtor believes that the Plan satisfies all the requirements for confirmation of a plan of reorganization under the Bankruptcy Code in

this regard. There can be no assurance, however, that the Court would also conclude that the requirements for confirmation of the Plan have been satisfied.

## VIII. TAX CONSEQUENCES

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE DEBTOR WITH RESPECT THERETO.

NOTHING HEREIN CONSTITUTES TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED HEREIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

## IX. ALTERNATIVES TO PLAN

As set forth in the analysis annexed as Exhibit B to this Disclosure Statement, if the Debtor's case were to be converted to a case under chapter 7 of the Bankruptcy Code or otherwise liquidated, no creditors other than NBP would receive a distribution upon their Claims. The Plan proposed by the Debtor, however, provides for distribution to all other creditors in the case. The Debtor therefore does not believe that there are any viable alternatives to the Plan which benefit its creditors.

# X. CONCLUSION

The Debtor believes that confirmation and implementation of the Plan will provide each creditor with a greater recovery than it would receive if the Debtor was to liquidate and distribute its assets under chapter 7, in which case creditors would likely receive smaller, if any, distributions. Thus, the Debtor recommends confirmation and implementation of the Plan as the best possible outcome for creditors.

The Debtor urges holders of impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Ballot Deadline.

DATED: July 9, 2010                    GLOBAL CONTAINER LINES LIMITED


By: ___s/ Hormoz Shayegan_____
     Hormoz Shayegan


CULLEN AND DYKMAN LLP
Attorneys for the Debtor


By: ___s/ C. Nathan Dee, Esq._____
Matthew G. Roseman, Esq. (MR-1387)
C. Nathan Dee, Esq. (CD-9703)
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516)357-3700